## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DAVID S. TAYLOR, JOHN CERNAK, ROBERT ARCURI, JIM CONLIN, MARTIN HALE, and KARL TODD, individually and on behalf of all those similarly situated | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | **CLASS ACTION COMPLAINT** |
| v. | ) ) ) | **CASE NUMBER_____** |
| UNITED TECHNOLOGIES CORPORATION, THE UNITED TECHNOLOGIES CORPORATION PENSION AND INVESTMENT COMMITTEE (PAIC), WILLIAM L. BUCKNALL JR., as Chair of the PAIC, JAMES E. GEISLER, as Vice President, Finance, THE UNITED TECHNOLOGIES CORPORATION PENSION ADMINISTRATIVE COMMITTEE (PAC), LAURIE P. HAVANEC, As Director, Employee Benefits and Human Resources Systems, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) | |

## COMPLAINT FOR BREACH OF FIDUCIARY DUTY

1.     Personal savings accounts, such as 401(k)s, are quickly becoming employees' primary method of financially planning for retirement. For many employees in the United States today, an employer-provided defined benefit pension awaiting their retirement is a quaint, historical notion.

2.     In 401(k) plans, employers provide an opportunity for employees to save their own pre-tax dollars in individual 401(k) accounts. The accounts provide a number of investment alternatives into which employees place a portion of their current income with

the hope of earning, over time, a return sufficient to support themselves and their families in retirement.

3.      Accordingly, in 401(k) plans, the return on employees' investments is critical. Even seemingly small reductions in a participant's return in one year may substantially impair his or her accumulated savings at retirement.

4.      While such reductions in 401(k) accounts' returns may result from market fluctuations, a consistent, albeit rarely discussed, force reducing 401(k) accounts' earnings is the administrative fees and expenses assessed against account balances.

5.      The most certain means of increasing the return on employees' 401(k) savings is to reduce the fees and expenses employees pay from their 401(k) accounts.

6.      Unlike generalized market fluctuations, employers can control these fees and expenses. Federal law requires them to do so.

7.      Under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"), an employer who provides a 401(k) plan for its employees is a "Plan Sponsor." The employer or its agent may also serve as "Plan Administrator," or the employer may appoint a third party to serve as such. Both the Plan Sponsor and the Plan Administrator are fiduciaries of the 401(k) plan. The Plan Administrator performs or contracts for administrative, record-keeping, investment management, and other services from entities in the financial and retirement industries. ERISA requires that the fees for these services must be reasonable, incurred solely for the benefit of Plan participants, and fully disclosed.

8. For providing various services, third-party plan administrators, record-keepers, consultants, investment managers, and other vendors in the 401(k) industry have developed a variety of pricing and fee structures.

9. At best, these fee structures are complicated and confusing when disclosed to Plan participants. At worst, they are excessive, undisclosed, and illegal.

10. In this action, pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), Plaintiffs and Class Representatives, on behalf of all similarly situated participants and beneficiaries of the United Technologies Corporation Employee Savings Plan (the "ESP Plan"), Plan 017, seek to recover the losses suffered by the ESP Plan on a plan wide basis and to obtain injunctive and other equitable relief for the ESP Plan from the ESP Plan's fiduciaries based upon their breaches of their fiduciary duties.

11. Also in this action, pursuant to ERISA § 502(a), Plaintiffs and Class Representatives, on behalf of all similarly situated participants and beneficiaries of the United Technologies Corporation Represented Employees Savings Plan (the "RESP Plan"), Plan 023, seek to recover the losses suffered by the RESP Plan on a plan wide basis and to obtain injunctive and other equitable relief for the RESP Plan from the RESP Plan's fiduciaries based upon their breaches of their fiduciary duties.

12. As set forth in detail below, the fees and expenses paid by the Plans, and thus borne by the participants in the Plans, were and are unreasonable and excessive; not incurred solely for the benefit of the Plans and their participants; and undisclosed to participants. By subjecting the Plans and their participants to these excessive fees and expenses, and by other conduct set forth below, the Defendants violated their fiduciary obligations under ERISA.

## PARTIES, JURISDICTION AND VENUE

### Plaintiffs

13. Plaintiff and Class Representative David S. Taylor lives in Naperville, Illinois.

14. Plaintiff and Class Representative Jim Conlin lives in Roscoe, Illinois.

15. Plaintiff and Class Representative Karl Todd lives in Mt. Prospect, Illinois.

16. Plaintiff and Class Representative Martin Hale is a citizen of New York.

17. Plaintiffs Taylor, Conlin, Todd and Hale are all participants in the ESP Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

18. Plaintiffs and Class Representative Robert Arcuri lives in Des Plaines, Illinois.

19. Plaintiff and Class Representative John Cernak lives in Manhattan, Illinois, within the Northern District of Illinois.

20. Plaintiffs Arcuri and Cernak are both participants in the RESP Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

### Defendants

21. Defendant United Technologies Corporation (UTC) is a Delaware corporation with its principal executive office in Hartford, Connecticut within this District. It provides high technology products and services to building systems and aerospace industries worldwide. It is the sponsor and an administrator of the Plans, within the meaning of ERISA § 3(16), 29 U.S.C. § 1002(16), and is the employer and principal of the Plans' other administrators. It is also a fiduciary with respect to the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

22. Defendant United Technologies Corporation Pension and Investment Committee ("PAIC"), whose members are United Technologies Corporation executives, employees and officers, is also a Plan Administrator within the meaning of ERISA § 3(16), 29 U.S.C. § 1002(16). Moreover, because the PAIC selects the investment options available to participants of both Plans, hires the investment managers, and gives them their investment directives, as well as manages the investments in the Income Fund, the PAIC is a fiduciary with respect to the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

23. Defendant William L. Bucknall Jr. is the Senior Vice President of Human Resources and Organization for United Technologies Corporation. He serves on the PAIC and, along with the Chair of the PAIC, has the responsibility for naming the other members of the PAIC. The PAIC delegates significant responsibility for the management of the Plans' investments, including the appointment of investment managers, to Mr. Bucknall. In his role as PAIC member, and as delegate of investment management responsibility, Mr. Bucknall is a fiduciary with respect to the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

24. Defendant James E. Geisler is the Vice President, Finance, of United Technologies Corporation. He succeeded to the responsibilities of the position formerly known as Senior Vice President and Chief Financial Officer. In that capacity, he is the Chair of the PAIC and shares responsibility with Mr. Bucknall for naming the other members of the PAIC and for the selection, management and monitoring of the Plans' investments and thus he is a fiduciary with respect to the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

25. Defendant Pension Administration Committee (PAC), whose members are United Technologies Corporation executives, employees and officers, acts in conjunction with Mr. Bucknall, Mr. Geisler and the other members of the PAIC. The PAC has additional responsibility for the operation of the Plans, including the interpretation of ESP and RESP Plan provisions, changes to the Plans, implementation of procedures, and compliance with IRS regulations. Because of these roles, the PAC and its members are fiduciaries with respect to both Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

26. Laurie P. Havanec is or was at the relevant time the United Technologies Corporation Director, Employee Benefits and Human Resources Systems. In this role, she is a person through which UTC acts as Plan Administrator, she has the authority to sign ESP and RESP-related documents on behalf of UTC, and is a fiduciary to the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

## Jurisdiction and Venue

27. Plaintiffs seek relief through the mechanisms found in ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502, 29 U.S.C. § 1132. Therefore, this Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

28. All Defendants are subject to service of process issued from this Court pursuant to 29 U.S.C. § 1132(e)(1)(2).

29. Venue of this action is proper pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132 (e)(2) because the Plans are administered from UTC's headquarters within this District, and because the Defendants may be found in this District.

## The Plaintiff Classes

30. Plaintiffs Taylor, Conlin, Todd, and Hale bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and all similarly situated participants and beneficiaries. They seek to represent the following class (the "ESP Plan Class"):

> All persons, *excluding the Defendants, the Committees and/or other individuals who are or may be liable for the conduct described in this Complaint,* who are or were participants or beneficiaries of the ESP Plan and who are, were or may have been affected by the conduct set forth in this Complaint, as well as those who will become participants or beneficiaries of the ESP Plan in the future.

31. Plaintiffs Arcuri and Cernak bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and all similarly situated participants and beneficiaries. They seek to represent the following class (the "RESP Plan Class"):

> All persons, *excluding the Defendants, the Committees and/or other individuals who are or may be liable for the conduct described in this Complaint,* who are or were participants or beneficiaries of the RESP Plan and who are, were or may have been affected by the conduct set forth in this Complaint, as well as those who will become participants or beneficiaries of the RESP Plan in the future.

32. Certification of the class is proper under Rule 23(a) because all of its prerequisites are satisfied:

   a. **Numerosity.** The members of the Class are so numerous that joinder of all members is impracticable. Although the Plaintiffs do not know the exact number of Class members as of the date of filing, there were at least 64,000 participants with

account balances in the ESP Plan at the end of the 2004 plan year. There were at least 26,000 participants with account balances in the RESP Plan at the end of the 2004 plan year.

b. **Commonality.** Common issues of fact and law predominate over any issues unique to individual class members. Issues that are common to all class members include, but are not limited to, whether the Defendants:

i. Charged fees and expenses to the Plans that were, or are, unreasonable and/or not incurred solely for the benefit of participants and beneficiaries of the Plans;

ii. Caused the Plans to enter into agreements with third-parties which caused and/or allowed the Plans to pay fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of participants and beneficiaries of the Plans;

iii. Failed to monitor the fees and expenses paid by the Plans and, by such failure, caused or allowed the Plans to pay fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of participants and beneficiaries of the Plans;

iv. Failed to inform themselves of, and understand, the various methods by which vendors in the 401(k) retirement

industry collect payments and other revenues from 401(k) plans;

v.   Failed to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plans were reasonable and incurred solely for the benefit of the participants and beneficiaries of the Plans;

vi.   Failed properly to inform and/or disclose to participants and beneficiaries of the Plans the fees and expenses that are, or have been, paid by the Plans;

vii.   Failed to inform and/or disclose to participants and beneficiaries of the Plans in proper detail and clarity the transaction fees and expenses which affect participants' accounts balances in connection with the purchase or sale of interests in investment alternatives;

viii.   Breached their fiduciary duties by failing to disclose that hidden and excessive fees were and are being assessed against assets of the Plans and by failing to stop such hidden excessive fees;

ix.   Appointed as fiduciaries persons who did not fulfill their fiduciary duties, failed to monitor and/or oversee the performance of those fiduciaries and to ensure that they

were fulfilling those duties, and failed to terminate the fiduciaries' appointment after breaches occurred;

x.  In charging, causing to be charged or paid, and failing to monitor the fees and expenses of the Plans, failed to exercise the care, skill, prudence, and diligence that a prudent person would when acting in like capacity and familiar with such matters;

xi.  Caused and/or allowed fees and expenses to be paid by the Plans for purposes other than those allowed by ERISA;

xii.  By the conduct above and/or by other conduct set forth in this Complaint, revealed in discovery and/or proven at trial, breached their fiduciary and other ERISA-imposed obligations to the Plans, participants and beneficiaries of the Plans, and members of the classes;

xiii.  Are liable to the Plans and the Classes for losses suffered as a result of the breaches of their fiduciary duties and other ERISA-imposed obligations; and

xiv.  Are responsible to account for the assets and transactions of the Plans and should be charged for any transactions and payments for which they cannot account.

c.  **Typicality.** The claims brought by the Plaintiffs are typical of those of the absent class members because:

i. The Defendants owed the exact same fiduciary and other ERISA-based obligations to each participant in the Plans and each member of the Classes;

ii. The Defendants' breach of those obligations constitutes a breach as to each participant and each member of the Classes;

iii. To the extent that there are any differences among class members' damages, such differences would be a product of simple mathematics based upon their account balances in the Plans. Such minimal and formulaic differences are no impediment to class certification.

d. **Adequacy of Representation.** The Plaintiffs are adequate representatives of the absent class members and will protect such absent class members' interests in this litigation. The Plaintiffs do not have any interests antagonistic to the other class members nor do they have any unique claims or defenses that might undermine the efficient resolution of the classes' claims. Plaintiffs have retained competent counsel, versed in ERISA, class actions, and complex litigation.

33. Class certification is also appropriate under Rule 23(b) and each subpart because:

a. Pursuant to Rule 23(b)(1)(B), in the absence of certification, there is a risk of inconsistent adjudications with respect to individual class members;

b. Pursuant to Rule 23(b)(2), as set forth above, the Defendants have acted on grounds generally applicable to each class as a whole;

c. Pursuant to Rule 23(b)(3), as set forth above, common issues of law and fact predominate over any purely individual issues and thus a class action is superior to any other method for adjudicating these claims.

## FACTS

### The Plans

34.     UTC offers certain of its employees the opportunity to participate in the ESP Plan and the RESP Plan as part of their compensation and benefits.

35.     The ESP Plan is a "defined contribution plan," as defined in ERISA § 3(34), 29 U.S.C. § 1002(34), and contains an employee stock ownership program provision. It is also a tax-qualified plan of the type popularly known as a "401(k) plan."

36.     Like the ESP Plan, the RESP Plan is a defined contribution plan containing an employee stock ownership plan provision and is a tax-qualified 401(k) plan.

37.     UTC benefits from its sponsorship of the Plans because the opportunity to participate in the Plans enhances its ability to recruit and retain qualified personnel, fosters employee loyalty and goodwill, and entitles UTC to tax advantages under the Internal Revenue Code.

38.     Under the terms of the ESP Plan, qualified employees may contribute a percentage of their before-tax earnings to the ESP Plan. UTC will make matching contributions, in UTC common stock rather than cash, in varying percentages of the employees' eligible compensation.

39.     In the RESP Plan, participants may contribute a percentage of their before-tax earnings and, in some cases, a percentage of their after-tax earnings, to the RESP Plan. UTC will make contributions to the RESP Plan in varying amounts, according to the terms of the relevant collective bargaining agreement.

40.     Participants in the ESP and RESP are always 100 percent vested in their own contributions and the earnings on those contributions. However, there is a two-year vesting period for UTC's matching contributions.

41.     Each participant's account is credited with the participant's contributions, the participant's share of UTC's matching contributions, and the earnings on those contributions.

42.     UTC has designed the Plans to be operated through a master trust, the UTC Employee Savings Plan Master Trust ("Master Trust").

43.     A "master trust" is a separate trust entity established by an employer or group of related employers to provide investment and administrative services to 401(k) plan or plans. Plan sponsors and administrators generally utilize master trusts in seeking to achieve efficiency or economies of scale in administering multiple 401(k) plans for an employer or related-employer group (*e.g.* a company/ or related companies that maintain both a salaried and an hourly employee plan; plans formerly sponsored or administered by a company which the employer acquired and/or with whom the employer merged).

44.     Through a master trust structure, several 401(k) plans may invest in common investment options or funds offered in the master trust and may share the services of master trust record-keepers, investment managers, consultants, and other service

providers. The fees incurred for such services typically are allocated among participating plans based upon each plan's proportionate share of the assets in the master trust.

45. The same is true here. The Master Trust currently holds the assets of three employee benefit plans, including both the ESP Plan and the RESP Plan. The ESP Plans' assets comprise approximately 89% of the assets held in the Master Trust while the RESP Plan's assets comprise approximately 11%. The plans in the Master Trust share the services of record keepers, investment managers and other providers. The fees for these services are allocated on a pro rata basis among the plans.

46. Employees participating in the ESP and the RESP Plans may choose to invest their contributions in any of 25 options. Eight of those options are collective trusts, created at the direction of the PAC, the PAIC or one or more of the committee members for the benefit of the ESP Plan and RESP Plan participants and beneficiaries.

47. A "collective trust" is similar to a mutual fund. It consists of a pool of money invested in a variety of securities chosen by a bank or an investment management company, often one that also manages retail mutual funds. Collective trusts are available only to large institutional clients such as pension plans or large 401(k) plans.

48. According to the Summary Plan Document, the collective trust investments offered to participants in the ESP and RESP are

      a.  Equity Index Fund, managed by Northern Trust Global Investments;

      b.  Growth Index Fund, managed by Northern Trust Global Investments;

      c.  Value Index Fund, managed by Northern Trust Global Investments;

      d.  Small Companies Stock Fund, managed by Northern Trust Global Investments;

     e. Mid Cap Index Fund, managed by Northern Trust Global Investments;

     f. International Equity Index Fund, managed by Northern Trust Global Investments;

     g. Global Index Fund, managed by Northern Trust Global Investments; and

     h. Income Fund, managed by UTC.

49. The Income Fund is described as a "stable value fund." Instead of investing in stocks or bonds, this fund enters into investment contracts with insurance companies. Under the terms of these contracts, known as "GICs" or "guaranteed investment contracts," the insurers promise to repay the principal and a contractually fixed rate of interest (the "stated rate") over a specific period of time. The insurance company then invests the money, seeking a higher return than the stated rate it has promised to pay.

50. An additional sixteen of the available options are retail mutual funds, the same funds available to any member of the general public, large or small. Of the sixteen, there are eleven standard mutual funds:

     a. Prudential Small Cap Value Fund;

     b. Vanguard Explorer Fund;

     c. Invesco Total Return Fund;

     d. First Eagle SoGen Global Fund

     e. Putnam Fund for Growth & Income;

     f. Putnam New Opportunities Fund;

     g. Fidelity Contrafund;

     h. Fidelity Growth & Income Fund;

     i. Fidelity Low-Priced Stock Fund;

    j.   Templeton Foreign Fund;

    k.   Templeton Developing Markets Fund.

51.     Another five mutual funds, are "target date" or "lifecycle" funds:

    a.   Vanguard Target Retirement 2005;

    b.   Vanguard Target Retirement 2015;

    c.   Vanguard Target Retirement 2025;

    d.   Vanguard Target Retirement 2035;

    e.   Vanguard Target Retirement 2045.

52.     Participants may also choose to invest in UTC common stock through the UTC Common Stock Fund.

53.     The investment options are held in separate trusts ("Sub-Trusts") within the Master Trust. There are 13 Sub-Trusts, each holding commingled assets of both the RESP and the ESP Plans.

54.     According to the 2004 filings with government regulators, those Sub-Trusts are:

    a.   UTC Employee Savings Plan Master Trust MTIA – Income Fund (001)

    b.   UTC Small Company Stock Index (002);

    c.   UTC Savings Plan – International Equity Index (003);

    d.   UTC Savings Plan – Global Fund (004);

    e.   UTC Savings Plan – Equity Index Fund (005);

    f.   UTC Savings Plan – Mutual Funds (006);

    g.   UTC Savings Plan – UTC Stock Fund (013);

    h.   UTC Savings Plan – ESOP Fund (017);

i.  UTC Savings Plan – Loan Account (018);

j.  UTC Savings Plan – Money Market (019);

k.  UTC Savings Plan – MidCap Index (020);

l.  UTC Savings Plan – Value Index (021);

m. UTC Savings Plan – Growth Index (022).

55.    There is not a one-to-one correspondence between the investment options and the Sub-Trusts.  For example, all of the mutual funds are held in one Sub-Trust, the "UTC Savings Plan – Mutual Funds" Sub-Trust.

56.    According to the Plans' filings with the government, the ESP and RESP:

> purchase units of participation in the investment
> funds based on their contribution to such funds
> and the unit value of the applicable investment fund
> at the end of the trading day in which a transaction
> occurs.  Income from the funds' investments, other
> than the UTC Common Stock Fund, increases the
> participating plans' unit values. UTC Common Stock Fund
> dividends increase the Plan's units in that fund.
> Distributions to participants reduce the number of participation
> units held by the participating Plans.

57.    By the end of 2005 the Master Trust, including all of the constituentSub-Trusts, held nearly $14 billion in assets.  At the end of 2005, the ESP Plan's assets were almost $12 billion and the RESP Plan's assets were approximately $1.4 billion.

**Fiduciary Duties Owed To The Plan Under ERISA**

58.    ERISA §403(c)(1), 29 U.S.C. §1103(c)(1), unambiguously mandates that:

> T]he assets of a plan shall never inure to the benefit of any employer and
> shall be held for the **exclusive purposes of providing benefits** to
> participants in the plan and their beneficiaries **and defraying reasonable
> expenses of administering the plan.**

(Emphasis added).

59.     ERISA §§ 404(a)(1)(A)&(B), 29 U.S.C. § 1104(a)(1)(A) & (B), require

that the Plan's fiduciaries "shall discharge [their] duties with respect to a plan solely in the

interest of the participants and beneficiaries" and

> a.  [F]or the exclusive purpose of:
>     i.  providing benefits to participants and their beneficiaries;
>         and
>     ii. defraying reasonable expenses of administering the plan;
>         and
> b.  [W]ith the care, skill, prudence, and diligence under the circumstances
>     then prevailing that a prudent man acting in a like capacity and familiar
>     with such matters would use in the conduct of an enterprise of a like
>     character and with like aims.

60.     ERISA § 405(a), 29 U.S.C. § 1105(a), provides that one fiduciary may be

held liable for breaches of fiduciary duty committed by another fiduciary where

> (1)     the fiduciary participates knowingly in or knowingly undertakes to
>         conceal, an act or omission of such other fiduciary, knowing such act or
>         omission is a breach";
> (2)     the fiduciary, by his or her "failure to comply with section 1104(a) of this
>         title in the administration of his specific responsibilities which give rise to
>         his status as a fiduciary" enables "such other fiduciary to commit such a
>         breach"; or
> (3)     the fiduciary "has knowledge of a breach by such other fiduciary," and
>         does not make "reasonable efforts under the circumstances to remedy the
>         breach."

61.     ERISA § 406, 29 U.S.C. § 1106, prohibits certain transactions between the

Plan and "parties in interest." This section provides that unless subject to an exemption as

set forth in ERISA § 408, 29 U.S.C. § 1108, a fiduciary:

> shall not cause the plan to engage in a transaction …if he knows or should
> know that such a transaction constitutes a direct or indirect – sale or
> exchange, or leasing, of any property between the plan and a party in
> interest …furnishing of goods, services or facilities between the plan and a
> party in interest …transfer to, or use by or for the benefit of, a party in
> interest, of any assets of the plan.

29 U.S.C. § 1106(a)(1).

62.     For purposes of section 406, a "party in interest" is any plan fiduciary, including the plan administrator, trustee, officer or custodian, any plan services provider, the employer, a relative of any of the above, and certain persons with ownership or leadership roles in any of the above.  ERISA § 3(14), 29 U.S.C. § 1002(14).

63.     Similarly, a fiduciary (1) shall not "deal with the assets of the plan in his own interest or for his own account"; (2) shall not "act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan" or its participants and beneficiaries; and (3) shall not "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."  29 U.S.C. § 1106(b).

64.     ERISA §104(b)(1), 29 U.S.C. § 1024(b)(1), requires that the Plan Administrator periodically provide to Plan participants and beneficiaries a summary plan description ("SPD").

65.     ERISA §104(b)(3), 29 U.S.C. § 1024(b)(3), requires that the Plan Administrator at least annually provide to Plan participants and beneficiaries copies of statements and schedules from the Plan's annual report for the previous year, and such additional information " as is necessary to fairly summarize the latest annual report."

66.     The schedules and statements that the Plan Administrator annually must provide to Plan participants and beneficiaries specifically include:

> [A] statement of the assets and liabilities of the plan aggregated by categories and valued at their current value, and the same data displayed in comparative form for the end of the previous fiscal year of the plan; and

> [A] statement of receipts and disbursements during the preceding twelve-month period aggregated by general sources and applications.

ERISA §103(b)(3), 29 U.S.C. §1023(b)(3).

67.     ERISA §104(b)(4), 29 U.S.C. § 1024(b)(4), entitles Plan participants and

beneficiaries to receive more detailed information from the Plan Administrator on request:

> The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated.

68.     ERISA §103(b)(2)&(3), 29 U.S.C. §1023(b)(2)&(3) mandates that, among

other extensive disclosures, Plan fiduciaries must include in the Plan's "Annual Report" a

statement of [the Plan's] assets and liabilities, and a statement of changes in net assets

available for plan benefits which shall include details of revenues and expenses and other

changes aggregated by general source and application.

69.     ERISA § 404(c) provides to Plan fiduciaries a "Safe Harbor" from liability

for losses that a participant suffers in their 401(k) accounts to the extent that the participant

exercises control over the assets in his or her 401(k) accounts.  To be eligible for the

protection of this "safe harbor" plan fiduciaries must, among other things, provide:

> an opportunity for a participant or beneficiary to exercise control over assets in his individual account," and must provide "a participant or beneficiary an opportunity to choose, from a broad range of investment alternatives, the manner in which some or all of the assets in his account are invested.

29 C.F.R. §2550.404c-1(b)(1).

70.     For a participant or beneficiary to be deemed to have "an opportunity to

exercise control over assets in his individual account" within the meaning of 404(c), the

plan fiduciaries must provide him or her with "the opportunity to obtain sufficient

information to make informed decisions with regard to investment alternatives available

under the plan." 29 C.F.R. §2550.404c-1(b)(i)(2)(B).

71.     The "sufficient investment information" that plan fiduciaries must provide to participants includes:

> A description of any transaction fees and expenses which affect the participant's or beneficiary's account balance in connection with purchases or sales of interests in investment alternatives (e.g., commissions, sales load, deferred sales charges, redemption or exchange fees)

29 C.F.R. §2550.404c-1(b)(2)(i)(B)(*1*)(*v*).

It must also include, at least upon request,

> A description of the annual operating expenses of each designated investment alternative (e.g., investment management fees, administrative fees, transaction costs) which reduce the rate of return to participants and beneficiaries, and the aggregate amount of such expenses expressed as a percentage of average net assets of the designated investment alternative.

29 C.F.R. §2550.404c-1(b)(2)(i)(B)(*2*)(*i*).

72.     ERISA's safe harbor regulations state that the imposition of *reasonable* charges for *reasonable* plan expenses does not interfere with a participant's opportunity to exercise control over his/her individual account so long as *plan fiduciaries inform the participant* of such actual expenses:

> A plan may charge participants' and beneficiaries' accounts for the reasonable expenses of carrying out investment instructions, *provided that procedures are established under the plan to periodically inform such participants and beneficiaries of actual expenses incurred with respect to their respective individual accounts.*

29 C.F.R. §2550.404c-1(b)(2)(ii)(A) (emphasis added).

### The Fees and Expenses Assessed Against The Plan

73.     The Defendants, directly or indirectly, have caused the Plans to purchase services from various plan service providers, including trustee, record-keeping, administration, investment advisory, investment management, brokerage, insurance, consulting, accounting, legal, printing, mailing, and other services.

74.     Either directly, or through the Master Trust or the Sub-Trusts, the Defendants have caused the amounts that the Plans pay for these services to be assessed against participants' accounts.

75.     Either directly, through the Master Trust, or through the Sub-Trusts, the Defendants have caused or allowed these service providers to receive payment in at least one of two ways:

     a.  By direct disbursement from the Plans, the Sub-Trusts, or the Master Trust to the entity providing the service; and/or

     b.  By receiving, or having the opportunity to receive, "Revenue Sharing" payments comprised of Plan assets distributed between and/or among various service providers.

### "Hard Dollar" Payments to Plan Service Providers

76.     Payments in the form of direct disbursements from the Plans to service providers are known as "Hard Dollar" fees.  They are usually paid in a straightforward manner – the plan sends the service provider a check

77.     The Plans disclose to government regulators and participants in the Plans, in one form or another, Hard Dollar payments made from the Plans to service providers.  For example, the ESP Plan disclosed in filings with government regulators covering plan year 2004 that it paid "Fidelity Investments" $2,809,613 that year for "administration."

78.     Based upon this disclosure, understanding the ESP Plan's administration expense for 2004 *appears* straightforward:  The ESP Plan sent a check to "Fidelity Investments" and, in exchange, "Fidelity Investments" provided administration services to the ESP Plan.

## Hard Dollar Expenses and Master Trusts

79.     When plans, like the ESP and the RESP Plans, are administered through a Master Trust, the disclosure of Hard Dollar payments for services provided to the 401(k) plan may become incomplete, unclear and inaccurate.

80.     These shortcomings arise when the Hard Dollar payments to plan service providers are made from the master trust and reported to government regulators in connection with the master trust.

81.     In such circumstances, the plan's disclosures to government regulators and Plan participants and beneficiaries do not include the Hard Dollar payments made to plan service providers from the master trust. Those payments to plan service providers – because they are disbursed from the master trust – are reported in the master trust's disclosures to government regulators.

82.     As a result, it may appear to the regulators and to plan participants and beneficiaries that Hard Dollar payments made by the plan to services providers in a given year were very small – or that the plan did not incur such expenses at all.

83.     In regard to the ESP Plan and the RESP Plan, not only did each Plan pay Hard Dollar expenses, but the Sub-Trusts holding the investment options within the Master Trust also paid Hard Dollar fees.

84.     In 2004, for example, the "UTC Savings Plan Master Trust MTIA – Income Fund" disclosed in filings with government regulators covering plan year 2004 that it paid "Fidelity Investments" $2,261,035 that year for "administration."

85.     As a result, in order to know the entire amount of Hard Dollar fees paid by any individual Plan member, one must combine all of the Hard Dollar fees, from all levels of the Plan, the Master Trust, and the Sub-Trusts.

## Revenue Sharing Payments to Plan Service Providers

86.     Revenue Sharing is a common practice in the financial, securities, and investment industry that provides services to 401(k) plans.

87.     Industry commentators and analysts consider Revenue Sharing to be the "big secret of the retirement industry."

88.     Industry commentators and analysts generally define "Revenue Sharing" as the transfer of asset-based compensation from brokers or investment management providers (such as mutual funds, common or collective trusts, insurance companies offering general insurance contracts, and similar pooled investment vehicles) to administrative service providers (record-keepers, administrators, trustees) in connection with 401(k) and other types of defined contribution plans.

89.     For example, a plan or its agent (a third-party administrator, consultant, or similar fiduciary) seeking to select an investment vehicle (mutual fund, common or collective trust, GICs, etc. (collectively "Fund")) to be offered to plan participants as an investment option will negotiate an agreement that sets the costs assessed against each dollar invested by specifying the expense ratio and available Revenue Sharing.

90.     In Revenue Sharing arrangements, the Plan and the Fund agree upon an asset-based fee that is not the true price for which the Fund will provide its service.

91.     Instead, the Fund's agreed asset-based fee includes *both* the actual price for which the Fund will provide its service *and* additional amounts that the Fund does not need to cover the cost of its services and to make a profit.

92.     The additional portion of the agreed-upon asset-based charge is "shared" with Plan service providers or others who do business with the Plan or the Fund.

93.     As a result of Revenue Sharing arrangements, Plan service providers or others who do business with the Plan or Fund receive *both* a Hard Dollar payment from the Plan *and* additional revenue that the Fund "shares" with them.

94.     The total fees a Fund charges to a plan can vary widely based upon a number of factors, including without limitation: the amount that the plan invests in the Fund; the level of sophistication of the plan fiduciary negotiating the fee agreement; the plan fiduciary's awareness of Revenue Sharing and inclination to expend effort monitoring Revenue Sharing transfers; the diligence with which the plan fiduciary conducts such negotiations; and the separate financial interests and/or agendas of the plan fiduciary and the Fund as they negotiate.

95.     Revenue Sharing is not confined to mutual funds. Common or collective trusts, providers of GICs, and private investment pools may enter into Revenue Sharing arrangements in connection with the services they provide to 401(k) plans.

96.     When an investment option involves GIC's, as in the UTC Income Fund, the picture is more complex. Fees and expenses reduce the returns available to participants in three ways: through a fee charged to manage the investment option and select the GICs in which to invest, through a fee charged by the insurance company to the Plan, usually known as a "wrap fee" or "wrapper," and through the "spread," the difference between

what the insurance company makes on its investment of the money given to it by the Plan and the stated rate of return it promised to pay the Plan. Adding further complexity is the fact that some insurance companies involved in the GIC pay revenue sharing to their business partners or to plan service providers.

97. Revenue Sharing also occurs between and among brokerage firms, investment managers, fund families and other service providers.

98. When 401(k) plan service providers receive compensation in the form of both Hard Dollar fees *and* Revenue Sharing payments, determining the total amount of fees and expenses that the Plan incurs for any category of services (*i.e.* recordkeeping and administration, investment advisory, trustee, auditing, and accounting, etc.) requires that *both* the Hard Dollar fees *and* Revenue Sharing payments be taken into account. And when GICs are involved, all three types of fees listed above must be taken into account.

99. Ascertaining whether a plan administrator has fulfilled its fiduciary obligation to ensure that the fees and expenses assessed against a 401(k) plan are reasonable and incurred solely in the interest of Plan participants requires consideration whether the *total of both* the Hard Dollar (Plan, Master Trust and Sub-Trust) *and* Revenue Sharing payments paid for any category of services complies with this standard.

100. Although Revenue Sharing monies arise only as a result of, and in connection with, transactions involving the plan, plan assets and plan service providers, Revenue Sharing is not always captured and used for the benefit of the plan and the participants.

101. When Revenue Sharing is foregone, the plan will not only pay additional hard dollar fees to the plan service providers (since no Revenue Sharing payments are

available to offset those Hard Dollar costs), but it will also pay additional money to the Fund, beyond what the Fund would normally charge and keep.

102.    Consequently, in determining whether a plan administrator or other fiduciary has fulfilled its obligation to ensure that the fees and expenses assessed against the plan are reasonable and incurred solely in the interest of plan participants, foregone Revenue Sharing must also be taken into account.

103.    Such is the case here.  The investment managers of the mutual funds charged fees to the Plans that included money with which to make Revenue Sharing payments.  However, the Defendants failed to capture the available Revenue Sharing and use it solely in the interest of the Plans and the participants and beneficiaries.

104.    As a result, when the foregone Revenue Sharing -- consisting of millions of dollars -- is taken into account, the participants and beneficiaries of the Plans paid unreasonably high fees for the administrative services and/or investment management they received.

**Revenue Sharing Arrangements Are Not Disclosed to Plan Participants**

105.    Revenue Sharing is not disclosed to plan participants and government regulators, even though it may account for a greater portion of certain categories of service provider payments than do Hard Dollar disbursements to those same providers.

106.    Accordingly, industry commentators and experts have dubbed Revenue Sharing payments to be "hidden fees" that are assessed against 401(k) plans and thus reduce plan participants' retirement savings.

107.    By entering into, allowing, and/or failing to monitor, discover, and prevent
or recover these undisclosed Revenue Sharing arrangements, the Defendants deprived
participants in the Plans of true and accurate information regarding:

    a.  How much they are paying in fees and expenses for each Plan;

    b.  Who is receiving the Plans assets through Revenue Sharing;

    c.  How much service providers are paid in addition to their disclosed, hard
       dollar fees; and

    d.  Whether the total amount paid to services providers (*i.e.* disclosed, hard
       dollar fees *combined with* Revenue Sharing payments) is reasonable and
       incurred solely for the participants' benefit.

108.    Further, the Summary Plan Document provided to RESP Plan participants
and beneficiaries by Defendants contains a paragraph that implies that the substantial
administrative fees are paid to Fidelity by UTC, not from the assets of the Plan.  However,
according to the documents Defendants filed for the RESP Plan with the government
regulators, both Hard Dollar and Revenue Sharing fees *are* paid by Plan participants.
Defendant's statement regarding the RESP Plan fees and expenses is misleading.

109.    Defendants also failed to provide the information required by ERISA § 103,
29 U.S.C. § 1023.  Section 103 states that a plan fiduciary must make available as part of
the Plan's annual report a statement of the Plan's assets and liabilities, and a statement of
changes in net assets available for Plan benefits, including details of revenues and expenses.
They did not do so.

110.    Defendants repeated their initial failure to provide the information required by ERISA § 103, 29 U.S.C. § 1023 by failing to provide the required information when it was requested.

### Investment Management and Other Fees Assessed Against Employer Stock Funds

111.    Employer stock funds or company stock funds ("Employer Stock Funds") are an investment option in many 401(k) plans, especially those of large employers with stock that is publicly traded on recognized stock exchanges.

112.    The UTC Common Stock Fund provides participants in the Plans with the opportunity to use a portion of their 401(k) retirement savings to purchase stock in the company for which they work.

113.    Beyond providing an *opportunity* for participants to invest in their employer's stock, UTC's matching contribution is made in only UTC stock.

114.    By their nature, Employer Stock Funds, like the UTC Common Stock Fund, are undiversified and risky, especially when they represent a disproportionately high percentage of a 401(k) plan participant's account.

115.    While such funds benefit employers by providing a steady market for the employer's stock and millions – or often billions – of dollars in working capital from their employees' salaries, Employer Stock Funds cause 401(k) participants to embrace the risks inherent in undiversified investing.

116.    For the typical 401(k) participant, the risk that such undiversified Employer Stock Fund imposes is greater than that of other undiversified investments.

117.    The typical 401(k) participant – before placing any retirement savings in an Employer Stock Fund – relies on the stability and financial viability of his/her employer as

the basis of his/her standard of living. The participant's present salary, healthcare, and other benefits, as well as his/her pension (if any) and retirement health insurance, depend upon the employer's continued solvency and viability.

118. Thus, the same risk that could impair the participant's investment in the Employer Stock Fund – the failure or insolvency of the employer – would also cause the loss of current income and benefits and future non-401(k) retirement benefits. The risks are correlated and, if realized, would financially devastate most employees and 401(k) plan participants.

119. Recent high-profile corporate scandals highlight the risks inherent in 401(k) participants' investment in Employer Stock Funds.

120. Purportedly countering these concerns, plan fiduciaries who establish and administer Employer Stock Funds, including UTC's, suggest that employees' ownership of employer stock increases the employees' concern for the financial well-being of the employer, fosters a feeling of ownership of and identification with the employer, and enhances productivity.

121. Regardless of the risks and benefits inherent in Employer Stock Funds, from a fee and expense standpoint, they *should be* a low cost 401(k) plan investment alternative.

122. Employer Stock Funds do not need to pay for investment management, which constitutes the largest portion of most Funds' fees and expenses and thus the largest portion of Funds' expense ratio. By their very nature, Employer Stock Funds forgo such investment management and hold an undiversified portfolio containing employer stock. Therefore, Employer Stock Funds should not charge investment management fees.

123.    It is crucial to participants' returns that Plan sponsors and administrators ensure that expenses are not assessed against plan participants' savings in Employer Stock Funds or that they be as minimal as possible *and* that the Employer Stock Fund not hold cash on a continuous basis.

124.    Plaintiffs and the class invest in the UTC Common Stock Fund with the goal of sharing in their employer's financial success through the receipt of dividends and/or the increase in the value of the employer's stock.

125.    ESP and RESP Plan participants who invest in the UTC Common Stock Fund do not own shares of their employer's stock.  They own units of the Stock Fund.

126.    Each UTC Common Stock Fund unit represents a portion of the shares of UTC stock in the Fund *and* a portion of the cash held in the Employer Stock Fund.

127.    The value of each UTC Common Stock Fund unit is reduced by the fees and expenses assessed against the assets in the Fund and by the cash – rather than the UTC stock – the Fund holds.

128.    As a result, the return that the Plans' participants receive on their investment in the UTC Common Stock Fund is, and has been, in general, lower than that of an investor holding a portfolio of pure employer stock outside of the Plans.

129.    The amount of cash that the UTC Common Stock Fund holds also reduces the extent to which participants share in their employers' financial success.

130.    If the value of UTC's stock is rising – as it has been – or if it is paying dividends, participants who place their retirement savings in this Fund naturally want *every* dollar they save to earn such investment gains.

131. But, the portion of the participant's savings that remains in cash, and is not used to purchase the employer's securities, does not generate such investment gains. Instead, its value remains essentially the same.

132. For example, if a *non-401(k) investor* purchases 100 shares of UTC stock at $100 per share, and the share value thereafter rises by 10%, he or she has reaped a $1000 gain on the initial $10,000 investment.

133. However a participant in the Plans placing the same $10,000 in the UTC Common Stock Fund does not receive 100 shares of the UTC stock. He or she receives UTC Common Stock Fund units representing an interest in the shares of UTC stock held in the Fund *and* an interest in the Fund's cash.

134. If the UTC Common Stock Fund held 4% cash and 96% employer stock, the 10% increase in the value of the employer stock would translate into $960 instead of the $1,000 earned by the non-plan investor. The value of the cash in the UTC Common Stock Fund would remain essentially static.

135. In this example, to make matters worse, participants investing $10,000 in the UTC Common Stock Fund will also have to pay fees and expenses. These fees and expenses will further reduce the participants' return.

136. While this difference may seem modest, the UTC Common Stock Fund is one of the largest of all investment alternatives, containing more than $5 billion participant dollars.

137. Plan participants' returns in the UTC Common Stock Fund have substantially underperformed those of complete strangers to the Company investing outside of the Plans.

138. The Defendants violated their fiduciary obligations under ERISA by maintaining and holding, causing to be maintained or held, and/or allowing to be maintained or held excess cash in the UTC Common Stock Fund and thereby impairing participants' returns.

### Defendants' Non-Compliance with §404(c)'s Safe Harbor Requirements and Concealment of Their Fiduciary Breaches

139. As set forth above, the Defendants did not disclose, and to this day have not disclosed, the true amount of the fees in the Plans, and the extent to which the UTC Common Stock Fund was underperforming UTC common stock purchased outside of the ESP and RESP Plans.

140. Participants in the Plans did not have, and do not have, complete and actual knowledge of the fees and expenses being charged to the Plans that reduced their account balances.

141. Thus, the Plans' fiduciaries, including the Defendants, have not told participants in the Plans, and participants in the Plans do not know:

    a.   the "annual operating expenses" of the investment options in the Plans, as required by 29 C.F.R. §2550.404c-1(b)(2)(i)(B)(2)(i); and

    b.   the actual expenses incurred with respect to their respective individual accounts, as required by 29 C.F.R. §2550.404c-1(b)(2)(ii)(A)

142. As a result of the Defendants' failure and refusal to provide such information, and the general failure on the part of the Plans' fiduciaries to disclose the actual expenses in the Plans, the participants have not been provided with "the opportunity to obtain sufficient information to make informed decisions with regard to investment alternatives available under the plan." 29 C.F.R. §2550.404c-1(b)(2)(i)(B).

143. Because the Defendants failed and refused to provide them with this information, and concealed this information from them, the participants and beneficiaries have lacked the information necessary to understand and protect their interests in the Plans and/or to have knowledge of, and seek redress for, the Defendants' breaches of fiduciary duty.

144. In fact, in their fiduciary roles, Defendants are the parties with the information necessary to know and understand whether the participants' rights and protections under ERISA are being, or have been, violated.

145. Defendants have an affirmative obligation to provide full and accurate information to the participants regarding the administration of the Plans.

146. Defendants' silence and/or non-disclosure in the face of such a duty to disclose is tantamount to an affirmative misrepresentation.

147. Here, despite the Defendants' duty to disclose full and accurate information regarding the fees and expenses assessed against participants' accounts, on an ongoing basis Defendants failed and refused to disclose to, and inform the participants of:

    a.   the total amount of fees and expenses reasonable and necessary to operate the Plans;

    b.   the total amount of amount of fees and expenses the Plans actually paid to service providers in the form of Hard Dollar payments and Revenue Sharing;

    c.   the availability of Revenue Sharing;

    d.   the true and accurate details regarding the revenues and expenses of the Plans;

e.   the true and accurate operating expenses which reduce participants' returns, including both Hard Dollar payments and Revenue Sharing, for each of the Plans' investment alternatives;

f.   the true and accurate transaction fees and expenses which affect the participants' account in connection with the purchase or sale of investment alternatives;

g.   the amount, when both Hard Dollar Payments and Revenue Sharing are considered, by which the Plans' expenses exceeded those which were reasonable and incurred solely in participants' interests; and

h.   other revenue and expense information necessary for the participants to understand and protect their interests in the Plans.

148.   Based upon the foregoing, Defendants are not entitled to the safe harbor protections of ERISA § 404 (c).

149.   Based upon the foregoing, the statue of limitations was tolled on the breaches set forth in this Complaint and did not begin to run until such time as Plaintiffs actually discovered them.

**COUNT I:**
**Breach of Fiduciary Duty – ERISA §502(a)(2)**

150.   Plaintiffs restate and incorporate the allegations contained in paragraphs 1 through 149 as though fully set forth here.

151.   As set forth in detail above, the Defendants owe the Plans, their participants and beneficiaries, and the Classes extensive fiduciary duties including, without limitation:

a. To conduct themselves as fiduciaries to the Plans with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent ERISA professional fiduciary would in operating and administering a 401(k) plan the size and character of the Plans;

b. To perform their fiduciary duties with the utmost loyalty and fidelity to the Plans and their participants and beneficiaries, avoiding at all times conflicts of interest, self-interest, and duplicity;

c. To ensure, at all times, that assets of the Plans "shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the Plans and their beneficiaries and defraying reasonable expenses of administering the Plans";

d. To track and account for all transactions involving the Plans and their assets so as to ensure that the assets are retained, managed, and disbursed in compliance with the Plan Documents and ERISA;

e. To track and account for all transactions involving the Plans and the Plans' assets so as to ensure that the assets "never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the Plans and their beneficiaries and defraying reasonable expenses of administering the Plans";

f. To ensure that the fees and expenses incurred by the Plans are reasonable and incurred for the sole and exclusive benefit of participants and beneficiaries of the Plans;

g. In entering into agreements with service providers to the Plans, to ensure that the payments from the Plans – whether they are direct or indirect – are reasonable for the services provided and made for the sole and exclusive benefit of participants and beneficiaries of the Plans;

h. In operating and administering the Plans, to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plans were reasonable and incurred solely for the benefit of participants of the Plans;

i. In operating and administering the Plans, on an ongoing basis to monitor the payments made by the Plans to service providers – whether they are direct or indirect – are and remain reasonable for the services provided and made for the sole and exclusive benefit of participants and beneficiaries of the Plans;

j. To inform themselves of, and understand, the various methods by which vendors in the 401(k) industry collect payments and other revenues from 401(k) plans;

k. To inform themselves of trends, developments, practices, and policies in the retirement, financial investment and securities industry which affect the Plans, and to remain aware and knowledgeable of such trends, practices and policies on an ongoing basis;

l. To communicate with participants and beneficiaries of the Plans regarding the Plans honestly, clearly and accurately;

m. To affirmatively and without request provide participants and beneficiaries of the Plans with honest, accurate and complete information they need to understand their investments in the Plans, the management, risk, potential returns of such investments, and the fees and expenses incurred in connection with those investments;

n. Upon request, to provide further any information to participants and beneficiaries of the Plans regarding the operation and administration of the Plans and the expenses incurred in doing so; and

o. To provide honest, accurate and complete information to participants and beneficiaries in the Plans regarding the costs associated with their various investment choices and directions.

p. To appoint fiduciaries who were capable of living up to their fiduciary duties, to monitor and oversee those fiduciaries in the performance of their duties, and to remove any fiduciaries who breached their fiduciary duties.

152. As set forth in detail above, the Defendants breached their fiduciary obligations to the Plans, participants and beneficiaries in the Plans and the members of the ESP and RESP Classes by, among other conduct to be proven at trial:

a. Causing the Plans to enter into agreements with service providers under which the Plans pay/paid – directly or indirectly – fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of participants and beneficiaries of the Plans;

b. Allowing the Plans to pay – directly or indirectly – fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of participants and beneficiaries of the Plans;

c. Failing to monitor the fees and expenses paid by the Plans and, by such failure, causing and/or allowing the Plans to pay fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of participants and beneficiaries of the Plans;

d. Failing to inform themselves of trends, developments, practices, and policies in the retirement, financial investment and securities industry which affect the Plans; and failing to remain aware and knowledgeable of such trends, practices and policies on an ongoing basis;

e. Failing to inform themselves of, and understand, the various methods by which vendors in the 401(k) industry collect payments and other revenues from 401(k) plans;

f. Failing to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plans were reasonable and incurred solely for the benefit of participants and beneficiaries of the Plans;

g. Failing to communicate with participants and beneficiaries of the Plans regarding the Plans honestly, clearly and accurately;

h. Failing properly to inform and/or disclose to participants and beneficiaries of the Plans the fees and expenses that are, or have been, paid by the Plans;

i.   Failing to inform and/or disclose to participants and beneficiaries of the Plans in proper detail and clarity the transactions, fees and expenses which affect participants' accounts balances in connection with the purchase or sale of interests in investment alternatives;

j.   Failing to discover, disclose and stop the charging of hidden and excessive fees to the Plans;

k.   Failing to appoint fiduciaries who lived up to their fiduciary duties, failing to monitor and oversee those fiduciaries in the performance of their duties, and failing to remove fiduciaries who breached their fiduciary duties;

l.   By the foregoing conduct, failing to exercise the care, skill, prudence and diligence that a prudent person would when acting in like capacity and familiar with such matters.

153.   As set forth in detail above, as a result of these breaches, Plaintiffs, the ESP and RESP Classes, the Plans, and the participants and beneficiaries of the Plans have suffered financial losses and damages.

154.   Further, as set forth in detail above, the Defendants failed to provide participants and beneficiaries with sufficient investment information to qualify for the safe harbor immunity of section 404(c). Accordingly, the Defendants are liable for participants and beneficiaries' investment losses in the Plans.

155.   Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a), the Defendants are liable to restore to the Plans the losses they experienced as a direct result of the Defendants' breaches of fiduciary duty and are liable for any other available and

appropriate equitable relief, including prospective injunctive relief and declaratory relief, and attorney's fees.

## COUNT II:
### Other Remedies for Breach of Fiduciary Duty – ERISA §502(a)(3)

156. Plaintiffs restate and incorporate the allegations contained in paragraphs 1 through 155 as though fully set forth here.

157. As an alternative to the causes of action stated in Count I, Plaintiffs seek further relief pursuant to ERISA § 502(a)(3), 29 U.S.C., § 1132(a)(3).

158. Under section 502(a)(3), a participant may enjoin any act which violates ERISA or may obtain other appropriate equitable relief to redress such violations or enforce the terms of ERISA.

159. The Defendants, as fiduciaries of the Plans, occupy a position of trust and confidence in connection with the Plans, the Plans' assets, and participants and beneficiaries of the Plans.

160. The Defendants have exclusive discretion and control over the Plans' assets and are strictly obligated to exercise that control "for the exclusive purposes of providing benefits to participants in the Plan[s] and their beneficiaries and defraying reasonable expenses of administering the Plan[s]."

161. Although *only* participants and beneficiaries are entitled to the Plans' assets and to the benefit of the Plans' assets, in the absence of full and candid disclosure from the Defendants, participants and beneficiaries of the Plans do not know, and have no means of knowing, how their assets have been managed and disbursed.

162. Accordingly, the Defendants occupy the position of a common law trustee in connection with the Plans, their assets, and their participants and beneficiaries.

163. As set forth in detail above, the Defendants have caused and/or allowed the plan to pay – directly or indirectly – excess fees and expenses to the Plans' service providers.

164. The Defendants, and not the Plaintiffs, have and/or should have specific and detailed information regarding how the Plans' assets have been treated and disbursed in this regard.

165. Accordingly, the Court should order that the Defendants render an accounting of all transactions, disbursements and dispositions occurring in, in connection with, and/or in respect of, the Plans and their assets.

166. Plaintiffs respectfully request that the Court order that such an accounting include, without limitation, detailed and specific information regarding all fees and expenses incurred by the plan and/or paid to third parties, whether paid directly by the Plans or indirectly transferred among plan service providers or other third parties.

167. Plaintiffs respectfully request that, to the extent that the Defendants do not or cannot account for all such transactions and their propriety under ERISA, the Plan Document and other applicable law, the Court surcharge against the Defendants all amounts for which they cannot account.

168. Plaintiffs further seek injunctive and other appropriate equitable relief to redress the wrongs described above, and to cause them to cease in order for the Plans' participants and beneficiaries to receive the full benefit of their retirement savings in the future.

WHEREFORE Plaintiffs, on behalf of the Plans and all similarly situated participants and beneficiaries of the Plans, respectfully request that the Court:

- find and declare that the Defendants have breached their fiduciary duties as described above;

- order the Defendants to make good to the Plans all losses that the Plans incurred as a result of the conduct described above and to restore the Plans to the position each would have been in but for the breaches of fiduciary duty;

- impose a constructive trust on any monies by which the Defendants were unjustly enriched as a result of their breaches of fiduciary duty and/or cause the Defendants to disgorge such monies and return them to the Plan;

- remove the fiduciaries who have breached their fiduciary duties and/or enjoin them from future breaches of ERISA;

- award actual damages to the Plans in the amount of their monetary losses;

- require Defendants to render an accounting as set forth above;

- surcharge against Defendants and in favor of the Plans all amounts involved in transaction which such accounting reveals were or are improper, excessive and/or in violation of ERISA;

- permanently enjoin Defendants from breaching their fiduciary duties in each respect set forth in the Complaint;

- order costs and attorneys fees pursuant to ERISA § 502(g) and the common fund doctrine;

- order equitable restitution or other available equitable relief against the Defendants;

- order the payment of interest to the extent it is allowed by law; and

- grant any other and further relief the Court deems appropriate.


**PLAINTIFFS DEMAND A TRIAL BY JURY OF ALL COUNTS SO TRIABLE.**

Dated: September 22, 2006          Respectfully submitted,


**Schlichter, Bogard & Denton**

Matthew H. Armstrong (*District Bar number pending*)
Jerome J. Schlichter
Elizabeth J. Hubertz
Heather Lea
120 W. Main Street, Ste 208
Belleville, IL 62220
and
100 South Fourth Street
Suite 900
St. Louis, MO 63102
Tel: 314-621-6115
Fax: 314-621-7151

marmstrong@uselaws.com
jschlichter@uselaws.com
ehubertz@uselaws.com
hlea@uselaws.com
Lead Counsel for Plaintiffs