# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| DAVID S. TAYLOR, et al., | ) |
|  | ) |
| Plaintiffs, | ) CASE NO. 3:06-CV-01494 (WWE) |
|  | ) |
| v. | ) |
|  | ) |
| UNITED TECHNOLOGIES | ) |
| CORPORATION, et al., | ) |
|  | ) |
| Defendants. | ) JUNE 7, 2008 |

## MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

*Of Counsel:*
Zachary R. Osborne (ct19988)
UNITED TECHNOLOGIES CORPORATION
One Financial Plaza
United Technologies Building
Hartford, CT 06103-2703
(860) 728-7821
(860) 998-4751 (fax)
zachary.osborne@utc.com

Jeffrey G. Huvelle (phv01440)
Thomas L. Cubbage III (phv01441)
Peter A. Swanson (phv01442)
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 662-6000
(202) 662-6291 (fax)
jhuvelle@cov.com
tcubbage@cov.com
pswanson@cov.com

Steven M. Greenspan (ct00380)
DAY PITNEY LLP
242 Trumbull St.
Hartford, CT 06103
(860) 275-0100
(860) 275-0343 (fax)
smgreenspan@daypitney.com

*Attorneys for Defendants*

ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................ iv

INTRODUCTION .........................................................................................................1

BACKGROUND ...........................................................................................................3

I. Overview of the Plan .........................................................................................3

II. Overview of Mutual Funds ................................................................................8

APPLICABLE LEGAL STANDARDS .......................................................................10

I. Summary Judgment Standard ..........................................................................10

II. Relevant ERISA Standards ..............................................................................11

    A. Prudence Standard ................................................................................11

    B. Reasonableness Standard .....................................................................15

ARGUMENT ...............................................................................................................17

I. UTC Was Not Imprudent in Offering or Managing the Company Stock Fund (Count I)...............................................................................................17

    A. ERISA's Fiduciary Duty Provisions Do Not Prohibit Unitized Stock Funds.................................................................................18

    B. UTC Acted Prudently in Setting a Reasonable Cash Level for the Stock Fund. ......................................................................................24

II. UTC Did Not Breach Its Fiduciary Duties by Offering Actively Managed Mutual Funds (Counts VII and VIII)..............................................27

    A. The Plan's Actively Managed Mutual Funds Are Not *Per Se* Imprudent. ...........27

        1. Offering Actively Managed Investment Options Does Not *Per Se* Violate ERISA. .........................................................28

        2. Offering Active Management Through Mutual Funds Does Not *Per Se* Violate ERISA.............................................33

    B. The Plan's Mutual Funds Are Not Unreasonably Expensive. ..............37

|  |  | 1. | The Existence of Managed Trust Accounts Does Not Render Mutual Fund Expenses *Per Se* Unreasonable. | 37 |
|  |  | 2. | Sub-Transfer Agent Fees Do Not *Per Se* Render Mutual Funds Unreasonably Expensive. | 41 |
|  | C. |  | UTC Prudently Investigated, Evaluated, and Selected the Plan's Mutual Funds. | 42 |
|  |  | 1. | UTC Acted Prudently in Selecting the Mutual Funds As Investments. | 42 |
|  |  | 2. | UTC Acted Appropriately in Considering the Expenses of the Plan Mutual Funds. | 45 |
|  |  | 3. | In Light of the Undisputed Evidence, Plaintiffs' Allegations Relating to UTC's Selection Process Fail. | 47 |
| III. |  |  | UTC Did Not Breach Its Fiduciary Duties in Hiring Fidelity As the Plan's Recordkeeper (Count II). | 50 |
|  | A. |  | UTC Acted Prudently in Hiring Fidelity. | 51 |
|  | B. |  | Fidelity's Compensation Is Reasonable. | 56 |
|  |  | 1. | The Undisputed Evidence Demonstrates That Fidelity's Compensation Was Reasonable. | 57 |
|  |  | 2. | The Sub-Transfer Agent Payments to Fidelity Do Not Render Its Compensation *Per Se* Unreasonable. | 61 |
| IV. |  |  | UTC Did Not Breach Its Fiduciary Duties in Communicating with Participants (Counts III, IV, and V). | 62 |
|  | A. |  | UTC Accurately Disclosed All Required Information Regarding Plan Fees. | 63 |
|  |  | 1. | UTC Accurately Disclosed the Fees and Expenses of Each Investment Option. | 63 |
|  |  | 2. | Plan Communications Were Not Misleading With Respect to Sub-Transfer Agent Fees. | 65 |
|  | B. |  | The Allegedly Misrepresented or Undisclosed Information Was Not Material. | 67 |
|  |  | 1. | Investment Fund Expenses Were Admittedly Immaterial to Plaintiffs. | 68 |

        2.     Sub-Transfer Agent Payments Are Immaterial to Investors.....................68

    C.     Plaintiffs Cannot Establish That the Alleged Misrepresentations and Non-Disclosures Caused a Loss to the Plans. ...................................................71

V.    UTC Did Not Breach Its Fiduciary Duties by Failing to Capture Float (Count VI). ........71

VI.    ERISA's Statute of Limitations Bars Counts I, VII, and VIII. ........................................73

    A.     The Applicable Statute Of Limitations For Plaintiffs' Breach of Fiduciary Duty Claims Is Three Years.......................................................................74

    B.     Count VIII Is Time-Barred. ...................................................................76

    C.     Count I Is Time-Barred.........................................................................77

    D.     Count VII Is Time-Barred......................................................................80

VII.    ERISA Section 404(c) Prevents Recovery on Counts I, VII, and VIII..............................81

    A.     The Plan Complies With ERISA Section 404(c)....................................83

    B.     The Alleged Investment Losses Resulted from Participants' Exercise of Control Over Investment Decisions........................................................85

        1.     The Plan's Alleged Experience of Cash Drag Resulted From Participant Control. ......................................................................85

        2.     The Plan's Alleged Losses Due to Mutual Fund Investments Resulted From Participant Control. ..........................................86

CONCLUSION.................................................................................................89

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*"Agent Orange" Prod. Liab. Litig., In re*, 818 F.2d 187 (2d Cir. 1987) ................................. 23-24

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................. 11, 36

*Ballone v. Eastman Kodak Co.*, 109 F.3d 117 (2d Cir. 1997) ................................................ 63, 67

*Bouboulis v. Transport Workers Union of Am.*, 442 F.3d 55 (2d Cir. 2006) .............................. 11

*Brock v. Robbins*, 830 F.2d 640 (7th Cir. 1987) ....................................... 15, 37, 51, 52, 56, 57, 58

*Brown v. Am. Life Holdings, Inc.*, 190 F.3d 856 (8th Cir. 1999) ...................................................... 74

*Bunch v. W.R. Grace & Co.*, 532 F. Supp. 2d 283 (D. Mass. 2008) ........................................ 21, 52

*Burgin v. Gen. Motors Corp.*, No. 04-CV-503S, 2006 WL 469355 (W.D.N.Y. Feb. 26, 2006) .............................................................................................................. 75, 80

*Bussian v. RJR Nabisco Inc.*, 223 F.3d 286 (5th Cir. 2000) ..................... 12, 14, 16, 17, 51, 55, 56

*Caputo v. Pfizer, Inc.*, 267 F.3d 181 (2d Cir. 2001) ..................................................... 74, 75, 79, 81

*Cardinal Health ERISA Litig., In re*, 424 F. Supp. 2d 1002 (S.D. Ohio 2006) ........................... 19

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...................................................................... 10, 26

*Cent. States, Se. and Sw. Areas Pension Fund v. Miss. Warehouse Corp.*, No. 91 C 1332, 1992 WL 683777 (N.D. Ill. Oct. 1, 1992) ...................................................... 75-76

*Chao v. Emerald Capital Mgmt., Ltd.*, No. 01-CV-6356T, 2006 WL 2620055 (W.D.N.Y. Sept. 13, 2006) ...................................................................................................... 74

*Chao v. Merino*, 452 F.3d 174 (2d Cir. 2006) .......................................... 12, 14, 22, 28, 30, 32, 36

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974) ...................................................... 75

*Connors v. Beth Energy Mines, Inc.*, 920 F.2d 205 (3d Cir. 1990) .............................................. 75

*Cooke v. Williams & Pattis*, No. 3:99-cv-2223, 2002 WL 32509019 (D. Conn. Aug. 27, 2002) .................................................................................................................... 59

*Demery v. Extebank Deferred Compensation Plan (B)*, 216 F.3d 283 (2d Cir. 2000) ............................................................................................................................... 11

*Diduck v. Kaszycki & Sons Contractors, Inc.*, 874 F.2d 912 (2d Cir. 1989) ................................ 12

*DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410 (4th Cir. 2007) ................................................ *passim*

*Donovan v. Cunningham*, 716 F.2d 1455 (5th Cir. 1983) .............................................................13

*Dupree v. Prudential Ins. Co.*, No. 99-8337-Civ., 2007 WL 2263892 (S.D. Fla. Aug. 7, 2007) ........................................................................................................38, 46

*Edes v. Verizon Commc'ns, Inc.*, 417 F.3d 133 (1st Cir. 2005) .....................................................75

*Edgar v. Avaya, Inc.*, 503 F.3d 340 (3d Cir. 2007) .........................................................................18

*Ferro Corp. ERISA Litig., In re*, 422 F. Supp. 2d 850 (N.D. Ohio 2006) ....................................19

*Fink v. Nat'l Savings & Trust Co.*, 772 F.2d 951 (D.C. Cir. 1985) ...............................................14

*Flanigan v. Gen. Elec. Co.*, 244 F.3d 78 (2d Cir. 2001) ..................................14, 20, 23, 29, 35, 45

*Ford Motor Co. ERISA Litig., In re*, No. 06-11718, 2008 WL 880161 (E.D. Mich. Mar. 31, 2008) ........................................................................................................18

*Frommert v. Conkright*, 433 F.3d 254 (2d Cir. 2006) ....................................................................75

*Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423 (2d Cir. 2001) ..................................................11

*Gallus v. Ameriprise Fin., Inc.*, 497 F. Supp. 2d 974 (D. Minn. 2007) .............................36, 39, 58

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923 (2d Cir. 1982) ...............................9

*Gen. Motors ERISA Litig., In re*, No. 05-71085, 2006 WL 897444 (E.D. Mich. Apr. 6, 2006) ..............................................................................................................18

*Goldberger v. Integrated Res., Inc.*, 204 F.3d 43 (2d Cir. 2000) ..................................................75

*Grain Traders, Inc. v. Citibank, N.A.*, 160 F.3d 97 (2d Cir. 1998) ...............................................77

*Hecker v. Deere & Co.*, 496 F. Supp. 2d 967 (W.D. Wis. 2007) .............................................82, 88

*Hecker v. Deere & Co.*, 2007 U.S. Dist. Lexis 78959 (W.D. Wis. Oct. 19, 2007) ..............................................................................................................................82, 89

*Henry v. Champlain Enters., Inc.*, 445 F.3d 610 (2d Cir. 2006) ....................13, 21, 43, 44-45, 48

*Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432 (1999) ...........................................................24, 79

*Hunter v. Caliber Sys., Inc.*, 220 F.3d 702 (6th Cir. 2000) .................12, 21, 24, 28, 30-31, 32, 36

*I.B.E.W. Local 1448 Health & Welfare Fund v. Thorndyke Int'l, Inc.*, No. Civ. A. 97-cv-5718, 1998 WL 764753 (E.D. Pa. Oct. 26, 1998) ....................................................16

*Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005)..................................................11, 49, 59

*Jenkins v. Yager*, 444 F.3d 916 (7th Cir. 2006) ...........................................................................83

*Jones v. Harris Assocs. L.P.*, __ F.3d ___, No. 07-1624, 2008 WL 2080753
    (7th Cir. May 19, 2008) .........................................................................................................39

*Jorgensen v. Epic/Sony Records*, 351 F.3d 46 (2d Cir. 2003) .......................................................58

*Katsaros v. Cody*, 744 F.2d 270 (2d Cir. 1984)........................................................................ *passim*

*Kouba v. Joyce*, No. 83 C 451, 1987 WL 33370 (N.D. Ill. Dec. 31, 1987)...........16, 17, 39, 40, 56

*Laborers Nat'l Pension Fund v. N. Trust Quantitative Advisors*, 173 F.3d 313
    (5th Cir. 1999).......................................................................................................................43

*Laborers' Pension Fund v. Arnold*, No. 00-C-4113, 2001 U.S. Dist. LEXIS
    2062 (N.D. Ill. Feb. 27, 2001).............................................................................................17

*Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299 (5th Cir. 2007) ...............................82, 86, 88

*Lanka v. O'Higgins*, 810 F. Supp. 379 (N.D.N.Y. 1992) .....................................14, 20, 30, 32, 35

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)...................................11

*McLaughlin v. Bendersky, D.D.S.*, 705 F. Supp. 417 (N.D. Ill. 1989) .........................................60

*Merrill Lynch Inv. Mgmt. Funds Secs. Litig., In re*, 434 F. Supp. 2d 233
    (S.D.N.Y. 2006)....................................................................................................................69

*Morgan Stanley & Van Kampen Mut. Fund Secs. Litig., In re*, No. 03 Civ.
    8208, 2006 WL 1008138 (S.D.N.Y. Apr. 18, 2006)............................................................69

*Mullins v. Pfizer, Inc.*, 23 F.3d 663 (2d Cir. 1994)......................................................................68

*Nelson v. Hodowal*, 512 F.3d 347 (7th Cir. 2008)......................................................................70

*Pineiro v. Pension Benefit Guar. Corp.*, 318 F. Supp. 2d 67 (S.D.N.Y. 2003).....................15, 51

*Quarles v. Gen. Motors Corp.*, 758 F.2d 839 (2d Cir. 1985) .......................................................11

*Raskin v. Wyatt Co.*, 125 F.3d 55 (2d Cir. 1997).................................................................59, 85

*Reich v. Lancaster*, 55 F.3d 1034 (5th Cir. 1995)............................................................15, 38, 61

*Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915 (8th Cir. 1994)............................14, 24, 26, 27

*Salomon v. Our Lady of Victory Hospital*, 514 F.3d 217 (2d Cir. 2008).....................................10

*Silverman v. Mut. Benefit Life Ins. Co.*, 138 F.3d 98 (2d Cir. 1998) ................................26, 63, 71

*Smith v. Delta Air Lines, Inc.*, 422 F. Supp. 2d 1310 (N.D. Ga. 2006) ........................................19

*Smith Barney Fund Transfer Agent Litig., In re*, No. 05 Civ. 7583, 2007 WL 2809600 (S.D.N.Y. Sept. 26, 2007) ...............................................................................69

*Sprint Corp. ERISA Litig., In re*, 388 F. Supp. 2d 1207 (D. Kan. 2004) ......................................19

*State St. Bank & Trust Co. v. Salovaara*, 326 F.3d 130 (2d Cir. 2003).....................17, 51, 53, 56

*Taylor v. United Techs. Corp.*, No. 3:06cv1494 (WWE), 2007 WL 2302284 (D. Conn. Aug. 9, 2007) ...........................................................................................65, 71

*Unisys Sav. Plan Litig., In re*, 74 F.3d 420 (3d Cir. 1996) ....................................................82, 86

*Unisys Savings Plan Litig., In re*, 173 F.3d 145 (3d Cir. 1999) ...................................................14

*United States v. Mason Tenders Dist. Council*, 909 F. Supp. 882 (S.D.N.Y. 1995) .................................................................................................................13, 42

*VanVels v. Betten*, No. 1:06-cv-710, 2007 WL 329048 (W.D. Mich. Jan. 31, 2007) ...............................................................................................15, 16, 41, 58, 62

*White v. Martin*, 286 F. Supp. 2d 1029 (D. Minn. 2003)...............................................................48

*Wsol v. Fiduciary Mgmt. Assocs.*, No. 99 C 1719, 2000 WL 139463 (N.D. Ill. Jan. 28, 2000)...............................................................................................................16, 56

*Xerox Corp. ERISA Litig., In re*, 483 F. Supp. 2d 206 (D. Conn. 2007) ......................................18

*Young v. Gen. Motors Inv. Mgmt. Corp.*, __ F. Supp. 2d __, No. 07-cv-1994, 2008 WL 1971544 (S.D.N.Y. Mar. 24, 2008) ..........................................73, 74, 75, 78, 80, 81

## FEDERAL STATUTES , RULES, AND REGULATIONS

15 U.S.C. §§ 77j(a), 80a-8(b) .........................................................................................................9

15 U.S.C. § 80a-35...........................................................................................................................9

Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* ...................................................................................................................................1

ERISA Section 3(21)(B), 29 U.S.C. § 1002(21)(B) ......................................................................34

ERISA Section 401(b)(1), 29 U.S.C. § 1101(b)(1)...................................................................34, 42

ERISA Section 403(c), 29 U.S.C. § 1103(c) .................................................................................15

ERISA Section 404(a)(1), 29 U.S.C. § 1104(a)(1) .................................................................51

ERISA Section 404(a)(1)(A)(ii), 29 U.S.C. § 1104(a)(1)(A) ..............................15, 17, 51, 52, 53

ERISA Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B) .................................................... *passim*

ERISA Section 404(c)(1), 29 U.S.C. § 1104(c)(1) ...........................................................82, 83

ERISA Section 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B) ..................................................86, 88

ERISA Section 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C) ........................................................17

ERISA Section 408(b)(2), 29 U.S.C. §§ 1108(b)(2)...............................................................17

ERISA Section 409, 29 U.S.C. §§ 1109 ...............................................................................57

ERISA Section 413, 29 U.S.C. § 1113 ............................................................73, 74, 75, 80, 81

ERISA Section 502(a)(2), 29 U.S.C. §§ 1132(a)(2) ................................................................57

17 C.F.R. § 270.18f-3 .........................................................................................................9, 41

17 C.F.R. § 274.11A ................................................................................................................9

29 C.F.R. § 2509.75-3 ...........................................................................................................34

29 C.F.R. § 2509.94-2 ...........................................................................................................47

29 C.F.R. § 2550.401c-1(e)(1)(i) .........................................................................................34

29 C.F.R. § 2550.404a-1(b) ..................................................................................................22

29 C.F.R. § 2550.404a-1(b)(1).................................................................................13, 33, 45

29 C.F.R. § 2550.404a-1(b)(1)(i) ..........................................................................................43

29 C.F.R. § 2550.404a-1(b)(2)....................................................................................13, 46

29 C.F.R. § 2550.404a-1(b)(2)(ii)(A) ...................................................................................43

29 C.F.R. § 2550.404c-1(a)(2) ..............................................................................................85

29 C.F.R. § 2550.404c-1(b)(2)(i)(B) .....................................................................................83

29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(1)(v) ...........................................................................83

29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(1)(vii) .........................................................................85

29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(2)(i) .............................................................................83

29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(2)(ii) ...................................................................83

29 C.F.R. § 2550.404c-1(c)(2)(iii) ...............................................................................85

29 C.F.R. § 2550.404c-1(b) ..........................................................................................83

29 C.F.R. § 2550.404c-1(b)(2)......................................................................................83

29 C.F.R. § 2550.404c-1(b)(3)(B) .................................................................................83

29 C.F.R. § 2550.404c-1(d)(2)(i)..............................................................................86, 88

29 C.F.R. § 2550.408c-2 ...............................................................................................61

SEC Form N-1A, *available at* http://www.sec.gov/about/forms/formn-1a.pdf .................9, 67, 69

Fed. R. Civ. P. 9(b) .......................................................................................................64

Fed. R. Civ. P. 56(c) .....................................................................................................10

Fed. R. Civ. P. 56(e) .....................................................................................................10

## MISCELLANEOUS

American Law Institute, Restatement (Third) of Trusts (2008) ....................................14, 31, 32, 62

Advisory Council on Employee Welfare and Pension Benefit Plans, Report of
    the Working Group on Prudent Investment Process (Nov. 2006) ...........................34

U.S. Dep't of Labor ("DOL"), Advisory Op. 97-03A (Jan. 23, 1997) ..........................15

DOL, Information Letter (July 28, 1998), *available at*
    http://www.dol.gov./ebsa/regs/ILsil072898.html .............................................16, 46

Investment Company Institute, 2008 Investment Company Factbook,
    *available at* http://www.icifactbook.org/pdf/2008_factbook.pdf .............................10

Kampner, Paul, "Inevitable Vertical Integration in 401(k)s," *Pensions & Invs.*,
    at 12 (Mar. 3, 1997) ..............................................................................................35

Kampner, Paul, "Trends Affecting Benefit Service Providers," *The Inside
    Edition* (Jan. 26, 2007).........................................................................................35

Kampner, Paul, "What's Wrong With the 401(k) Industry?," *Pensions &
    Invs.*, at 12 (Nov. 27, 2006) ...........................................................................30, 34, 35

Kosowski, Robert, *et al.*, *Can Mutual Fund "Stars" Really Pick Stocks? New
    Evidence from a Bootstrap Analysis*, 61 J. Finance 2551 (2006) ...........................32

Perdue, Pamela D., *Satisfying ERISA's Fiduciary Duty Requirements with Respect to Plan Costs,* 25 J. Pension Plan. & Compliance 1 (1999) ......................................16

## <u>INTRODUCTION</u>

This suit arises under the Employee Retirement Income Security Act of 1974 ("ERISA"). Plaintiffs allege that United Technologies Corporation and other defendants (collectively, "UTC") breached their fiduciary duties with respect to UTC's largest defined contribution 401(k) plan ("the Plan"). Although the Plan's investments generally have performed well over recent years, and its assets have grown tremendously, Plaintiffs complain that a number of investment options in the Plan were imprudent and that the fees and expenses of the Plan are unreasonable. Plaintiffs claim that their views on investment options and plan fees are not only superior to the decisions made by UTC, but that they are the *only* prudent and reasonable choices that a fiduciary may make. Plaintiffs' broad *per se* claims, if accepted, would result not just in a finding that the UTC Plan violates ERISA but would condemn many large 401(k) plans nationwide.

Plaintiffs' claims are based on a fundamental misunderstanding of ERISA's standards of prudence and reasonableness. Fiduciaries are not legally obligated to divine the perfect or optimal investments or arrangements for a plan. Rather, ERISA simply requires that they act carefully, skillfully, diligently, and only in the interests of participants. If fiduciaries' decisions are objectively appropriate in light of prevailing standards, subjective disagreement with these decisions does not render them imprudent or unreasonable.

UTC is entitled to summary judgment on all of Plaintiffs' claims. The undisputed facts demonstrate that the investments chosen by UTC were prudent, that plan fees were reasonable, and that both investments and fees were consistent with numerous other large 401(k) plans. Further, UTC has carefully and thoroughly investigated and evaluated Plan investment options and service providers, always acting in the interest of participants.

In Counts I, VII, and VIII, Plaintiffs claim that it was *per se* imprudent to (1) hold cash in the UTC Stock Fund, (2) offer active management in the Plan, and (3) offer active management in form of mutual funds, and that the expenses of the Plan's mutual funds were *per se* unreasonable.  It is incontrovertible, however, that each of these types and structures of investment options provides certain benefits to plans and thus are widely used by other 401(k) plans and that the expenses were commensurate with market rates.

In Count II, Plaintiffs allege that the compensation provided to Fidelity, the Plan recordkeeper, was unreasonable, primarily because it received sub-transfer agent payments from certain mutual funds in the Plan in addition to its per-participant recordkeeping fees.  But it is undisputed that sub-transfer agent payments are a standard part of compensation for recordkeepers of 401(k) plans and that the amounts of such payments to Fidelity were commensurate with industry standards.  Plaintiffs have no evidence that Fidelity received materially more than the compensation received by other service providers for large 401(k) plans.

In Counts III, IV, and V, Plaintiffs allege that UTC made misrepresentations regarding fees and expenses of investment options and sub-transfer agent payments made to Fidelity.  The undisputed facts demonstrate, however, that UTC clearly and accurately disclosed all required information relating to fees and expenses.  Moreover, Plaintiffs have no evidence that any of the alleged misrepresentations were material or caused a loss to the Plan.

In Count VI, Plaintiffs allege that the interest earned on money that is in the process of being contributed to or withdrawn from the Plan is improperly retained by Fidelity or the Plan trustee.  This claim is based on a factual misunderstanding.  All of the testimony shows that such interest was in fact paid to the Plan.

Finally, UTC is entitled to judgment as a matter of law on two affirmative defenses to Counts I, VII, and VIII.  The claims under these three counts are barred both by ERISA's statute of limitations and by the affirmative defense provided by ERISA Section 404(c).

For all of these reasons, UTC respectfully requests that the Court grant summary judgment in favor of UTC on all of Plaintiffs' claims.

## BACKGROUND

This Section provides a brief overview of the Plan and the general structure and operation of mutual funds.  The material undisputed facts are more fully identified in UTC's Local Rule 56(a)(1) Statement of Undisputed Material Facts submitted with this Motion and in the Argument section of this Memorandum.

## I.   Overview of the Plan

Plaintiffs' fiduciary duty claims concern only one of UTC's retirement plans, the Employee Savings Plan.[1]  Second Am. Compl. ("S.A.C.") ¶ 1 (Dkt. No. 147).  The Plan is a defined contribution 401(k) plan in which eligible participants may contribute a portion of their earnings and determine how to invest these contributions in the Plan's various investment options.  Statement of Undisputed Material Facts ("S.F.") ¶ 1, 11, 22.  The participants in the Plan are salaried employees of UTC and certain of its subsidiaries.  *Id.* ¶ 2.  The Plan's named fiduciaries are UTC, which is the Plan Administrator, and the Pension Administration and Investment Committee ("PAIC"), which is a committee comprising certain UTC employees, such as UTC's Chief Financial Officer and UTC's Senior Vice President of Human Resources.  *Id.* ¶¶ 5, 6, 10.  The PAIC delegates certain responsibilities and functions with respect to the Plan

---

[1]   The original Complaint in this case alleged breaches of fiduciary duty against another UTC 401(k) plan, the Represented Employee Savings Plan.  *See* Class Action Compl. ¶ 11 (Dkt. No. 1).  Plaintiffs have since withdrawn their allegations against that plan.

to UTC employees working in the Human Resources Department and the Pension Investments

Group of the Treasury Department.  *Id.* ¶ 8.  From time to time, UTC and the PAIC solicit advice

from outside consultants regarding aspects of the Plan.  *Id.* ¶ 9.

The Plan permits participants to contribute a portion of their earnings each pay period on

a tax-deferred or after-tax basis.  *Id.* ¶ 11.  UTC voluntarily matches a percentage of participant

contributions with UTC common stock.  *Id.* ¶¶ 11, 12.  The assets of the Plan are held in a master

trust by a third-party trustee,[2] and the trust assets are allocated to accounts for the individual Plan

participants.  *Id.* ¶ 16.  Participants direct how the contributions made to their accounts are to be

allocated among the various investment choices available through the Plan.  *Id.* ¶ 22.  The Plan

features both daily valuation, which means that participants' account balances are valued on a

daily basis, and daily transactions, which means that participants' investment changes, if

communicated before the close of business, are effective at the beginning of the next business

day.  *Id.* ¶¶ 23-26.

Fidelity Institutional Retirement Services Company ("Fidelity") performs certain

administrative and recordkeeping services for the Plan.  *Id.* ¶ 27.  Fidelity values the account

balances for all participants and carries out participant transactions with the Plan.  *Id.* ¶ 28.  For

example, Fidelity executes participant requests for allocations and reallocations of contributions

among investment options, switches among investment options, changes in contribution rates,

and distributions of funds from the Plan.  *Id.* ¶¶ 29-31.  Fidelity also is responsible for interacting

with participants and delivering certain information to participants.  *Id.* ¶¶ 29, 33.  Through

Fidelity's call center and NetBenefits website, participants may, around-the-clock, perform or

---

[2]     The Plan's third-party trustee currently is State Street Bank & Trust Co.  Although the same business group has
provided this service to the Plan since 1996, it previously did so under the names of Bankers Trust Co. and, later,
Deutsche Bank Trust Co. Americas.  S.F. ¶¶ 17, 19-21.

request a variety of activities, including accessing account information, changing their contribution rates, switching among investment options, initiating loans, and obtaining mutual fund prospectuses. *Id.* ¶¶ 32, 34, 35. Fidelity previously mailed quarterly statements to participants (and still does on request); it now primarily delivers statements electronically. *Id.* ¶ 36.

Participants in the Plan may choose to invest their funds in a number of investment options. One option is the UTC Common Stock Fund ("UTC Stock Fund" or "Stock Fund"), whose assets consist of UTC common stock and a small amount of cash for liquidity purposes. *Id.* ¶ 44. UTC provides its matching contributions to the Plan in the form of UTC common stock. *Id.* ¶¶ 12, 13. UTC does not make these contributions through the Stock Fund, however, but rather through the separate UTC Employee Stock Ownership Program ("ESOP"). *Id.* ¶ 12. Although participants can transfer their matching contributions out of the ESOP, they cannot direct their own contributions into the ESOP. *Id.* ¶¶ 14, 15.

Plan investment options also include a stable value fund (the Income Fund), which provides participants a specified rate of return based on a guaranteed investment contracts with insurance companies, *id.* ¶ 43, and seven index funds, which are available through managed trust accounts administered by Northern Trust, *id.* ¶¶ 45-47. The index funds are designed to replicate particular market indices and feature relatively low expenses. *Id.* ¶¶ 48-62. The Stock Fund, the ESOP, the Income Fund, and the index funds have together consistently held at least 88% of the Plan's assets (and usually more). *Id.* ¶ 73. None of Plaintiffs' claims target the Income Fund, the ESOP, or the index funds.

Like the vast majority of 401(k) plans, the UTC Plan also offers participants active management through actively managed mutual fund options. *Id.* ¶ 63. The mutual funds

represent a variety of assets classes and investment styles, such as international stocks, small capitalization stocks, growth stocks, and bonds.  *Id.*  ¶¶ 63, 71.  Each of the mutual funds in the Plan discloses the expense ratio of the fund in its prospectus (which is available to participants on request and on Fidelity's website) and through other public sources.  *Id.* ¶¶ 33, 34, 279.  Funds' past investment performance, net of such expenses, also is disclosed.  *Id.* ¶ 281.   In addition to these mutual funds, the Plan offers ten Vanguard "retirement date" funds.  *Id.* ¶¶ 68, 69.  These retirement date funds invest in a mix of underlying index funds, and gradually alter the allocation of assets over time to emphasize the preservation of principal as the specified target retirement date approaches.  *Id.* ¶ 70.

Fidelity has served as the recordkeeper of the Plan since January 1, 1997.  *Id.* ¶ 27.  UTC had been dissatisfied with the quality of service provided by the previous recordkeeper for the Plan.  *Id.* ¶¶ 147, 148.  Before hiring a new recordkeeper, UTC solicited proposals from a number of vendors, evaluated these proposals with the assistance of a consultant, and then negotiated with its top choice, Fidelity, on the terms and price of the recordkeeping contract.  *Id.* ¶¶ 150-66.  The hiring of a new recordkeeper also coincided with the Plan's transition from monthly valuation to daily valuation.  *Id.* ¶ 149.  UTC has been generally pleased with the level and quality of Fidelity's service and therefore rehired Fidelity as the Plan recordkeeper for the years beginning 2000 and 2003.  *Id.* ¶ 172.

From 1997 through 2001, UTC voluntarily subsidized the Plan by paying, with corporate funds, recordkeeping fees owed to Fidelity under the contract.[3]  *Id.* ¶ 167.  In 2002, participants

---

[3]    At certain times from 1997 to 2001, the Plan paid part of the recordkeeping fees or non-recordkeeping administrative fees, but such payments were made with Plan assets not allocated to individual participant accounts. For example, in 2000, the Plan paid part of Fidelity's fee from the trust's forfeiture account.  S.F. ¶ 168.  Also, the Plan occasionally paid for other administrative services using the trust's unallocated ESOP account.  None of these payments affected any individual participant accounts.

began to pay part of Fidelity's fees while UTC paid the remainder.  *Id.* ¶¶ 384, 387.  Since 2005, participants have paid all of Fidelity's recordkeeping fee, while UTC pays Fidelity and other vendors for certain other administrative expenses of the Plan, such as non-discrimination testing, trustee fees, a participant investment advisory and education service (Financial Engines), and the trustee fee for the Stock Fund.  *Id.* ¶¶ 387-89, 393.

Before 1997, the Plan included four investment options—the Stock Fund, the Income Fund, and two index funds.  *Id.* ¶ 40.  UTC added a number of mutual funds as investment options in 1997.  *Id.* ¶¶ 41, 63.  UTC selected the funds in the Plan after investigating various mutual funds that met relevant criteria, meeting with the managers of the funds, and otherwise performing due diligence.  *Id.* ¶¶ 206-31.  Since beginning to include mutual funds in the Plan, UTC has monitored the funds, and at times has replaced and added funds.  *Id.* ¶¶ 64-67, 319-39.

Since 1997 the Plan has grown substantially in both participants and assets.  Enrollment has increased from just over 50,000 participants in 1997 to 72,498 participants in 2006.  *Id.* ¶¶ 37, 38.  Plan assets have nearly doubled, increasing from slightly over $6 billion at the end of 1997 to over $13.6 billion at the end of 2006.  *Id.* ¶¶ 73-82.  In addition, the number and variety of investment options available to participants have increased, *id.* ¶¶ 40-71, and the Plan offers many services that were not available in 1997, such as Fidelity's website, *id.* ¶ 35.

Participants have expressed widespread satisfaction with the operation and structure of the Plan.  *Id.* ¶¶ 99, 100.  Fidelity has provided more services and higher-quality service than its predecessor.  *Id.* ¶ 100.  Many participants have appreciated the wider variety of investment options, particularly the opportunity to invest in actively managed mutual funds as complements to the Plan's passively managed options.  *Id.* ¶¶ 100, 108.  Each of the current investment options has enjoyed positive cumulative returns since it was added to the Plan, and some options have

performed exceptionally well.  *Id.* ¶¶ 358-63, 366-80.  The rate of return on the Stock Fund, for

instance, has averaged over 15% annually (318% cumulatively) from 1997 to 2006.  *Id.* ¶¶ 363-

64.  Not surprisingly, Plaintiffs Taylor and Todd both testified that they were generally pleased

with the performance of their investments in the Plan, and both have remained in the Plan despite

being eligible to roll their assets over to new 401(k) plans or other investment vehicles.  *Id.* ¶ 95.

## II.    <u>Overview of Mutual Funds</u>

Mutual funds offer investors the opportunity to indirectly invest in the stock market in a

diversified manner.  Mutual funds invest in bonds, stocks, or other investment vehicles and they

typically hold a small amount of cash for liquidity purposes.  S.F. ¶¶ 119, 283-90.  Many mutual

funds invest using a specified investment style or in a specified category of assets, such as

growth stocks or stocks of large-capitalization companies, small-capitalization companies, or

foreign companies.  *Id.* ¶ 292.  The mutual fund manager chooses particular investments for the

fund pursuant to the specified investment style or asset category.  *Id.* ¶ 293.  The investors of a

mutual fund are considered shareholders of the fund but are not deemed owners of the

underlying securities held by the fund.  In addition to investment management, mutual funds

provide numerous services to shareholders, including communications with shareholders (*e.g.*,

the creation and distribution of fund prospectuses and responding to shareholder inquiries),

compliance with federal regulations and the fund's own bylaws, and accounting services (*e.g.*,

the valuation of shares on a daily basis and preparation of tax papers).  *Id.* ¶¶ 294, 295.

The Investment Company Act of 1940 (the "'40 Act") and regulations promulgated by

the Securities and Exchange Commission ("SEC") govern the operation of mutual funds.

Among other things, these laws require mutual funds to provide prospectuses to shareholders

containing extensive information about the mutual fund organization, the fees and expenses of

the fund, the fund's investment strategy, investment risks, and the past performance of the fund.

*See* 15 U.S.C. §§ 77j(a), 80a-8(b); 17 C.F.R. § 274.11A; SEC Form N-1A (Ex. 192), *available at* http://www.sec.gov/about/forms/formn-1a.pdf.  The prospectus must identify the fund's total expense ratio and the allocation of the expense ratio among investment management fees, distribution or service fees (also known as "12b-1 fees"), and other administrative expenses.  *See* SEC Form N-1A at 13-14 (Ex. 192).  The distribution fees and other administrative expenses of the fund include expenses incurred by the fund in providing services to shareholders.  *See id.* at 15-17.  For example, mutual funds regularly employ transfer agents to keep shareholder records, process dividend distributions to shareholders, and distribute prospectuses.  S.F. ¶ 237.  Such agents are paid what is known as a "transfer agent fee."  *Id.* ¶ 239.  The investment management fee is paid to the investment advisor of a mutual fund, and the fiduciary duties owed by the adviser to the shareholders require this fee to be reasonable.  *See* 15 U.S.C. § 80a-35; *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 928 (2d Cir. 1982).

A mutual fund may offer multiple share classes to investors, with each class having a different expense ratio.  *See* 17 C.F.R. § 270.18f-3.  The availability of a share class to an investor generally depends on the amount of the anticipated investment.  S.F. ¶ 244.  Within a certain share class, SEC regulations prohibit a mutual fund from charging shareholders more or less than the total expense ratio disclosed for that share class.  *See* 17 C.F.R. § 270.18f-3.

Actively managed mutual funds provide investors the possibility of receiving above-market returns, while also protecting investors through diversification and extensive federal regulation.  S.F. ¶ 293.  For these reasons, the vast majority of large-employer 401(k) plans, including twenty-six of the thirty largest plan sponsors, offer actively managed mutual funds as investment options.  *Id.* ¶¶ 302-04.  In addition, 55% of all 401(k) plan assets nationwide are

held in mutual funds.  *See* Investment Company Institute ("ICI"), 2008 Investment Company Factbook at 91-92 (Ex. 207), *available at* http://www.icifactbook.org/pdf/2008_factbook.pdf.

In a 401(k) plan that includes mutual funds as investment options, the plan trustee is generally the formal shareholder, while the participants whose plan accounts are invested in the mutual funds are the beneficial owners of the shares.  S.F. ¶ 16.  Accordingly, mutual funds in the plan need only keep track of the plan's omnibus account, as opposed to keeping records for the thousands of participants invested in the funds.  *Id.* ¶ 237.  The plan recordkeeper, as the sub-transfer agent for the mutual funds, is responsible for keeping track of each participant's investment in each fund and communicating this information to participants.  *Id.* ¶¶ 237, 238.  Some mutual funds compensate recordkeepers for performing such services for a fund's beneficial shareholders by paying what is known as a "sub-transfer agent fee" out of the fund's expense ratio.  *Id.* ¶ 239.  Mutual funds that do not pay recordkeepers a sub-transfer agent fee are necessarily obtaining the transfer agent services from the recordkeepers for free.

## APPLICABLE LEGAL STANDARDS

### I.     Summary Judgment Standard

UTC is entitled to summary judgment if UTC demonstrates that the undisputed material facts entitle UTC to judgment as a matter of law on Plaintiffs' claims.  *See* Fed. R. Civ. P. 56(c); *Salomon v. Our Lady of Victory Hospital*, 514 F.3d 217, 226 (2d Cir. 2008).  Once UTC satisfies its initial burden of showing the absence of a genuine issue of fact on a necessary element of Plaintiffs' claims, Plaintiffs must point to specific evidence demonstrating that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  In order to create a genuine issue of fact, Plaintiffs "may not rely on conclusory allegations or unsubstantiated speculation" but rather must proffer enough evidence that a reasonable factfinder

could find in their favor.[4] *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005)

(quoting *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)); *see also*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (non-moving party

"must do more than simply show that there is some metaphysical doubt as to the material facts"

to avoid summary judgment).

Even if Plaintiffs raise a genuine issue of fact, the issue must be material in order to

defeat a motion for summary judgment:  "The substantive law governing the case will identify

those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the

suit under the governing law will properly preclude the entry of summary judgment.'"

*Bouboulis v. Transport Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "Factual disputes that are irrelevant or

unnecessary will not be counted."  *Anderson*, 477 U.S. at 248; *see also Demery v. Extebank*

*Deferred Compensation Plan (B)*, 216 F.3d 283, 286 (2d Cir. 2000) ("[T]he mere existence of

factual issues – where those issues are not material to the claims before the court – will not

suffice to defeat a motion for summary judgment.") (quoting *Quarles v. Gen. Motors Corp.*, 758

F.2d 839, 840 (2d Cir. 1985)).

## II.     Relevant ERISA Standards

### A.     Prudence Standard

Section 404(a)(1)(B) of ERISA requires a fiduciary to "discharge his duties with respect

to the plan … with the care, skill, prudence, and diligence under the circumstances then

prevailing that a prudent man acting in a like capacity and familiar with such matters would use

in the conduct of an enterprise of a like character and with like aims .…"  29 U.S.C.

---

[4]     In this ERISA case, the Court would be the trier of fact, as the Court ruled during the Status Conference on July 27, 2007 (Dkt. No. 85).

§ 1104(a)(1)(B).  This objective prudent person standard, which is based on the common law of trusts, evaluates fiduciary actions "according to the standards of others acting in a like capacity and familiar with such matters."  *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984).  Because a fiduciary is held to the standard of a prudent person acting under the circumstances prevailing at that time, the fiduciary's "actions are not to be judged 'from the vantage point of hindsight.'" *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006) (quoting *Katsaros*, 744 F.2d at 279).

ERISA's standard of prudence focuses on the process employed by a fiduciary—not the results achieved.  *See Bussian v. RJR Nabisco Inc.*, 223 F.3d 286, 299 (5th Cir. 2000) ("ERISA's test of prudence is one of conduct, and not a test of performance of the investment."); *Katsaros*, 744 F.2d at 279.  "[A] court must ask whether the fiduciary engaged in a reasoned decision-making process, consistent with that of a prudent man acting in like capacity." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 420 (4th Cir. 2007).  "What the appropriate methods are in a given situation depends on the 'character' and 'aim' of the particular plan and decision at issue and the 'circumstances prevailing' at the time a particular course of action must be investigated and undertaken."  *Bussian*, 223 F.3d at 299 (quoting Section 404(a)(1)(B)).

Importantly, the prudent person standard does not require a fiduciary to make the perfect or optimal decision—merely a careful and well-informed decision:  "[S]o long as the 'prudent person' standard is met, ERISA does not impose a 'duty to take any particular course of action if another approach seems preferable.'"  *Merino*, 452 F.3d at 182 (quoting *Diduck v. Kaszycki & Sons Contractors, Inc.*, 874 F.2d 912, 917 (2d Cir. 1989)).  "The fact that the problem could have been solved by other means does not render [a fiduciary's] decisions imprudent or unreasonable."  *Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 722 (6th Cir. 2000).

Consistent with this focus on conduct, Section 404(a)(1)(B) requires a fiduciary to investigate and evaluate plan investments.  "[T]he court's task is to inquire whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." *Henry v. Champlain Enters., Inc.*, 445 F.3d 610, 618 (2d Cir. 2006); *see also Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983) ("Under ERISA, as well as at common law, courts have focused the inquiry under the 'prudent man' rule on a review of the fiduciary's independent investigation of the merits of a particular investment, rather than on an evaluation of the merits alone."); *United States v. Mason Tenders Dist. Council*, 909 F. Supp. 882, 886 (S.D.N.Y. 1995) (fiduciary required "(1) to employ proper methods to investigate, evaluate and structure the investment; (2) to act in a manner as would others who have a capacity and familiarity with such matters; and (3) to exercise independent judgment when making investment decisions").

The Department of Labor ("DOL") regulations provide that Section 404(a)(1)(B) is satisfied with respect to an "investment or investment course of action" if the fiduciary:

> (i) Has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and
>
> (ii) Has acted accordingly.

29 C.F.R. § 2550.404a-1(b)(1); *see also id.* § 2550.404a-1(b)(2) (defining "appropriate consideration").  By their emphasis on the facts and circumstances prevailing at the time of the fiduciary's action, ERISA Section 404(a)(1)(B) and DOL Regulation 2550.404a-1(b) reflect the view from the common law of trusts that the standard of prudence does not generally give rise to

*per se* rules regarding investment decisions.  *See* Restatement (Third) of Trusts § 90 cmt. f at 308

(2008) ("Specific investments or techniques are not per se prudent or imprudent.").

 While ERISA's standards of prudence thus emphasize process, courts also have

recognized that a fiduciary cannot be held liable for damages under ERISA if a decision made

without adequate consideration is nevertheless objectively prudent:

> I know of no case in which a trustee who has happened—through
> prayer, astrology or just blind luck—to make (or hold) objectively
> prudent investments (*e.g.*, an investment in a highly regarded 'blue
> chip' stock) has been held liable for losses from those investments
> because of his failure to investigate and evaluate beforehand.

*Fink v. Nat'l Savings & Trust Co.*, 772 F.2d 951, 962 (D.C. Cir. 1985) (Scalia, J., dissenting in

part); *accord Bussian*, 223 F.3d at 300; *In re Unisys Savings Plan Litig.*, 173 F.3d 145, 153 (3d

Cir. 1999); *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 919 (8th Cir. 1994).

 Moreover, mere disagreement with an investment does not establish that it is objectively

imprudent; rather, the investment must be sufficiently unsound that no prudent fiduciary would

select the investment.  *Cf. Merino*, 452 F.3d at 182 ("[S]o long as the 'prudent person' standard

is met, ERISA does not impose a duty to take any particular course of action if another approach

seems preferable."); *Flanigan v. Gen. Elec. Co.*, 244 F.3d 78, 86 (2d Cir. 2001) (affirming grant

of summary judgment where fiduciary did not act "irrationally or imprudently" in making an

investment decision); *Katsaros*, 744 F.2d at 279 (finding Section 404(a)(1)(B) violation where

"[a] reasonable investigation would have revealed evidence that the loan was totally unsound");

*Fink*, 772 F.2d at 962 (noting that fiduciary can be liable in damages for "patently unsound"

investment); *Lanka v. O'Higgins*, 810 F. Supp. 379, 387 (N.D.N.Y. 1992) ("This standard [of

prudence] requires that the fiduciary's behavior be measured as against the standards in the

investment industry.").

ERISA's duty of prudence also applies when a fiduciary selects a plan service provider. *See Brock v. Robbins*, 830 F.2d 640, 646 (7th Cir. 1987).  In selecting a service provider, a fiduciary may consider the needs of the plan, solicit and evaluate proposals from potential providers, and select a provider whose level of service, quality of service, and fees meet the plan's needs.  *See Pineiro v. Pension Benefit Guar. Corp.*, 318 F. Supp. 2d 67, 93 (S.D.N.Y. 2003).  As with investment decisions, however, a fiduciary is not liable for damages resulting from the failure to prudently select a service provider unless the provider's compensation is unreasonable.  *See Robbins*, 830 F.2d at 647 (fiduciaries not liable in damages where compensation provided by imprudently made contract was nonetheless reasonable).

B.    <u>Reasonableness Standard</u>

Under ERISA, fees for services rendered for a plan, such as recordkeeping or investment management, may be paid using plan assets, so long as the fees are reasonable.  *See* 29 U.S.C. § 1104(a)(1)(A)(ii) ("[A] fiduciary shall discharge his duties with respect to a plan … for the exclusive purpose of … defraying reasonable expenses of administering a plan."); *id.* § 1103(c) ("[T]he assets of a plan … shall be held for the exclusive purposes of … defraying reasonable expenses of administering the plan.").  ERISA does not require the plan sponsor to subsidize the reasonable fees or expenses of a plan, except to the extent a sponsor has undertaken this obligation in the document establishing and governing the plan.  *See* DOL, Advisory Op. 97-03A (Jan. 23, 1997) (Ex. 193).

The reasonableness of an expense incurred by a plan for a service depends on the prevailing market rates for the service.  *See, e.g.*, *Reich v. Lancaster*, 55 F.3d 1034, 1052 (5th Cir. 1995) (comparing service provider's compensation to that of a predecessor); *Robbins*, 830 F.2d 645, 648 (affirming conclusion of reasonableness where district court relied on expert testimony of what other service providers would have charged); *VanVels v. Betten*, No. 1:06-cv-

15

710, 2007 WL 329048, at *6 (W.D. Mich. Jan. 31, 2007) (Ex. 194) (finding compensation reasonable where provider was "offered and paid market rates for investment services").  Thus, a plan expense is reasonable if it is within the range of what other plans pay, or what other vendors charge, for similar services.  *See I.B.E.W. Local 1448 Health & Welfare Fund v. Thorndyke Int'l, Inc.*, No. 97-cv-5718, 1998 WL 764753, at *4 (E.D. Pa. Oct. 26, 1998) (Ex. 195) (finding compensation reasonable where no evidence showed that commission was "contrary to customary business practices or otherwise unreasonable"); *Wsol v. Fiduciary Mgmt. Assocs.*, No. 99 C 1719, 2000 WL 139463, at *11 (N.D. Ill. Jan. 28, 2000) (Ex. 196) (finding commissions reasonable where industry standard rates were paid).

The standard for reasonableness under ERISA does not require a plan fiduciary to choose the cheapest service provider or investment option.  *See Kouba v. Joyce*, No. 83 C 451, 1987 WL 33370, at *5, *8 (N.D. Ill. Dec. 31, 1987) (Ex. 246) (attorney's contingency fee of $950,116,80 reasonable even though opposing attorney received $93,362.50); Pamela D. Perdue, *Satisfying ERISA's Fiduciary Duty Requirements with Respect to Plan Costs,* 25 J. Pension Plan. & Compliance 1, 9 (1999) (Ex. 197) ("The requirement that fees be reasonable does not mean, of course, that the fiduciary must only or always select those products or vendors with the lowest cost."); *cf. Bussian*, 223 F.3d at 302 n.17 ("Price alone is not a good indicator, one way or the other, of an annuity provider's ability to promote the interests of participants and beneficiaries."). Rather, the amount paid for a service must reflect the quality and quantity of services obtained for the plan.  *See Kouba*, 1987 WL 33370, at *8 (finding attorney's fee reasonable under ERISA in light of the amount of money at stake and attorney's experience and expertise); DOL, Information Letter (July 28, 1998) (Ex. 198), *available at* http://www.dol.gov/ebsa/regs/ILs/il072898.html ("In choosing among potential service

providers, as well as in monitoring and deciding whether to retain a service provider, the trustees must objectively assess the qualifications of the service provider, the quality of the work product, and the reasonableness of the fees charged in light of the services provided.").

In an action for breach of fiduciary duty based on allegedly unreasonable plan fees, a plaintiff must not only establish that the fees were unreasonable but also that they resulted from the fiduciary's failure to comply with the duty of care and prudence (Section 404(a)(1)(B)) or the duty to act for the exclusive purpose of defraying reasonable plan expenses (Section 404(a)(1)(A)).[5]  *See State St. Bank & Trust Co. v. Salovaara*, 326 F.3d 130, 140 (2d Cir. 2003) ("The parties agree that the proper standard of evaluation [under Section 404(a)(1)(A)] is the purpose [of the action], not the result."); *Bussian*, 223 F.3d at 299 ("ERISA's test of prudence is one of conduct ….").  Thus, if a fiduciary diligently investigates a service and honestly determines that the fees associated with the service are reasonable, the fiduciary is not liable under ERISA's fiduciary duty provisions.  *See Kouba*, 1987 WL 33370, at *7 (granting summary judgment to fiduciaries where the evidence showed that they "carefully and prudently determined that the particular fee agreement would be in the Fund's best interests").

## ARGUMENT

### I.   UTC Was Not Imprudent in Offering or Managing the Company Stock Fund (Count I).

The UTC Common Stock Fund (the "Stock Fund") has provided outstanding investment returns during the period at issue.  In fact, since the beginning of 1997, the cumulative return of the Stock Fund has surpassed that of every other investment alternative in the Plan.  S.F. ¶¶ 363-

---

[5]    The same principles apply with respect to a claim under ERISA Section 406 that a fiduciary caused a plan to enter into a service contract that provides for unreasonable compensation.  *See* 29 U.S.C. §§ 1106(a)(1)(C), 1108(b)(2).  The plaintiff must establish that the compensation is unreasonable and that the fiduciary acted with actual or constructive knowledge of this fact.  *See Laborers' Pension Fund v. Arnold*, No. 00-C-4113, 2001 U.S. Dist. LEXIS 2062, at *22-23 (N.D. Ill. Feb. 27, 2001) (Ex. 247); *Kouba*, 1987 WL 33370, at *6-8.

65.  Plaintiffs complain, however, that it should have done slightly better.  Count I of the Second Amended Complaint alleges that UTC breached its fiduciary duties to the Plan by imprudently structuring and operating the Stock Fund.  S.A.C. ¶¶ 41, 42.  In Plaintiffs' view, it is *per se* imprudent for an employer, or at least a large employer, to offer as an investment option a unitized stock fund with a small cash component.  *See* Miller Dep., Ex. 235, at 31:8-11, 32:16-20.  Plaintiffs' contend that it is imprudent because the cash component will dilute the returns on the stock at times when the value of the stock is increasing at a faster rate than the returns on cash investments.  S.A.C. ¶ 38.

Plaintiffs' challenge to the UTC Stock Fund has no merit.  Like many employers that offer their own stock in 401(k) plans, UTC appropriately determined to hold a small amount of cash for liquidity purposes so that participants could trade in and out of the stock fund on the same time basis as other investment options.  Even Plaintiffs' expert conceded that it is "an advantage" in terms of "simplicity" and "consistency" for participants to be able to move between all investment options on the same basis.  S.F. ¶¶ 111-12 (citing Miller Dep., Ex. 235, at 58:16-59:2).  Moreover, UTC achieved the advantages of simplicity and consistency in the Stock Fund while the Fund was achieving an extraordinary 318% rate of return, higher than any of the other investment options available to plan participants.  *Id.* ¶¶ 363-65.

A.    ERISA's Fiduciary Duty Provisions Do Not Prohibit Unitized Stock Funds.

Most companies that offer their own stock in 401(k) plans do so through a unitized stock fund with a cash component.  *Id.* ¶ 116.  This includes other large and sophisticated businesses, such as General Motors, Xerox, and Delta Air Lines,[6] as well as Boeing and Deere, *id.* ¶ 117-18.

---

[6]    A cursory review of so-called "stock drop" cases show the extensive use of unitized stock funds with a cash component.  *See, e.g.*, *Edgar v. Avaya, Inc.*, 503 F.3d 340, 343 (3d Cir. 2007); *DiFelice*, 497 F.3d at 414; *In re Ford Motor Co. ERISA Litig.*, No. 06-11718, 2008 WL 880161, at *3 (E.D. Mich. Mar. 31, 2008) (Ex. 215); *In re Xerox Corp. ERISA Litig.*, 483 F. Supp. 2d 206, 210 (D. Conn. 2007); *In re Gen. Motors ERISA Litig.*, No. 05-71085, 2006

Here, the UTC Stock Fund primarily invests in shares of UTC stock but also holds some cash in the form of a money market mutual fund, in amounts that have generally ranged from 1% to 3% of Fund assets. *Id.* ¶¶ 103, 131-34. A participant in the Stock Fund holds units representing shares in a fund consisting of both UTC stock and the cash component, rather than shares of the UTC stock. *Id.* ¶ 104; *see also* Ex. 242. This type of structure is commonly referred to as a "unitized" stock fund.

The reason for holding cash in the Stock Fund relates to the settlement time for stock transactions – *i.e.*, the time between a sale of stock and receipt of the proceeds. Ordinarily, an individual who sells her shares of stock through a broker does not receive the proceeds until three business days after the sale. S.F. ¶ 105. This is called a T+3 transaction. During this three-day settlement window, the seller is no longer invested in the stock, nor can the seller invest the proceeds elsewhere; she is completely out of the market. *Id.* ¶ 106. Likewise, an individual buying stock does not need to pay the broker until the third day after the stock is purchased, permitting her to hold two investments during the three day window. *Id.* ¶ 105.

A unitized stock fund holds cash in order to provide settlement of participant sales of units of the stock fund in one business day—*i.e.*, on a T+1 basis. *Id.* ¶ 109. When a participant sells her units of the Stock Fund, the Stock Fund has cash available to distribute to the participant the next day, even though the Fund must wait three days to receive the cash from the sale of UTC stock corresponding to the participant's units. *Id.* ¶¶ 105, 107. Thus, a unitized stock fund allows participants to invest in stock without the limited liquidity of ordinary stock ownership. Mutual funds also hold cash for this same reason. *Id.* ¶ 119.

---

WL 897444, at *1 (E.D. Mich. Apr. 6, 2006) (Ex. 216); *In re Cardinal Health ERISA Litig.*, 424 F. Supp. 2d 1002 (S.D. Ohio 2006); *Smith v. Delta Air Lines, Inc.*, 422 F. Supp. 2d 1310, 1320 (N.D. Ga. 2006); *In re Ferro Corp. ERISA Litig.*, 422 F. Supp. 2d 850, 854-55 (N.D. Ohio 2006); *In re Sprint Corp. ERISA Litig.*, 388 F. Supp. 2d 1207, 1215 (D. Kan. 2004).

By providing this transactional liquidity, UTC has created an investment option that operates in the same manner as the other Plan investment options, all of which settle on a one-day basis.  *Id.* ¶ 110.  Accordingly, participants can move funds between any two investment options in the Plan in one business day.  Participants who exit the Stock Fund are not uninvested for the three days following the sale of units of the Fund.  Plaintiffs' expert conceded that this transactional liquidity for an investment option in company stock is "an advantage."  *Id.* ¶¶ 111, 112 (quoting Miller Dep., Ex. 235, at 58:16-59:2).  Implicit in the alternative approach that he advocated is the need to educate participants in the difference between T+1 and T+3 transactions, and the complexity of dealing with transactions that close on a different basis.  *Id.* ¶ 114.  Dealing with that complexity, he conceded, would be "a negative."  *Id.* ¶ 115.

Because a unitized stock fund with a cash component provides a benefit to the Plan, it cannot be a *per se* imprudent structure.  *See Flanigan*, 242 F.3d at 86 (affirming grant of summary judgment where fiduciary did not act "irrationally or imprudently" by making investment intended to further liquidity requirements of the plan).  Moreover, the fact that many other employers offer company stock funds on the same basis as UTC demonstrates that it is not a *per se* imprudent decision.  *See Katsaros*, 744 F.2d at 279; *Lanka*, 810 F. Supp. at 387 ("This standard [of prudence] requires that the fiduciary's behavior be measured as against the standards in the investment industry.").

ERISA encourages companies to offer company stock as one of the investment options in defined contribution plans.  *See DiFelice*, 497 F.3d at 425 ("Congress … has chosen to follow a strong policy and preference in favor of investment in employer stock.") (internal quotation marks omitted).  But neither the statute nor the regulations promulgated by the DOL dictate how a stock fund is to be structured.  In effect, Plaintiffs seek to mandate through ERISA's general

fiduciary duty provisions what Congress and the DOL have chosen not to do and to require the use of a particular structure favored by Plaintiffs' expert, despite the complexity and confusion that it might cause for plan participants.

The standard of prudence, however, requires only that an investment option be structured in a manner reasonably calculated to serve the purposes of the investment and the interests of the plan. *See Henry*, 445 F.3d at 618 ("[T]he court's task is to inquire whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment."). This objective standard does not dictate a single correct decision; rather, if "others acting in a like capacity and familiar with such matters" would arrive at the same conclusion, the decision is prudent. *Katsaros*, 744 F.2d at 279; *see also Hunter*, 220 F.3d at 722 ("The fact that the problem could have been solved by other means does not render [a fiduciary's] decisions imprudent or unreasonable.").

Further, Plaintiffs cannot dispute that UTC considered the characteristics of and alternatives to a unitized stock fund when deciding to employ that approach. UTC internally discussed the possibility of trading stock with the corporate treasury, before it ultimately decided to use cash in order to achieve daily transactional liquidity in the Stock Fund. *Id.* ¶ 123 (citing Moody 3/5/08 Dep., Ex. 113, at 37:9-20). This unrebutted evidence establishes the prudence of UTC's process in evaluating and deciding to employ a unitized stock fund. *See DiFelice*, 497 F.3d at 420 ("[A] court must ask whether the fiduciary engaged in a reasoned decision-making process, consistent with that of a prudent man acting in a like capacity."); *Bunch v. W.R. Grace & Co.*, 532 F. Supp. 2d 283, 290 (D. Mass. 2008) ("[T]he test is not whether [the fiduciary] got

the best possible return on the investment, but whether it considered all relevant factors in deciding the prudence of divesting the investment.").

Plaintiffs' expert, Ross Miller, opines that a unitized stock fund is *per se* imprudent because its performance does not exactly match the performance of the company stock due to the cash holdings of the fund.  *See* Miller Dep. 30-32; *see also* S.A.C. ¶ 36.  Despite the extraordinarily high rate of return achieved by the UTC Stock Fund (a cumulative 318% return over the relevant period), and the lack of any support in the literature for his view (Miller Dep. 118), Plaintiff's expert contends that it was a breach of fiduciary duty for the Plan not to hold company stock directly, which in his view would have achieved yet higher returns.  *See* Miller Dep., Ex. 235, at 31:8-11, 32:16-20, 104:23-105:1; *see also* S.A.C. ¶ 39.  But the proper inquiry under ERISA's fiduciary responsibility provisions does not hinge on Miller's subjective opinion that a non-unitized approach will generate higher returns.  Fiduciary claims fail where there are concededly valid and beneficial reasons to employ different approaches.  *See Merino*, 452 F.3d at 182 ("[S]o long as the 'prudent person' standard is met, ERISA does not impose a duty to take any particular course of action if another approach seems preferable.").  Under such circumstances, ERISA permits fiduciaries to choose the approach that they reasonably conclude works best within the characteristics and requirements of their plan – without fear of second-guessing by plan participants or the courts.

Moreover, Plaintiffs' argument suffers from a myopic focus on rates of return that is inconsistent with ERISA's fiduciary duty provisions.  Although the likely returns of an investment option are an important focus of a fiduciary, they are not the only factor that a fiduciary is permitted to consider.  *See* 29 C.F.R. § 2550.404a-1(b) (identifying the "opportunity for gain (or other return)" as merely one factor to be considered in making investments).  As

Plaintiffs' expert admitted, holding cash in the Stock Fund provided "an advantage"—the benefit of transactional liquidity and uniform settlement times for all Plan investment options.  S.F. ¶¶ 111, 112.  In his own words, the UTC approach avoids "the T+1/T+3 mismatch."  Miller Dep., Ex. 235, at 68:19-20.  This avoids the need to educate participants as to the differences between T+1 and T+3 transactions and avoids the complexity of executing investment changes on different bases.  S.F. ¶¶ 114, 115.

Plaintiffs' expert, who holds a Ph.D. from Harvard in economics and understands T+1 and T+3 transactions, admitted that he was not aware of the extent to which these concepts are familiar to plan participants.  *Id.* ¶¶ 113, 126.  Thus, he was in no position to assess the importance of simplicity and consistency in the operation of the Plan.  But UTC is permitted to consider and value the importance of these benefits in selecting the structure of the Stock Fund.  So long as UTC's conclusion has a rational basis, which it concededly does, Plaintiffs may not later second-guess it.  *See Flanigan*, 242 F.3d at 86.

Finally, Plaintiffs' claim fails for the additional reason that they do not identify any actual alternatives to a unitized stock fund that UTC could have implemented in its fiduciary capacity, as opposed to its sponsor capacity.  Although Miller proposed an alternative where participants directly buy and sell UTC stock through a separate brokerage account in the Plan, he conceded that he knew of no plan that offered company stock in this manner.  S.F. ¶ 124.  Thus, this purely hypothetical alternative is not sufficient to create a genuine issue of fact.[7]  *See In re "Agent*

---

[7]     In any event, it cannot be contested that this third alternative suffers from the same issue that Plaintiffs raise with respect to the Stock Fund—the holding of assets in cash.  In Miller's hypothetical brokerage account, a short-term cash vehicle must be utilized to hold funds that will be used to purchase shares of stock.  This is because when stock is purchased, the funds are not required until three days after the purchase—the opposite of what happens when stock is sold.  S.F. ¶ 105.  During this three day period, all of the funds must sit in a stable, liquid cash investment.  They could not be held in an investment that may decrease in value because the purchaser must supply the requisite cash three days after the purchase, and thus participants would incur liability for any shortfall.  Accordingly, in Miller's hypothetical alternative, participants will earn cash returns for three days when purchasing stock.

*Orange" Prod. Liab. Litig.*, 818 F.2d 187, 193 (2d Cir. 1987) (issue of fact "cannot be

established by mere speculation or idiosyncratic opinion, even if that opinion is held by one who

qualifies as an expert under Fed. R. Evid. 702").  Miller's other suggestion was that the plan

sponsor conduct stock transactions between the plan and the corporate treasury.  *See* Miller Rpt.,

Ex. 129, ¶ 15.  This alternative would require UTC to transact with the Plan in its capacity as a

Plan sponsor and to absorb administrative costs of the Plan, which, as Miller conceded, UTC is

not required to do.  S.F. ¶ 125.  Thus, UTC's decision to not adopt this alternative is a plan

sponsor decision for which UTC cannot incur fiduciary liability.  *See Hughes Aircraft Co. v.

Jacobson*, 525 U.S. 432, 444 (1999) (sponsor decisions regarding the "form or structure" of a

plan do not implicate ERISA's fiduciary duties).

   But even if Miller proposed a viable alternative, a unitized stock fund would not be *per se*

imprudent, as the benefits of a unitized stock fund make it an appropriate choice for fiduciaries.

*See Hunter*, 220 F.3d at 722 ("The fact that the problem could have been solved by other means

does not render [a fiduciary's] decisions imprudent or unreasonable.").  For these reasons, UTC

is entitled to judgment as a matter of law on Plaintiffs' *per se* claim.

   B. <u>UTC Acted Prudently in Setting a Reasonable Cash Level for the Stock Fund.</u>

   Plaintiff's alternative claim in Count I is that UTC breached its fiduciary duties by

holding an excessive amount of cash in the Stock Fund.  This claim requires Plaintiffs to

establish that (1) UTC acted imprudently in setting the cash level of the Stock Fund, and (2) this

imprudent conduct resulted in the holding of an unreasonable amount of cash in the Stock Fund.

*See Roth*, 16 F.3d at 919.  The uncontested facts do not support either contention.

   First, there can be no genuine dispute that throughout the relevant time period, UTC was

aware of the factors relevant to the amount of cash in the Stock Fund and evaluated these factors

when setting the targeted cash level for the Stock Fund.  UTC has been mindful that holding cash

in the Stock Fund may reduce returns when UTC stock is outperforming the returns on the money market fund in which the cash is held.  S.F. ¶¶ 135, 138.  On the other hand, UTC has also known that there are costs and risks if the Stock Fund has insufficient cash to cover participant sales of units of the Stock Fund on any given day.  *Id.* ¶¶ 136, 137.  If there is insufficient cash on a particular day to cover participant sales, the Stock Fund must borrow cash pending the settlement of sales of stock by the Fund.  *Id.* ¶ 121.  These lines of credit for such borrowing, however, are not guaranteed to be available to the Stock Fund, and thus UTC has also considered the possibility that the Stock Fund may not be able to access credit on a day on when cash is needed.  *Id.* ¶¶ 122, 141.

UTC has carefully balanced these factors in monitoring and setting the level of cash in the Stock Fund throughout the relevant time period.  From January 1997 to December 1999, UTC determined that setting the cash level at 1% struck an appropriate balance among the opportunity cost of holding cash, the need for liquidity, and the cost of borrowing.  *Id.* ¶¶ 131, 138-40.  In December 1999, UTC raised the cash level to 4%, anticipating that a potential Y2K crisis could increase liquidity needs, but after no such crisis occurred, UTC immediately lowered the cash level to 1.5% in January 2000.  *Id.* ¶¶ 132, 133.  After the events of September 11, 2001, and the resulting stock market closures, UTC became concerned that similar events could spark a mass exodus from the Stock Fund and thus decided that 3% was an appropriate cash level.  *Id.* ¶¶ 134, 141.  In making this decision, UTC analyzed historical data of returns on UTC Stock and the amount of borrowing by the Fund.  *Id.* ¶¶ 141, 142.

These undisputed facts establish that as a matter of law UTC has acted with care and prudence in monitoring and setting the cash level in the Stock Fund.  UTC has paid attention to the relevant factors and data relating to the cash level and has carefully and deliberately

evaluated these factors and data in determining whether to alter the cash level and setting the cash level.  Accordingly, because UTC has acted prudently in setting the level of cash in the Stock Fund, UTC is entitled to judgment as a matter of law on this claim.  *See DiFelice*, 497 F.3d at 421 (no breach of duty of prudence where fiduciary "engage[d] in a reasoned, prudent decision-making process, using appropriate methods to investigate the merits of retaining … an investment option") (internal quotation marks omitted).

Second, Plaintiffs have no evidence that the specific cash level of the Stock Fund was unreasonable.  Indeed, cash levels of 2% to 3% are common in 401(k) plan employer stock funds, and cash levels of 5% to 6% are common in mutual funds.  S.F. ¶¶ 143, 144.  Plaintiffs have not articulated, much less presented evidence of, what they contend is a reasonable cash level for the Stock Fund.  The Complaint is silent on this issue, and Plaintiffs' expert Miller limited his opinion to Plaintiffs' claim that holding any cash in the Stock Fund is *per se* imprudent.  *See* Miller Dep., Ex. 235, at 31:8-11.  Accordingly, because Plaintiffs have no evidence supporting their allegation that the amount of cash in the Stock Fund was unreasonable, UTC is entitled to judgment as a matter of law on Plaintiffs' alternative claim.[8]  *See Celotex*, 477 U.S. at 322.

---

[8]    Plaintiffs include a single allegation in the S.A.C. that UTC also breached its fiduciary duties to the plan by "charging an excessive management fee in the company stock fund."  S.A.C. ¶ 41(f).  Fidelity charges a two basis point fee for serving as the subtrustee and manager of the Stock Fund, but this fee is limited to $100,000 per year.  *See* Miller Rpt., Ex. 129, ¶ 13.  It is undisputed that UTC pays this management fee each year with corporate funds, not Plan assets.  S.F. ¶ 388.  Accordingly, Plaintiff cannot assert a claim that this allegedly excessive fee caused any loss to the plan for which recourse is available under ERISA.  *See Roth*, 16 F.3d at 920 (fiduciary can prevail on summary judgment "by showing that the plaintiff cannot establish a prima facie case of loss"); *see also Silverman v. Mut. Benefit Life Ins. Co.*, 138 F.3d 98, 104 (2d Cir. 1998) (plaintiff must prove that fiduciary breach caused a loss to the plan).

II.    **UTC Did Not Breach Its Fiduciary Duties by Offering Actively Managed Mutual Funds (Counts VII and VIII).**

Plaintiffs assert two claims for damages relating to the actively managed mutual funds in the Plan.  In Count VIII, Plaintiffs claim that the actively managed mutual funds in the Plan are imprudent investment options.  *See* S.A.C. ¶¶ 99-103.  In Count VII, Plaintiffs claim that the fees and expenses of Plan mutual funds are unreasonably expensive.  *See id.* ¶¶ 91-98.  These claims are not specific to any particular mutual funds in the Plan; rather, Plaintiffs broadly accuse actively managed mutual funds as *per se* imprudent and unreasonably expensive in the context of a large 401(k) plan.  These *per se* claims, and the expert opinions supporting them, however, misapprehend ERISA's standards of prudence and reasonableness.  Under the correct standards, the undisputed facts show that mutual funds are neither *per se* imprudent nor *per se* unreasonably expensive and that, in any event, UTC acted prudently and properly in deciding to include mutual funds in the Plan.  Accordingly, Defendants are entitled to judgment as a matter of law on Count VII and VIII.

A.    The Plan's Actively Managed Mutual Funds Are Not *Per Se* Imprudent.

UTC is entitled to summary judgment on Plaintiffs' prudence claim (Count VIII) if, regardless of UTC's conduct in choosing mutual funds, they were objectively prudent investment options.  *See Roth*, 16 F.3d at 919 ("Even if a trustee failed to conduct an investigation before making a decision, he is insulated from liability if a hypothetical prudent fiduciary would have made the same decision anyway.").  In Count VIII, Plaintiffs broadly assert that offering mutual funds in the Plan was *per se* imprudent because ERISA's fiduciary duty provisions prohibit, at least in a large 401(k) plan, the inclusion of (1) any actively managed investment option, and (2) alternatively, mutual funds.  These sweeping assertions, if accepted, would render the vast majority of 401(k) plans offered by employers nationwide in violation of ERISA.  Plaintiffs'

assertions, however, rely on an incorrect standard of prudence.  Under the correct standard, the

undisputed facts establish that mutual funds are objectively prudent investments in 401(k) plans,

and UTC is therefore entitled to judgment as a matter of law on Count VIII.

> 1.    Offering Actively Managed Investment Options Does Not *Per Se* Violate
> ERISA.

Two of Plaintiffs' experts on the issue of mutual funds (Edward O'Neal and Paul

Kampner) opine that including *any* actively managed investment options in the Plan was *per se*

imprudent:  "Because active management of investment portfolios does not promise heightened

net-of-expense performance for investors, it was not prudent to populate the UTC 401(k) plan

with active investment portfolios."  O'Neal Rpt. ¶ 7 (Ex. 128); *see also* Kampner Rpt. ¶ 33 (Ex.

126).  Plaintiffs' experts contend that instead the Plan should have only offered passively

managed investment options.  *See* S.F. ¶¶ 304, 307 (quoting Kamper Dep. ("In a 401K plan, in

my opinion, it is always a better option to offer index funds .…"); O'Neal Dep. ("[I]t is my

opinion in general active funds do not deserve a place in 401k plans .…")).  These contentions

fail under the correct application of ERISA's prudence standard, which does not require a single

optimal investment outcome, and therefore they do not constitute relevant evidence on this issue.

Accordingly, because these expert opinions do not create an issue of fact, UTC is entitled to

judgment as a matter of law on this claim.

ERISA Section 404(a)(1)(B) employs an objective standard of prudence, and thus

fiduciaries are held "to the standards of others acting in a like capacity and familiar with such

matters." *Katsaros*, 744 F.2d at 279.  Alternative investment courses of actions may each be

prudent:  "[S]o long as the prudent person standard is met, ERISA does not impose a duty to take

any particular course of action if another approach seems preferable." *Merino*, 452 F.3d at 182

(internal quotation marks omitted); *see also Hunter*, 220 F.3d at 722 ("The fact that the problem

could have been solved by other means does not render [a fiduciary's] decisions imprudent or unreasonable.").  Thus, ERISA does not require a fiduciary to divine the optimal investment outcome but rather merely select an investment that other fiduciaries acting under similar circumstances would choose.  *See Flanigan*, 242 F.3d at 86 (affirming grant of summary judgment that fiduciary did not act "irrationally or imprudently" with regard to an investment).

Under this standard, the undisputed facts demonstrate that active management is objectively prudent.  The purpose of active management is to allow investors the opportunity to outperform the relevant market indices (*i.e.*, a passive investment).  S.F. ¶ 293.  Indeed, Plaintiffs' experts concede that certain actively managed funds consistently outperform their market index benchmarks.  *Id.* ¶¶ 311-14.  Thus, the duty of prudence requires care and skill on the part of a fiduciary in selecting an investment for a plan—whether active or passive—but it does not completely prohibit fiduciaries from offering participants the ability to outperform passive investments.  *See* Restatement (Third) of Trusts § 90 cmt. e(1) at 304 ("The usual emphasis on long-term investing, however, does not prevent the use of active management strategies.").

The prudence of active management is further evidenced by the fact that the fiduciaries of the vast majority of large employer 401(k) plans offer actively managed mutual funds in their plans.  At least twenty-six of the thirty largest plan sponsors offered actively managed mutual fund investment options to participants in recent years (2002-06) for which data are reported.  S.F. ¶ 301.  As of September 30, 2007, there were sixteen 401(k) plans, other than the UTC Plan, with assets between $10 billion and $20 billion, and all sixteen plans included actively managed mutual funds.  *Id.* ¶ 302.  In addition, a recent study of over 800 defined contribution 401(k) plans found that 88% of plans offer actively managed domestic equity funds and 84% offer

actively managed international or global equity funds.  *Id.* ¶ 303.  Further, Plaintiffs' expert

Kampner, who contends that active management is imprudent, acknowledged in a 2006

publication that "[a]ctively managed mutual funds have been the investment of choice for most

401(k) plans for many years."  Paul Kampner, "What's Wrong With the 401(k) Industry?,"

*Pensions & Invs.*, at 12 (Nov. 27, 2006) (Ex. 205).  Two of Plaintiffs' other experts admitted that

they recommend active management to their own defined contribution plan clients.  *Id.* ¶¶ 308-

09 (citing Otto and Pomerantz Deps.).  All of this indisputable evidence establishes that "others

acting in a like capacity and familiar with such matters" have also chosen to offer active

management in 401(k) plans.  *Katsaros*, 774 F.2d at 279; *see also Lanka*, 810 F. Supp. at 387

("This standard [of prudence] requires that the fiduciary's behavior be measured as against the

standards in the investment industry.").

　　　　O'Neal's and Kampner's *per se* opinions on active management are premised on the

wrong standard of prudence under ERISA and thus do not preclude summary judgment on

Plaintiffs' claim.  Their opinions hinge on their subjective belief that active management

generally will not outperform passive management, net of fees, in the long-term:  "[M]y opinion

is that over—certainly over any short period of time there may be situations where active

managers outperform what might be an appropriate benchmark for them, but over the long term

that's very, very difficult to do consistently."  S.F. ¶ 314 (quoting O'Neal Dep.).  Even assuming,

*arguendo*, that this view is factually correct,[9] it does not render active management objectively

imprudent.  Prudence simply requires that an investment be reasonably suitable for a Plan—not

that a fiduciary find the optimal investment in every case.  *See Merino*, 452 F.3d at 182; *Hunter*,

---

[9]    Defendants have disclosed expert opinions to refute Plaintiffs' experts, but this Motion does not require the
Court to evaluate the credibility and accuracy of the competing experts' opinions.  Given the relevant standards,
Plaintiffs' claims would fail even if their experts' opinions were sincerely held and factually reliable.

220 F.3d at 722.  By providing participants the opportunity to outperform passive market indices, active management comports with this standard:  "The usual emphasis on long-term investing, however, does not prevent the use of active management strategies."  Restatement (Third) of Trusts § 90 cmt. e(1) at 304.

The *per se* prohibition of active management advocated by Plaintiffs sweeps too broadly because it assumes all actively managed investment funds with a given strategy are fungible. But as Plaintiffs' experts conceded, active managers vary in terms of experience and skill.  S.F. ¶¶ 340-41.  Moreover, it is possible to recognize those active managers who consistently outperform the relevant market index benchmarks.  For instance, the managers of two of the mutual funds offered in the Plan were recently named by business media as stockpicker of the year and stockpicker of the decade.  *Id.* ¶¶ 346-47.  Under Plaintiffs' view, however, fiduciaries would be prohibited from including even these managers' mutual funds in a 401(k) plan.  Such a rule is plainly overbroad.  *See* Restatement (Third) of Trusts, ch. 17, Introductory Note, at 288 ("Knowledge, practices, and experience in the modern investment world have demonstrated that arbitrary restrictions on trust investments are unwarranted and often counterproductive.").

In addition, as O'Neal recognized, there is an ongoing debate among academics and investment professionals as to whether active management provides value over passive management.  S.F. ¶ 310 (citing O'Neal Supp. Rpt., Ex. 132, ¶ 17; Starks Dep., Ex. 118, at 195:16-196:6).  O'Neal's opinion simply reflects his choice of one side of this debate.  The debate, however, does not concern whether active management is "imprudent" *per se*, but rather concerns the frequency, likelihood, or magnitude of superior investment returns by active

management (in the aggregate or the abstract) compared to passive management.[10]  The standard

of prudence does not require a fiduciary—or the courts—to resolve this debate and determine the

optimal or preferable investment.  *See Merino*, 452 F.3d at 182; *Hunter*, 220 F.3d at 722.  Rather,

prudence in this context simply requires active management to be a sound plan investment; under

this standard, the debate shows that there are sound reasons to invest in active management.  *Cf.*

*Katsaros*, 744 F.2d at 279 (finding investment imprudent where it was "totally unsound").

Moreover, the UTC committee overseeing the Plan's investments (the PAIC) knew of and

expressly deliberated over the issues raised by the active/passive debate.  S.F. ¶¶ 232-34; *see*

*also* pp. 49-50, *infra.*

     Plaintiffs' *per se* claim against active management is also inconsistent with the flexible

nature of ERISA's fiduciary duty provisions.  These provisions were intended to encourage

decision-making based on the facts and circumstances present in a particular situation.  *See*

*DiFelice*, 497 F.3d at 420 (holding that the prudence analysis "depends on the character and aim

of the particular plan and decision at issue and the circumstances prevailing at the time");

Restatement (Third) of Trusts § 90 cmt. e(1) at 305 ("[T]he prudent investor rule … does not

classify specific investments or courses of action as prudent or imprudent in the abstract").  Rigid

or *per se* prohibitions that prevent a fiduciary from even considering an entire class of

investments are antithetical to the standard of prudence.  *See id.* § 90 cmt. f at 308 ("Specific

investments or techniques are not per se prudent or imprudent."); *see, e.g.*, *Lanka*, 810 F. Supp.

at 389 (rejecting *per se* imprudence claim).  Such a reading of ERISA would constrict—rather

than promote—fiduciary discretion.  Accordingly, Plaintiffs' *per se* claim against active

management should be rejected.

---

[10]  *See, e.g.*, Robert Kosowski, *et al.*, *Can Mutual Fund "Stars" Really Pick Stocks? New Evidence from a Bootstrap Analysis*, 61 J. Finance 2551, 2594 (2006) (Ex. 248) (finding that the investment performance of the best and worst mutual fund investment managers cannot be explained by sampling variability).

Finally, Plaintiffs' *per se* claim also fails with respect to the UTC Plan because active management was offered to participants along with a number of passively managed options, including seven index funds.  S.F. ¶¶.  UTC disclosed to participants information on the risks and expenses of active management, and noted the distinctions between that approach and passive management.  *Id.* ¶¶ 271-79, 282-90; *e.g.*, Ex. 37, at 17 (communication to participants noting that "mutual funds have a higher investment expense than a passive index fund because investment managers receive higher fees for active management").  Because the prudence of investments is analyzed in the context of the Plan's entire portfolio, active management is certainly not *per se* imprudent where it is a complement to passive management.  *See* 29 C.F.R. § 2550.404a-1(b)(1) (fiduciary should consider "the role the investment or investment course of action plays in … the plan's investment portfolio").  For these reasons, UTC is entitled to judgment as a matter of law on Plaintiffs' claim that active management was *per se* imprudent.

2.    Offering Active Management Through Mutual Funds Does Not *Per Se* Violate ERISA.

As an alternative to their claim that all active management is *per se* imprudent, Plaintiffs assert that UTC committed a fiduciary breach because the actively managed funds are mutual funds, which, Plaintiffs claim, constitute imprudent investment vehicles due to their investment management expenses.  Plaintiffs' experts contend that investment management must only be offered in the form of a managed trust account—a trust that invests in equities but, unlike a mutual fund, is generally not available to the investing public—because in their view such trust accounts are cheaper than mutual funds.  *See* Pomerantz Rebuttal Rpt. ¶ 33 (Ex. 127) ("UTC fiduciaries were imprudent in their selection of high priced actively managed mutual funds rather than lower cost separate management accounts available to them."); Otto Supp. Rpt. ¶ 12 (Ex. 131); Kampner Rebuttal Rpt. ¶ 15 (Ex. 126).  Like their contention that active management is

inherently imprudent, this alternative claim misapprehends ERISA's fiduciary duty provisions. Under the correct standard, the undisputed facts demonstrate that mutual funds are not *per se* imprudent in a 401(k) plan, and therefore Plaintiffs' claim must fail.[11]

Plaintiffs cannot contest that actively managed mutual funds provide certain features that actively managed trust accounts do not. First, mutual funds offer a number of services that are not offered by trust accounts yet may be desirable for 401(k) plans. S.F. ¶¶ 237, 294-96, 349-51, 353. For example, a mutual fund provides disclosures to shareholders; accounting services, including daily valuation of shares; legal protections for shareholders through compliance with federal regulations and the fund's own governance; and underwriting, custodial, and transfer agent services. *Id.* ¶¶ 237, 295, 349-51, 353. In addition, mutual funds are generally more recognizable to participants than trust accounts, which may make participants more likely to participate in a plan. *Id.* ¶ 231; *see also* Advisory Council on Employee Welfare and Pension Benefit Plans, Report of the Working Group on Prudent Investment Process (Nov. 2006) (Ex. 199) (noting testimony that "mutual funds are the easiest investment to understand by participants"). Even Plaintiffs' expert Kampner has acknowledged that mutual funds are "the investment of choice for most 401(k) plans," because "they are well established, widely known and accepted, regulated and easy to use." Paul Kampner, "What's Wrong with the 401(k) Industry?," *Pension & Invs.*, at 12 (Nov. 27, 2006) (Ex. 205) ("Actively managed mutual funds have been the investment of choice for most 401(k) plans for many years."). Furthermore, trust accounts may not offer the diversity of investment styles and strategies available with mutual funds. *Id.* ¶ 356. Considerations relating to participant services, understandability, and flexibility are appropriate for fiduciaries in choosing investment options in a 401(k) plan, in

---

[11]   Notably, several provisions of ERISA and the DOL regulations expressly contemplate the use of mutual funds by employee benefit plans. *See*, *e.g.*, 29 U.S.C. §§ 1002(21)(B), 1101(b)(1); 29 C.F.R. §§ 2509.75-3, 2550.401c-1(e)(1)(i).

which employee participation is voluntary.  *Id.* ¶ 11.  These undisputed facts demonstrate that the choice of mutual funds over managed trust accounts is objectively prudent.  *See Flanigan*, 242 F.3d at 86 (affirming grant of summary judgment that fiduciary did not act "irrationally or imprudently" by making investment intended to further liquidity requirements of the plan).

Moreover, as with active management generally, actively managed mutual funds are pervasive throughout the 401(k) industry, including large plans.  As discussed above, at least twenty-six of the thirty largest 401(k) plan sponsors offer mutual funds in their plans; all sixteen 401(k) plans (besides the UTC Plan) with assets in the range of $10 billion to $20 billion offer mutual funds.  S.F. ¶¶ 301, 302.  In the very year that UTC added mutual fund options to the Plan for the first time, Plaintiffs' expert Kampner observed in a publication that "there has been a strong move toward the use of mutual funds as the primary investment vehicle" for 401(k) plans.  Paul Kampner, "Inevitable Vertical Integration in 401(k)s," *Pensions & Invs.*, at 12 (Mar. 3, 1997) (Ex. 206).[12]  Providing managed trust accounts exclusively, on the other hand, is rare in the 401(k) plan industry, as Kampner conceded in his deposition.  *Id.* ¶ 356.  Thus, "measured as against the standards in the investment industry," the undisputed facts show that providing active management through mutual funds is not *per se* objectively imprudent.  *Lanka,* 810 F. Supp. at 387; *see also Katsaros*, 744 F.2d at 279 (prudence assessed "according to the standards of others acting in a like capacity and familiar with such matters").

In proffering their opinions that mutual funds are *per se* imprudent, Plaintiffs' experts have disregarded the objective standard of prudence.  Steve Pomerantz admitted that he did not consider how other similar fiduciaries have acted under similar circumstances.  S.F. ¶ 315.

---

[12]  *See also* Paul Kampner, "Trends Affecting Benefit Service Providers," *The Inside Edition* (Jan. 26, 2007) (Ex. 233) (observing that "mutual funds became the overwhelming choice of plan sponsors many years ago"); Paul Kampner, "What's Wrong with the 401(k) Industry?," *Pension & Invs.*, at 12 (Nov. 27, 2006) (Ex. 205) ("Actively managed mutual funds have been the investment of choice for most 401(k) plans for many years.").

O'Neal and Kampner likewise failed to account for what fiduciaries have offered in other similar 401(k) plans, even though Kampner testified in his deposition that "historically, investments in 401(k) plans have been pretty much limited to mutual funds." *Id.* ¶ 317. Because their opinions are not based on the objective evidence, they are not germane to the issue of prudence.

Rather, Plaintiffs' experts have transformed their own personal judgments that managed trust accounts are preferable into a mandate that ERISA requires such a structure. But their subjective belief that there is a preferable alternative to mutual funds does not render mutual funds *per se* imprudent. *See Hunter*, 220 F.3d at 722 ("The fact that the problem could have been solved by other means does not render [a fiduciary's] decisions imprudent or unreasonable."). The proper standard of prudence merely requires reasonably appropriate investment decisions—not optimal or perfect decisions. *See Merino*, 452 F.3d at 182 ("[S]o long as the prudent person standard is met, ERISA does not impose a duty to take any particular course of action if another approach seems preferable.") (internal quotation marks omitted); *cf. Fink*, 772 F.2d at 962 (Scalia, J., dissenting in part) (ERISA fiduciary may be liable for "patently unsound" investment).

As with the debate over active and passive management, the Court need not determine as a factual matter whether mutual funds are superior to managed trust accounts. It is sufficient that mutual funds are appropriate investments for 401(k) plans, as the undisputed objective evidence shows. Because Plaintiffs' experts have proffered opinions under a flawed standard of prudence, these opinions do not preclude summary judgment. *See Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."); *Gallus v. Ameriprise Fin., Inc.*, 497 F. Supp. 2d 974, 982-83 (D. Minn. 2007) (in securities law case, comparison between mutual funds

and managed trust accounts was not relevant to legal standard for reasonableness of mutual fund fees and thus did not create issue of fact precluding summary judgment).

For all of these reasons, UTC is entitled to judgment as a matter of law on Plaintiffs' claim that mutual funds are *per se* imprudent under ERISA.

B.    The Plan's Mutual Funds Are Not Unreasonably Expensive.

Count VII of the Complaint asserts a claim for damages on the ground that UTC breached its fiduciary duties by offering mutual funds with unreasonable fees.  Plaintiffs do not challenge any particular mutual fund as having unreasonable fees.  Rather, like Plaintiffs' claim that mutual funds are *per se* imprudent investments, this claim challenges mutual fund expenses as *per se* unreasonable:  "Fees and expenses charged by mutual fund companies for mutual fund products are high and are unreasonable and excessive in the context of a large 401(k) plan, such as the plans operated by Defendants because mutual funds have a cost structure designed for retail investors."  S.A.C. ¶ 94.  Plaintiffs contend that mutual funds are *per se* unreasonably expensive for two reasons:  (1) the existence of allegedly cheaper managed trust accounts, and (2) the fact that some funds make sub-transfer agent payments to Fidelity.

Like Plaintiffs' prudence claim, these *per se* claims are inconsistent with the relevant standard of reasonableness under ERISA.  Plaintiffs can proffer no evidence of facts that are material under the correct standard, and UTC is thus entitled to judgment as a matter of law on Count VII.  *See Robbins*, 830 F.3d at 648 (holding that a fiduciary who imprudently incurs expenses on behalf of a plan is not liable for damages if the expenses are reasonable).

1.    The Existence of Managed Trust Accounts Does Not Render Mutual Fund Expenses *Per Se* Unreasonable.

The first basis for Plaintiffs' claim that mutual fund fees are excessive is the contention that managed trust accounts provide the same investment services as mutual funds at a lower

cost.  *See* S.A.C. ¶ 95 ("Separate accounts, by contrast, have a lower const [*sic*] structure").

Plaintiffs and their experts leap from this supposition to the conclusion that mutual funds bear

inherently excessive fees and are therefore prohibited by ERISA's fiduciary responsibility

provisions.  *See* Pomerantz Rpt. ¶ 2 (Ex. 127) (opining that "typical" mutual fund fees make

them "unsuitable" because they exceed managed trust account fees); O'Neal Rpt. ¶ 24 (Ex. 128)

(opining that managed trust account fees are "typically" lower than fees for similar mutual

funds).  This analytical leap has neither legal nor factual support and thus does not preclude

survive summary judgment.

      First, the allegation that separate accounts are necessarily cheaper than mutual funds,

even assuming its truth, is not the proper focus of the reasonableness inquiry.  The alleged

availability of cheaper investment options does not—by itself—render mutual funds *per se*

unreasonably expensive.  Rather, Plaintiffs must show that the expenses of the Plan's mutual

funds materially exceed the range of what large 401(k) plans generally pay for the same

investment services.  *See Lancaster*, 55 F.3d at 1052 (finding service provider's compensation

unreasonable in view of a predecessor's compensation).  Plaintiffs' experts have not

demonstrated that actively managed separate accounts have set a standard throughout the market

for investment expenses, which was exceeded by the Plan's mutual funds—nor could they,

because mutual funds are pervasive throughout the 401(k) plan industry.  *See Dupree v.*

*Prudential Ins. Co.*, No. 99-8337-Civ., 2007 WL 2263892, at *41 (S.D. Fla. Aug. 7, 2007) (Ex.

213) (concluding that existence of cheaper single-client accounts did not render fees of pooled

funds unreasonable under ERISA where other plans paid the same fees for pooled funds).

Accordingly, these expert opinions are not germane to the reasonableness inquiry.

Second, Plaintiffs' claim that managed trust account fees *per se* establish the unreasonableness of mutual fund fees further suffers from the faulty premise that the services provided by managed trust accounts are equivalent to the services provided by mutual funds. It cannot be disputed that mutual funds provide numerous services to shareholders, such as the mandatory disclosure of relevant information and other shareholder communications, compliance with legal regulations and fiduciary obligations, independent governance, fund accounting, and daily valuation of shares. S.F. ¶¶ 294-95. Managed trust accounts do not provide these services or provide them only at an additional cost. *Id.* ¶ 296.

In cases under the '40 Act, courts have rejected attempts to compare the fees of managed trust accounts to the fees of mutual funds because mutual fund fees pay for services and legal protections that are not provided by managed trust accounts. *See Jones v. Harris Assocs. L.P.*, __ F.3d ___, No. 07-1624, 2008 WL 2080753, at *6 (7th Cir. May 19, 2008) (Ex. 214) (investment advisor's lower fees through managed account structure does not render unreasonable same advisor's higher fees through mutual fund). Indeed, when two of Plaintiffs' experts opined in a '40 Act case that mutual fund fees are excessive when compared to managed trust accounts, *Gallus*, 497 F. Supp. 2d at 981 (noting opinions of Pomerantz and O'Neal), the court disregarded those opinions as immaterial and held that the fees of trust accounts are not relevant to the fees of mutual funds, *id.* at 982-83 (granting summary judgment despite those opinions).

The same reasoning applies no less under ERISA: managed trust accounts are not equivalent investment vehicles to mutual funds. This means that proof of allegedly cheaper trust accounts *by itself* does not create an issue of material fact on whether mutual fund fees are reasonable. *See Kouba*, 1987 WL 33370, at *5, *8 (granting summary judgment to fiduciaries

on grounds that plan attorneys' compensation was reasonable under ERISA despite argument that opposing attorney's compensation, which was less than 10% of the challenged compensation, raised a material issue of fact).

Finally, putting aside the additional services provided by mutual funds, Plaintiffs have no evidence that UTC could have obtained the *same* investment management services it desired through trust accounts at a lower cost—a necessary showing for Plaintiffs' *per se* claim. Plaintiffs' experts concede that active investment management is not a fungible service—*i.e.*, not all active managers are equivalent.  S.F. ¶ 341 (citing Kampner Dep.).  As Pomerantz admitted, even managers in the same category of investment style (*e.g.*, mid-cap growth stocks) assemble different equity portfolios.  *Id.* ¶ 340 (citing Pomerantz Dep.).  In this regard, active investment management is like other professional services, such as legal or medical services, whose providers clearly are not fungible.  The mere availability of a cheaper lawyer, for example, does not suggest, let alone prove, that the fees of higher-priced lawyers are unreasonable.  *See Kouba*, 1987 WL 33370, at *5, *8 (assessing attorney's fee).  Nor could one conclude that a patient had been imprudent in choosing to pay more for a surgeon or oncologist whose experience, credentials, or track record offered the patient more grounds for confidence in the treatment.

Here, when picking mutual funds for the Plan, UTC sought out particular mutual fund companies and active managers with successful track records, stable organizations, and evident sophistication.  *Id.* ¶¶ 342-45.  Moreover, UTC has even inquired whether some of these same fund managers were available through trust accounts, but was told they were only available through their mutual funds.  *Id.* ¶ 348.  Plaintiffs have no evidence that the Plan could have necessarily obtained the same services at a lower cost, and thus their *per se* claim must fail.

2.    Sub-Transfer Agent Fees Do Not *Per Se* Render Mutual Funds
Unreasonably Expensive.

Nor do sub-transfer agent fees paid by some mutual funds necessarily render the

expenses of those mutual funds unreasonable.[13]  The reasonableness of mutual fund expenses is

assessed in light of the market rates for such mutual funds, and the market rates are naturally the

total expenses of mutual funds—*i.e.*, their disclosed expense ratios.  *See VanVels,* 2007 WL

329048, at *6 (determining reasonableness in light of market rates).  Certain mutual funds in the

Plan pay sub-transfer agent fees to Fidelity in return for managing the individual accounts of

each participant invested in each fund and communicating with these participants about the

funds—services the fund would perform itself or procure through another provider outside of a

401(k) plan.  *Id.* ¶¶ 237-39.  The Plan, however, always pays the total expense ratio disclosed in

a mutual fund's prospectus, and the presence of a sub-transfer agent payment does not cause the

Plan to pay more than this stated expense ratio.  S.F. ¶ 255.  In addition, SEC regulations prohibit

a mutual fund from offering an investor an expense ratio that is lower than the fund's disclosed

expense ratio.  *See* 17 C.F.R. § 270.18f-3.  Thus, even if these mutual funds had not made sub-

transfer agent payments, the Plan would not, and could not, have paid less than the funds'

specified expense ratios.  Because sub-transfer agent payments do not affect the total expenses

charged by a fund, the presence of such payments by itself is insufficient to establish

unreasonableness.

Plaintiffs might argue that sub-transfer agent payments are improper because they are

made using Plan assets or from participant accounts.  *See* S.A.C. ¶ 52 (referring to

"'reimbursements'/'kickbacks' Fidelity received from mutual fund investment managers using

---

[13]    Twelve of the mutual funds currently offered through the Plan have not paid sub-transfer agent fees to the
Plan's recordkeeper Fidelity.  S.F. ¶ 251.

the assets of Savings Plan participants and beneficiaries"). This argument is meritless. When

the Plan invests in a mutual fund, the fund or its manager periodically collects the amount of the

fund's disclosed expense ratio from the amount invested by the Plan. S.F. ¶¶ 279, 280, 297.

Once the amount of the expense ratio has been collected from the Plan's investment, the

collected amount is not a Plan asset. *See* 29 U.S.C. § 1101(b) (plan assets do not include assets

of mutual fund company). A mutual fund manager may use the collected amount as she sees fit,

whether as its compensation for investment management services or to pay for other fund

expenses, such as lease payments for office space or utility bills. Like lease or utility payments

made by the fund, the sub-transfer agent fees are paid after the mutual fund has collected its

expenses from the Plan, and they are thus not made by the Plan or with assets of the Plan.

      C.     <u>UTC Prudently Investigated, Evaluated, and Selected the Plan's Mutual Funds.</u>

Plaintiffs' claim requires them to prove not only that the investment options were

imprudent or unreasonably expensive but that their inclusion in the Plan resulted from the failure

to engage in a careful and deliberate selection process. Here, indisputable facts establish that

UTC has acted carefully and diligently when choosing mutual funds for the Plan. UTC

determined the categories of funds to offer in the Plan, thoroughly researched and evaluated

funds within each category, and chose funds based on several criteria. Moreover, UTC took

mutual fund expenses into account when making investment decisions. For this reason alone,

UTC did not breach its fiduciary duties in offering the mutual funds in the Plan and is therefore

entitled to judgment as a matter of law on Counts VII and VIII.

      1.     UTC Acted Prudently in Selecting the Mutual Funds As Investments.

With respect to a fiduciary's investment decisions, "[t]he test of prudence focuses on the

trustee's conduct in investigating, evaluating and making the investment." *Mason Tenders*, 909

F. Supp. at 886. "[T]he court's task is to inquire whether the individual trustees, at the time they

engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment."  *Henry*, 445 F.3d at 618; *see also Laborers Nat'l Pension Fund v. N. Trust Quantitative Advisors*, 173 F.3d 313, 317 (5th Cir. 1999) ("In determining compliance with ERISA's prudent man standard, courts objectively assess whether the fiduciary, at the time of the transaction, utilized proper methods to investigate, evaluate and structure the investment; acted in a manner as would others familiar with such matters; and exercised independent judgment when making investment decisions.") (citing *Katsaros*, 744 F.2d at 279).

Because the goal of an actively managed mutual fund is to outperform the relevant market benchmark, the investigation process for a mutual fund may include a number of criteria and steps.  First, a fiduciary should consider the asset classes and investment styles that the fiduciary seeks to offer through the mutual funds (*e.g.*, small-cap stocks, developing markets). *See* 29 C.F.R. § 2550.404a-1(b)(1)(i) (fiduciary should consider "the role the investment … plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties"); *id.* § 2550.404a-1(b)(2)(ii)(A) (identifying the "composition of the portfolio with regard to diversification" as a factor for consideration).  Once a fiduciary determines the categories of mutual funds to be offered, the fiduciary should research funds falling within each category because mutual funds, even those with similar investment strategies, are not fungible. S.F. ¶¶ 340-41.  Mutual fund managers vary in terms of experience, judgment, skill, and resources, and actively managed mutual funds that employ the same investment strategies may invest in different securities and, as a consequence, may not produce the same returns.  *Id.* ¶ 340.

UTC followed such criteria in choosing mutual funds for the Plan.  Before 1997, the Plan offered four investment options:  the UTC Stock Fund, the Income Fund, and two passively

managed index funds.  *Id.* ¶ 40.  In connection with the transition to daily valuation in 1997,

UTC decided to expand the investment options available to participants in the Plan and, as part

of this expansion, to offer actively managed mutual funds.  *Id.* ¶¶ 211-13.  UTC weighed the

pro's and con's of mutual funds before making that choice, including the issue of cost.  *Id.* ¶ 207;

*see*, *e.g.*, Ex. 223.  Before investigating particular mutual funds, UTC determined the asset

classes and investment styles that should be offered in the Plan in order to maintain a diversified

set of investment options.  *Id.* ¶¶ 214-15, 217-18.

A team of UTC pension investment staff members led by James Moody then researched

mutual funds within these categories that UTC thought would perform well, as determined by the

characteristics of the fund managers, the fund organizations, and the size and historical

performance of the fund.  *Id.* ¶¶ 219-20.  The mutual fund selection team also considered other

factors, such as funds and fund companies that would attract employee participation, the

administrative efficiency of offering certain funds in the Plan, and the ease with which

participants could obtain information about the mutual funds.  *Id.* ¶¶ 219, 228-31.  In a

presentation to the PAIC in July 1996, Moody summarized this selection process.  *Id.* ¶¶ 228-31;

*see* Ex. 73.  During this presentation, Moody recommended ten "preferred funds," managed by

six different mutual fund companies, based on the research conducted by UTC's mutual fund

selection team.  *Id.* ¶ 228.  He identified the key parameters used to evaluate funds and provided

a performance summary of the preferred funds, including each fund's Morningstar rating and

risk adjusted return.  *Id.* ¶ 229.

These uncontroverted facts demonstrate that, in selecting mutual funds for the Plan, UTC

"at the time [it] engaged in the challenged transactions, employed the appropriate methods to

investigate the merits of the investment and to structure the investment."  *Henry*, 445 F.3d at

618.  By identifying relevant criteria and thoroughly investigating, evaluating, and selecting a diversified range of mutual funds pursuant to these criteria, UTC has appropriately considered "those facts and circumstances that … [it] knows or should know are relevant to the particular investment or investment course of action involved," and "[h]as acted accordingly."  29 C.F.R. § 2550.404a-1(b)(1) (identifying steps that a fiduciary may take to comply with Section 404(a)(1)(B)).  Accordingly, UTC is entitled to summary judgment on Plaintiffs' claim relating to the prudence of offering mutual funds as investment options in the Plan.[14]  *See Flanigan*, 242 F.3d at 86 (affirming grant of summary judgment where "the undisputed facts demonstrated that [the fiduciary] employed appropriate methods to investigate and determine the wisdom of the … investment").

> ### 2.  UTC Acted Appropriately in Considering the Expenses of the Plan Mutual Funds.

It also is beyond genuine dispute that UTC considered the expenses of each fund.  In particular, by considering the returns of a mutual fund *net* of its investment management expenses, UTC implicitly accounted for the expenses of that fund.  *Id.* ¶ 227.  As Moody testified:

> Q:  Did the expense ratio of the fund figure into your screens in any other way?
>
> A:  Yes.
>
> Q:  How is that?
>
> A:  Expense ratio impacts the performance of the fund through the return.
>
> Q:  Okay.

---

[14]   Since beginning to offer mutual funds through the Plan, UTC has from time-to-time added to or replaced those funds.  S.F. ¶¶ 64-67.  UTC has investigated and evaluated newly-added mutual funds using the same factors and criteria.  *Id.* ¶¶ 319-39.  Accordingly, UTC has not breached its fiduciary duties with respect to any additional funds in the Plan.

    A:  We were analyzing returns.

Moody 10/16/07 Dep., Ex. 112, at 80:25-81:11.  Moody's former colleague Harsh Bansal

recalled that the UTC staff's investment manager selection process typically considered "what

fees were charged by them."  S.F. ¶ 220 (quoting Bansal Dep.).

    Not only did UTC's diligence analysis encompass expenses of mutual funds, it also took

expenses directly into account in some decisions.  For example, when both of the two Putnam

mutual funds UTC selected offered a choice between a more expensive share class and a less

expensive share class, UTC chose the less expensive share class.  *Id.* ¶¶ 245-48.

    Mutual fund expenses, however, were not the sole criterion for selecting funds for the

Plan.  Instead, based on other factors discussed above, UTC chose mutual funds that seemed best

suited to the Plan's needs, even though other funds with similar investment strategies might (or

might not) have involved smaller expense ratios.  *Id.* ¶¶ 219-20, 229-31.  ERISA, however, does

not mandate that the cheapest investment option or provider be chosen—only that expenses of an

investment option be reasonable.  *See Dupree*, 2007 WL 2263892, at *47 (finding fees of pooled

fund reasonable despite availability of cheaper single client accounts).  So long as fees are

reasonable, fiduciaries may and, in fact must, consider other factors, such as the quality of

investment services provided.  *See id.*; 29 C.F.R. § 2550.404a-1(b)(2) (appropriate consideration

of an investment requires accounting for "the risk of loss and the opportunity for gain (or other

return)").  As a notice published by DOL aptly stated, "[i]n choosing among potential service

providers … the trustees must objectively assess the qualifications of the service provider, the

quality of the work product, and the reasonableness of the fees charged *in light of the services*

*provided*."  DOL, Information Letter (July 28, 1998) (Ex. 198) (emphasis added).  Thus, UTC

acted prudently and for the exclusive purpose of defraying reasonable expenses in considering

mutual funds for the Plan.

Contrary to Plaintiffs' contentions, UTC did not include mutual funds in the Plan based on whether the funds paid sub-transfer agent fees.  As explained above, UTC evaluated and selected mutual funds based on their merits.  *See* pp. 43-45, *supra*.  Indeed, a number of mutual funds offered in the Plan have never made sub-transfer agent payments to Fidelity.  S.F. ¶ 252. Moreover, when UTC was given a choice by Putnam of a more expensive share class that would pay a sub-transfer agent fee to Fidelity, UTC declined.  *Id*. ¶¶ 245-47.  As Moody memorialized in his contemporaneous notes, "Putnam is prepared to provide a rebate of fees to UTC participants or Fidelity but not both …. I think the choice is clear, it must be our employees." *Id.* ¶ 247 (quoting Ex. 72).  Accordingly, it is indisputable that UTC obtained the lower expense ratio for Plan participants by choosing Putnam's Y-class shares.  *Id.* ¶¶ 245-49.

> 3.      In Light of the Undisputed Evidence, Plaintiffs' Allegations Relating to UTC's Selection Process Fail.

As discussed above, Plaintiffs allege that the inclusion of actively managed mutual funds was *per se* imprudent.  As such, Plaintiffs and their experts have largely ignored UTC's process of selecting mutual funds for the Plan.  Although Plaintiffs have made a few allegations concerning UTC's process, these allegations fail in light of the undisputed facts.

First, one of Plaintiffs' experts, Al Otto, has opined that UTC breached its fiduciary duties by failing to create a written Investment Policy Statement ("IPS") for the Plan—a document that is intended to provide guidelines for making investment decisions for the Plan. Otto Rpt. ¶ 43 (Ex. 130); Otto Supp. Rpt. ¶¶ 18, 19 (Ex. 131).  But as Otto conceded in his deposition, neither ERISA nor the DOL regulations requires an IPS.  S.F. ¶ 318; 29 C.F.R. § 2509.94-2.  More importantly, the absence of a written IPS does not establish that UTC failed to carefully evaluate and select investment options for the Plan:  "The focal point of [the] inquiry under ERISA is not whether a fiduciary took adequate notes of its investigation, but whether it

acted with the prudence required of a fiduciary under the prevailing circumstances at the time of

the transaction." *Henry*, 445 F.3d at 620. Given all of the irrefutable evidence that UTC acted

prudently and properly with respect to the selection of funds for the Plan, the lack of a written

IPS by itself does not create a genuine dispute of material fact on this issue. *See White v. Martin*,

286 F. Supp. 2d 1029, 1040 (D. Minn. 2003) ("[Plaintiff's] arguments fail because a statement of

investment policy is not required under ERISA; it is merely one way of fulfilling fiduciary

obligations.").

Second, Otto and another expert, Kampner, have asserted that UTC did not act properly

in selecting Fidelity mutual funds in the Plan. They erroneously contend that because (*a*)

Fidelity's contract for recordkeeping services provides a discount from its base fee if the Plan

invests in Fidelity-affiliated mutual funds and (*b*) UTC subsidized the Plan by paying Fidelity's

fee using corporate funds during the 1997-2001 period, then (*c*) UTC selected three Fidelity

mutual funds for the Plan in order to generate discounts and reduce the company's subsidy to the

Plan. Otto Supp. Rpt. ¶¶ 37-39 (Ex. 131); Kampner Rpt. ¶¶ 14, 25 (Ex. 126). Although

premises (*a*) and (*b*) are true, conclusion (*c*) is contradicted by the facts.

As discussed in Section IV, *infra*, in April 1996, UTC selected Fidelity to become the

Plan's recordkeeper the following year. At the time, UTC had not yet selected any mutual funds

for the Plan. Nonetheless, Fidelity offered to provide certain discounts from its base

recordkeeping fee if the Plan were to invest in any Fidelity-affiliated mutual funds. S.F. ¶ 165.

Such a discount became part of the Fidelity contract with UTC, *id.* ¶ 166, even though UTC

informed Fidelity before signing that the $40 base fee had "[n]ever been directly tied to or

contingent upon offering Fidelity's mutual funds under our Plans." *Id.* ¶ 209. In the same

communication, however, UTC acknowledged that "offering Fidelity's funds represents an

obvious incentive for UTC" and "Fidelity is well positioned to be selected in the likely event that a mutual fund option is added to our Plans." *Id.*

The evidence establishes, however, that the potential discount to the recordkeeping fee (then being paid by UTC) did not motivate UTC's decision to include three Fidelity mutual funds among the ten mutual funds added to the Plan in 1997. As an initial matter, if the discount had motivated the mutual fund selection, UTC would have made Fidelity the *exclusive* mutual fund provider. Instead, UTC included seven other mutual funds. S.F. ¶ 63. More importantly, the UTC personnel who selected mutual funds for the Plan had not been involved with the recordkeeping contract and did not know about its discount provision. *Id.* ¶¶ 223-25. As a result, the possibility that UTC would pay less for the Plan's recordkeeping if Fidelity mutual funds were selected could not, and did not, affect their decisions. Rather, as already discussed, all evidence shows that these employees selected Fidelity funds for the Plan based solely on their merits. *See* pp. 43-45, *supra*. And, due to their merits, those Fidelity funds remain even though the Plan, rather than UTC, now pays the recordkeeping fee and receives the discounts. Otto's and Kampner's speculative assertions of bias by UTC in these selections are therefore unfounded and provide no basis for precluding summary judgment. *See Jeffreys*, 426 F.3d at 554 ("conclusory allegations or unsubstantiated speculation" insufficient to defeat summary judgment).

Finally, Plaintiffs' claims regarding the mutual funds in the Plan are premised on Plaintiffs' beliefs that passive management is necessarily superior to active management and, alternatively, that managed trust accounts are necessarily superior to mutual funds. Although these claims fail, as discussed above, UTC was mindful of issues concerning the value of active management. S.F. ¶¶ 232-34. The PAIC (which oversees investments of UTC's defined

contribution and defined benefit plans) occasionally deliberated over the relative merits of active and passive management, noting the kinds of concerns with active management that Plaintiffs treat as disqualifying.  For example, in 1997, while discussing the investment of the defined benefit plan master trust, the PAIC recognized that "[s]ome research suggest[s] that active managers, in the aggregate, do not add value to portfolios.  …  Committee members engaged in an extensive discussion on the merits of passive versus active management."  S.F. ¶ 233 (quoting Ex. 228).  The PAIC concluded that a mix of both approaches was appropriate.  *Id.*  UTC also expressly deliberated over "[r]easons for mutual funds" and "[c]ons for mutual funds."  S.F. ¶ 207 (citing Ex. 223).  Moreover, UTC was aware of the availability of managed trust accounts as alternatives to mutual funds because the Plan's index funds utilize a managed trust account structure.  *Id.* ¶ 291.  In fact, UTC has asked whether some of its mutual fund managers will serve the Plan using a separate account structure, but was told that those particular managers were not available through this structure.  *Id.* ¶ 348.  Because the UTC fiduciaries were mindful of the issues Plaintiffs cite, their fiduciary decisions should not be second-guessed as supposed breaches of duty.  *See DiFelice*, 497 F.3d at 421 (affirming conclusion of no breach of duty where plaintiff claimed fiduciary should have removed investment option, because fiduciary "engage[d] in a reasoned, prudent decision-making process, using appropriate methods to investigate the merits of retaining … an investment option").

## III.    UTC Did Not Breach Its Fiduciary Duties in Hiring Fidelity As the Plan's Recordkeeper (Count II).

In Count II, Plaintiffs allege that UTC breached its fiduciary duties by allowing the Plan to pay allegedly unreasonable compensation to its recordkeeper, Fidelity.  This claim fails for two independent reasons.  First, undisputed facts demonstrate that UTC exercised care and diligence in hiring (and retaining) Fidelity and determining its compensation.  Second,

undisputed evidence establishes as a matter of law that Fidelity did not receive unreasonable

compensation resulting from the alleged breach of fiduciary duty.  For each of these reasons,

UTC is entitled to judgment as a matter of law on Count II.  *See Robbins*, 830 F.2d at 647

(plaintiff must establish both imprudent conduct and unreasonable compensation to hold

fiduciaries liable for damages).

A.        UTC Acted Prudently in Hiring Fidelity.

In order to prevail on their claim relating to Fidelity's compensation, Plaintiffs must

establish that, in hiring Fidelity, UTC failed to act with "care, skill, prudence, and diligence" or

for the purpose of "defraying reasonable plan expenses."  29 U.S.C. § 1104(a)(1).  Both of these

obligations focus on the fiduciary's conduct, not the results.  *See Salovaara*, 326 F.3d at 140

(Section 404(a)(1)(A)); *Bussian*, 223 F.3d at 299 (Section 404(a)(1)(B)).  In accordance with

these duties, when selecting a service provider, a fiduciary may "consider the Plan's needs,

solicit competing proposals, evaluate them with due care, and select the one that could best serve

the Plan's needs within budgetary constraints."  *Piniero*, 318 F. Supp. 2d at 93.  The undisputed

facts establish that UTC followed all of these procedures carefully, diligently, and for the

purpose of defraying reasonable plan expenses.

First, there can be no genuine dispute that the needs of the Plan and its participants were

paramount during UTC's process of investigating and selecting a recordkeeper.  In 1995, UTC

decided to hire a new Plan recordkeeper for the year beginning 1997, because UTC was

dissatisfied with the level of service from Bankers Trust, the recordkeeper at the time, and UTC

was dubious about the ability of Bankers Trust to adequately serve a plan of this size.  S.F. ¶¶

147-48.  Providing recordkeeping services for a large plan, like the UTC Plan, can be difficult

and expensive, and, as Plaintiffs' expert Otto conceded, there are a limited number of

recordkeepers capable of servicing such a plan.  *Id.* ¶ 193.  As such, the level and quality of

51

service provided by a recordkeeper has been a significant consideration for UTC in making recordkeeping decisions. *Id.* ¶¶ 148, 156, 179.

Second, UTC considered the fees and services of a number of recordkeeping vendors. After deciding in 1995 to solicit bids for the 1997 contract, UTC requested proposals from nine firms. *Id.* ¶ 152. UTC retained consultant Price Waterhouse to help identify candidates and evaluate bids. *Id.* ¶ 150. *See DiFelice*, 497 F.3d at 24 (crediting fiduciaries for having consulted with advisers); *Bunch*, 532 F. Supp. 2d at 19-20 (same), After several firms were removed from consideration—including ones UTC concluded were not capable of performing the requisite services for so large and complex a plan, *id.* ¶¶ 155-56—UTC met with the remaining four vendors to determine whether they could provide the services at a competitive price. *Id.* ¶ 157.

Third, UTC selected Fidelity based on its fees and quality and level of service. UTC's staff concluded that Fidelity would provide quality service at a price competitive to the other vendors: "Fidelity appears to be the clear leader in technology, staff, commitment to the business and future potential. They are price competitive …." *Id.* ¶ 158 (quoting Ex. 28). Consultant Price Waterhouse's "overall impressions [of Fidelity] were extremely favorable," and, given Fidelity's range of services and its technological capabilities, Price Waterhouse concurred with UTC's selection of Fidelity. *Id.* ¶ 159. These undisputed facts show that UTC acted diligently and carefully in investigating recordkeepers and selecting Fidelity. *Cf. Robbins*, 830 F.2d at 648 (noting possible violation of Section 404(a)(1)(B) where fiduciaries contracted to pay a service provider "over $10 million after less than ten minutes discussion and without any study").

When agreeing to Fidelity's compensation, UTC indisputably acted for the purpose of defraying "reasonable plan expenses." 29 U.S.C. § 1104(a)(1)(A). After choosing Fidelity,

UTC negotiated with Fidelity regarding the recordkeeping fee, and the parties ultimately agreed on an annual base fee of $40 per participant for a three-year contract, with discounts from this fee if participants invested through the Plan in Fidelity-affiliated mutual funds.[15]  *Id.* ¶ 164-66. The agreement included a most favored nations clause, obligating Fidelity to lower the Plan's recordkeeping fee if Fidelity lowered its fee for any similar plan.  *Id.* ¶ 170.  As a result of the bidding process and consultant Price Waterhouse's input, UTC was aware of the market price for these services and therefore knew that Fidelity's compensation was commensurate with market rates.  Given these incontrovertible facts, UTC's conduct demonstrated that it was acting for the purpose of defraying reasonable expenses.  *See Salovaara*, 326 F.3d at 140 (Section 404(a)(1)(A) concerned with purpose of fiduciary action).

Undisputed facts also show that UTC acted prudently and properly in retaining Fidelity as the Plan recordkeeper when the original contract expired at the end of 1999, and again when the second contract expired at the end of 2002.  When UTC began to consider an extension of Fidelity's contract beyond 1999, UTC and the Plan participants were generally pleased with Fidelity's services and support.  *Id.* ¶¶ 99-100.  Fidelity, on the other hand, had expressed dissatisfaction to UTC over the initial recordkeeping fee and demanded an increase to $48 per participant.  *Id.* ¶¶ 173-74.  UTC negotiated with Fidelity to lower this base fee to $47 and to include additional discounts against that fee based on reductions in participant phone calls and increased investment in Fidelity-affiliated mutual funds.  *Id.* ¶¶ 179-81.  UTC also checked again with a consultant, who advised UTC that the proposed $47 base fee of was reasonable in light of market rates and the services required by the Plan.  *Id.* ¶¶ 178-79.  Thus, UTC prudently

---

[15]    At the time of this agreement, it was not yet known whether any Fidelity-affiliated mutual funds would be selected for inclusion among the Plan's alternatives.  Later in 1996, UTC decided to include only three Fidelity funds among the ten mutual funds added to the Plan.  S.F. ¶ 63.

determined that Fidelity's services met the needs of the Plan and that its fees for a contract through 2002 were commensurate with market rates.

UTC and its participants remained satisfied with Fidelity's recordkeeping services when UTC began to consider the need for a recordkeeper beyond 2002.  UTC researched and spoke to other recordkeeping vendors and determined that Vanguard was the most suitable vendor to compare to Fidelity at that time.  *Id.* ¶¶ 183-84.  UTC solicited a competing proposal from Vanguard and received a bid that bundled recordkeeping and investment management services and required switching all investment options in the Plan to Vanguard funds.  *Id.* ¶¶ 185-86.  The proposal was analyzed by staff in UTC's Treasury and Human Resource departments.  One of them (a former math teacher with a master's degree in mathematics) recalled that process in his deposition:

> I took the Vanguard quotes, adjusted because I understand the difference between a bundled and an unbundled cost—I'm not trying to compare an apple and an orange—worked with my friends at treasury, UTC treasury and arrived at a conclusion[,] [a]nd I can't quantify it because I don't have the numbers in front of me[,] that we were no worse off and probably better off price-wise, which was not the only component of the decision because quality enters in.  But price-wise, we were fine to remain with Fidelity.

Ex. 104 (at 42-43).  Thus, UTC determined that, when recordkeeping was unbundled from investment management, Vanguard's proposal was more expensive than Fidelity's recordkeeping fee.  Further, UTC considered that a transition to Vanguard would incur substantial expense and disruption for the Plan, because it would require switching all investment options to Vanguard. *Id.* ¶ 186.  UTC therefore decided to extend the contract with Fidelity, but negotiated a reduction of the base fee to $46, along with the same discounts.  *Id.* ¶ 190.  These undisputed facts establish that UTC has complied with its fiduciary obligations in hiring and rehiring Fidelity to provide recordkeeping services for the Plan.

The basis of Plaintiffs' claim that Fidelity's compensation has been unreasonable is that Fidelity has received sub-transfer agent payments from certain mutual funds in the Plan. *See* S.A.C. ¶ 52; Otto Supp. Rpt. ¶ 5 (Ex. 131) (citing such payments as reason why Plan's recordkeeping cost was "excessive").  As explained in Section III.B. below, such payments do not render compensation unreasonable.  In addition, these sub-transfer agent payments cannot serve as the basis for any fiduciary duty liability because UTC acted prudently and properly with respect to such payments.  *See Bussian*, 223 F.3d at 298, 299 (Sections 404(a)(1)(A) and 404(a)(1)(B) require imprudent or improper conduct).

Although Plaintiffs alleged in their original Complaint that UTC was ignorant of sub-transfer agent payments (which Plaintiffs called "revenue sharing"), Plaintiffs withdrew this allegation in the Second Amended Complaint and now allege that UTC was aware of sub-transfer agent fees paid to Fidelity.  *Compare* Compl. Breach Fiduciary Duty ¶ 151(j),(k) (Dkt. No. 1) *with* S.A.C. ¶ 48; *see also* Otto Supp. Rpt. ¶ 9.  Uncontrovered evidence shows that UTC took these payments into account when evaluating and negotiating the recordkeeping proposals and contracts.  For example, in evaluating the vendor bids for the 1997 contract, UTC's consultant specified that Fidelity's rival Vanguard proposed to collect sub-transfer agent payments from mutual funds as part of its recordkeeping compensation.  *Id.* ¶ 243.  During the same due diligence process, UTC learned that another recordkeeper candidate, Bankers Trust, also would seek to collect sub-transfer agent payments from mutual funds in the Plan.  *Id.* ¶ 242.

These undisputed facts demonstrate that UTC acted prudently and for the exclusive purpose of defraying the reasonable expenses of the Plan with respect to Fidelity's compensation, including sub-transfer agent payments to Fidelity.  Accordingly, Plaintiffs' cannot establish a necessary element of their claim—imprudent or improper conduct on the part of

UTC.  *See Salovaara*, 320 F.3d at 140; *Bussian*, 223 F.3d at 298, 299.  UTC is therefore entitled

to judgment as a matter of law on Count II.

      B.    <u>Fidelity's Compensation Is Reasonable.</u>

Count II also fails because Plaintiffs have no evidence that Fidelity's compensation was

unreasonable at any time—a necessary element of Plaintiffs' claim for damages.[16]  *See Robbins*,

830 F.2d at 647.  The reasonableness of fees paid to a service provider depends on the prevailing

market rates for such services.  *See Wsol*, 2000 WL 139463, at *11 (finding expenses reasonable

where they were commensurate with the industry standard rates).  ERISA does not mandate that

a fiduciary select the lowest-cost vendor.  Rather, because cost is not the sole criterion in

selecting a vendor, other factors, such as the level and quality of services, may justify a higher

cost.  *See Kouba*, 1987 WL 33370, at *8 (finding attorney's fee for a litigation reasonable under

ERISA in light of the amount of money at stake and the attorney's expertise and experience).

Applying these legal principles to the undisputed facts requires dismissal of Count II.

First, the only material facts on the issue of reasonableness—the market data obtained by UTC—

demonstrate that Fidelity's compensation was reasonable.  Although Plaintiffs' expert on this

issue opined that Fidelity's compensation was unreasonable, he employs an incorrect standard,

and thus his opinions do not create an issue of material fact.  Second, Plaintiffs' contention that

the sub-transfer agent payments to Fidelity rendered its compensation *per se* unreasonable is

supported by neither the appropriate legal principles nor the undisputed facts in this case.[17]

---

[16]    When a service provider's compensation is objectively reasonable, a fiduciary's failure to fix that compensation through a sufficiently prudent process would support only an action for equitable relief, such as removal or supervision of the fiduciary.  *See Robbins*, 830 F.2d at 647-48.  Because Plaintiffs' claim relating to Fidelity's compensation only seeks damages, not equitable relief, *see* S.A.C. at 13-14, the reasonableness of Fidelity's compensation warrants dismissal of this claim in its entirety.

[17]    From 1997 to 2001, UTC subsidized the Plan by paying Fidelity's base recordkeeping fee.  S.F. ¶ 167.  As a result, Plaintiffs cannot contend that those payments, even if deemed unreasonable, constituted an actionable loss to

1.      The Undisputed Evidence Demonstrates That Fidelity's Compensation
        Was Reasonable.

        a)      The Market Data Obtained by UTC Establish That Fidelity's
                Compensation Was Reasonable.

Reasonableness of compensation is determined in light of what the market generally pays for similar services.  *See Robbins*, 830 F.2d at 645-46 (affirming conclusion of reasonableness where claims processor's rates were commensurate with the rates of other claims processors).  In this case, the *only* evidence relating to the market rates for recordkeeping services is what the other recordkeeping vendors proposed to charge the Plan.  Therefore, this indisputable evidence is dispositive of the issue of reasonableness.

All of the per-participant fee proposals received by UTC for the 1997 contract were greater than or similar to the $40 per-participant base fee ultimately paid to Fidelity.  S.F. ¶¶ 158-61.  For example, Hewitt proposed an annual base fee of $50 per participant, and State Street proposed an annual base fee of $64.80 per participant.  *Id.* ¶¶ 160-61.  These indisputable facts not only establish the reasonableness of Fidelity's recordkeeping fee during the 1997-99 contract term (which UTC paid), they further demonstrate that the base fees paid by participants under the 2000 and 2003 contracts ($47 and $46, less discounts, respectively) were reasonable. *Id.* ¶¶ 181, 192.

The market data obtained by UTC in connection with the 2000 and 2003 contacts further demonstrate the reasonableness of Fidelity's fees under these contracts.  Before UTC entered into the 2000 contract with Fidelity, consultant Price Waterhouse informed UTC that the base fee of $47 comported with then-prevailing market rates.  *Id.* ¶¶ 178-79.  As discussed above, UTC

---

the Plan.  *See* 29 U.S.C. §§ 1109, 1132(a)(2).  Thus, Plaintiffs have no basis to complain about Fidelity's compensation before 2002.

obtained a proposal from Vanguard before hiring Fidelity for the 2003 contract; when compared

on an equivalent-services basis, Vanguard's proposed fee exceeded Fidelity's fee.  *Id.* ¶¶ 187-88.

In addition to the base fees, several vendors who bid on the 1997 contract, including

Fidelity, were proposing to collect sub-transfer agent payments from affiliated and non-affiliated

mutual funds.  *Id.* ¶¶ 242-43.  The sub-transfer agent payments ultimately collected by Fidelity

were similar to these payments.  *Id.* ¶¶ 258-59.  Accordingly, the only relevant evidence of

reasonableness in this case conclusively establishes that Fidelity's recordkeeping compensation,

including both base fees and sub-transfer agent revenue, did not exceed market rates.  *See Van

Vels*, 2007 WL 329048, at *6 (finding reasonable compensation where the "only evidence of

record" showed that market rates were paid).

> b)    Plaintiffs Have No Evidence That Fidelity Received Above-
>        Market Compensation.

Plaintiffs have no evidence to show that the UTC Plan paid to Fidelity fees that exceeded

what comparable plans have paid for similar administrative services.  Although Plaintiffs

proffered an expert on this issue, he did not offer an opinion based on the correct standard of

reasonableness, and therefore his opinion does not preclude summary judgment.  *Cf. Robbins*,

830 F.2d. at 645 (disregarding testimony of plaintiff's expert who despite having more than 25

years of experience in the area had no opinion on reasonableness).  This failure of proof is fatal

to Plaintiffs' claim for damages.  *See Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 56 n.9 (2d

Cir. 2003) (expert's opinion under incorrect legal standard did not preclude summary judgment);

*Gallus*, 497 F. Supp. 2d at 984 (granting summary judgment where expert opinions were not

germane to applicable standard in '40 Act case challenging mutual funds fees).

Plaintiffs' expert Otto opined that Fidelity was overcompensated for the services

provided to the Plan.  *See* Otto Rpt. ¶¶ 38-40 (Ex. 130); Otto Supp. Rpt. ¶ 5 (Ex. 131).  But Otto

did not perform an evaluation under the correct standard of reasonableness—*i.e.*, what other large plans pay for similar recordkeeping services. To the contrary, he admitted during his deposition that he lacks experience with large plans that require the level of service of the UTC Plan. *Id.* ¶¶ 261-63. In an attempt to salvage his opinion, Otto submitted a supplemental report stating that his conclusion is based on "information [he] received from several large plan vendors in 2003 while working on requests for information and proposals for large plans." Otto Supp. Rpt. ¶ 22. This statement made after his deposition is suspect in light of his sworn testimony that he does not have experience working with large plans. *Cf. Raskin v. Wyatt Co.*, 125 F.3d 55, 63 (2d Cir. 1997) ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."). More importantly, however, Otto fails to explain how this information he purportedly received from large plan vendors compares to Fidelity's compensation. *See* Otto Supp. Rpt. ¶ 22. Thus, this conclusory and unsubstantiated opinion is insufficient to create a genuine issue of fact.[18] *See Jeffreys*, 426 F.3d at 554 ("conclusory allegations or unsubstantiated speculation" insufficient to preclude summary judgment); *Cooke v. Williams & Pattis*, No. 3:99-cv-2223, 2002 WL 32509019, at *7 (D. Conn. Aug. 27, 2002) (conclusory opinion of expert does not raise genuine issue of material fact).

Further, Otto ignored or misconstrued the only facts relevant to reasonableness in this case—the bids received by Fidelity from other potential recordkeepers. First, in forming his opinion, Otto did not consider or account for the other proposals for the 1997 contract, such as

---

[18] Otto also claimed to have reviewed the Form 5500s filed on behalf of several large 401(k) plans. *See* Otto Supp. Rpt. ¶ 22 (Ex. 131). However, plans are required to report total compensation for all services on these forms, and the compensation listed on these forms may, and often does, include payments for non-recordkeeping services, which are not at issue in this case. Thus, the aggregate data reported on a Form 5500 are not evidence of the market rates for recordkeeping services.

the proposed $50 and $64.80 per participant fees offered by Hewitt and Bankers Trust.  S.F. ¶¶ 160-61.  Second, Otto mischaracterizes UTC's review of the Vanguard proposal for the 2003 by asserting, without foundation, that UTC failed to adjust the bundled Vanguard bid and thus "compared applies to oranges."  Otto Supp. Rpt. (Ex. 131) at 5.  As already shown, p. 54, *supra*, the facts prove otherwise.

The only specific bases articulated by Otto for his opinion are not material to the proper standard for reasonableness.  First, Otto opined that an annual fee of $40 per participant is the *maximum* reasonable fee because this was the agreed-upon base price between UTC and Fidelity in 1997.  *See* Otto Supp. Rpt. ¶ 22 ("Lastly and most importantly, the FIRSCO contract with UTC was specifically priced at $40 per participant per year[,] a fact which not only supports my conclusion about the cost of recordkeeping but also was a level specifically available to UTC."); *id.* ¶ 28.  This defies both logic and the undisputed facts in this case.  That two parties agree to a contract price does not establish that any amount above the contract price is necessarily unreasonable—especially when the seller was bidding against others to acquire the contract.  Indeed, Fidelity later complained to UTC that this initial fee structure was causing Fidelity to lose money.  In negotiating for the 2000 contract, Fidelity insisted on an increase to $48 (which was later negotiated down to $47).  S.F. ¶¶ 174, 181.

Second, Otto also bases his opinion on his belief that reasonable compensation must be capped by the vendor's cost of providing a service plus a certain percentage of profit.  *Id.* ¶ 268 (citing Otto Dep.).  This "cost-plus" theory of reasonableness, however, directly conflicts with ERISA's standard for reasonableness—*i.e.*, what other 401(k) plans pay for similar services.  *See McLaughlin v. Bendersky, D.D.S.*, 705 F. Supp. 417, 420 (N.D. Ill. 1989) ("[T]he [reasonableness] inquiry must focus not on how much it ultimately cost … to provide those

services, or how much it made in doing so, but rather on how much a prudent ERISA trustee would have determined was reasonable payment for the services ….").  Indeed, Otto's approach would have ERISA regulate service providers like public utilities.  Such a system would require fiduciaries to make speculative determinations regarding a service provider's costs and reasonable profit.  For all of these reasons, Otto's opinion does not create a genuine issue of material fact on reasonableness and therefore does not preclude summary judgment in favor of UTC on Count II.

> 2. The Sub-Transfer Agent Payments to Fidelity Do Not Render Its Compensation *Per Se* Unreasonable.

Plaintiffs and Otto also contend that Fidelity's compensation was *per se* unreasonable because it received sub-transfer agent payments from certain mutual funds in the Plan.  *See* S.A.C. ¶ 52; Otto Supp. Rpt. ¶ 5.  Like Plaintiffs' other *per se* claims, this allegation is fundamentally at odds with the flexible legal standards developed under ERISA:  "Generally, whether compensation is 'reasonable' under sections 408(b)(2) and (c)(2) of [ERISA] depends on the particular facts and circumstances of each case."  29 C.F.R. § 2550.408c-2.  Because there is no basis for finding that sub-transfer agent payments necessarily render compensation unreasonable, UTC is entitled to judgment as a matter of law on this claim.

First, sub-transfer agent fees paid to a recordkeeper are not gratuitous payments.  To the contrary, certain mutual funds provide this compensation to 401(k) recordkeepers for performing certain services that mutual funds must provide or obtain for themselves outside the 401(k) context.  *Id.* ¶¶ 237-39.  Thus, it cannot be validly disputed that sub-transfer agent fees are made in return for reasonable and proper services.[19]  *See Lancaster*, 55 F.3d at 1052 (affirming finding

---

[19]    In fact, mutual funds that do not make sub-transfer agent payments to the recordkeeper are "free riders" that impose some costs on other parties within a 401(k) plan arrangement.

of unreasonable compensation where district court implicitly found that additional work had not been performed for the compensation); Restatement (Third) of Trusts § 88 cmt. b at 257 ("A trustee … may incur expenses that, in the exercise of fiduciary judgment … are reasonable and appropriate in carrying out the purposes of the trust, serving the interests of the beneficiaries, and generally performing the functions and responsibilities of the trusteeship.").

Second, because reasonableness is based on what the market pays for similar services, Plaintiffs' claim is only tenable if the amount of sub-transfer agent payments caused Fidelity's total compensation to exceed market rates. *See Van Vels*, 2007 WL 329048, at *6 (finding reasonable compensation where the "only evidence of record" showed that market rates were paid). It is undisputed that numerous other large 401(k) plan recordkeepers receive sub-transfer agent payments, as evidenced by the proposals that UTC received for the 1997 contract. S.F. ¶¶ 242-43. The consultant Price Waterhouse informed UTC that such payments were commonplace in the 401(k) market. *Id.* ¶ 240.[20] And Plaintiffs have no evidence that the sub-transfer agent payments to Fidelity materially exceeded those to other recordkeepers. To the contrary, the payments to Fidelity were commensurate with what the other recordkeepers bidding on the 1997 contract proposed to collect. *Id.* ¶¶ 240-43, 258-59. Thus, the sub-transfer agent payments to Fidelity did not constitute unreasonable compensation.

## IV.  UTC Did Not Breach Its Fiduciary Duties in Communicating with Participants (Counts III, IV, and V).

In Counts III through V of the Complaint, Plaintiffs allege that UTC made misleading statements to participants regarding Plan fees. Specifically, Count III asserts a claim for damages based on allegedly misleading disclosures of the fees and expenses of the investment

---

[20]    Indeed, Plaintiffs have repeatedly acknowledged the ubiquity of payments between mutual funds and 401(k) plan recordkeepers. *See* Compl. Breach Fiduciary Duty (Dkt. No. 1) ¶¶ 86-98; Pls. Mem. in Supp. of Mot.. for Class Cert. (Dkt. No. 26), at 5 ("Revenue-sharing arrangements are common in the mutual fund and retirement arenas ….).

options in the Plan.  *See* S.A.C. at 14-18.  Count V asserts a claim for damages based on alleged

misrepresentations relating to sub-transfer agent payments made by certain mutual funds to

Fidelity.  *See id.* at 23-25.  Finally, Plaintiffs seek equitable relief in Count IV relating to the

alleged misrepresentations and non-disclosures in Counts III and V.  *See id.* at 19-23.

The undisputed evidence requires that Plaintiffs' claims be dismissed.  First, UTC

accurately disclosed all information relating to Plan fees and expenses that was required to be

disclosed.  Second, the information allegedly misrepresented or undisclosed was not material to

participants.  *See Ballone v. Eastman Kodak Co.*, 109 F.3d 117, 122 (2d Cir. 1997)

(misrepresentation action under ERISA requires proof of materiality).  Third, Plaintiffs have no

evidence that the alleged misrepresentations or non-disclosures caused a loss to the Plan.  *See*

*Silverman v. Mut. Benefit Life Ins. Co.*, 138 F.3d 98, 104 (2d Cir. 1998) (ERISA plaintiff must

establish causation between alleged breach of fiduciary duty and loss to the Plan).  For each of

these reasons, Defendants are entitled to judgment as a matter of law on Counts III through V.

A.     UTC Accurately Disclosed All Required Information Regarding Plan Fees.

1.     UTC Accurately Disclosed the Fees and Expenses of Each Investment
Option.

In Count III and portions of Count IV, Plaintiffs allege that the fees and expenses of Plan

investment options were not clearly disclosed to participants.  *See* S.A.C. ¶¶ 61-63; *id.* 71(a), (c),

(e).  Plaintiffs do not dispute that the total expenses of each investment option were disclosed to

participants but rather contend that participants did not understand how the expenses affected

their accounts.  *See id.*  This contention, however, is belied by the undisputed facts.

As Plaintiffs concede, participants were informed that the Plan's investment options had

associated fees, charges, and expenses.  *See* S.A.C. ¶ 60.  Indeed, participants were told,

"Investment management fees for the mutual funds are charged against the assets and reflected in

63

the funds' value (NAV)."  Ex. 231.  With regard to mutual funds, the Summary Plan Description

and Investment Brochure provided by UTC to participants informed them to examine fund

prospectuses, which disclose expense ratios.  S.F. ¶¶ 277-79.  Fidelity's website for the Plan also

provides participants with ready access to each mutual fund's expense ratio.  S.F. ¶ 34.  As

required by SEC regulations, every mutual fund's prospectus displays its expense ratio in a table

devoted to fees and expenses.  S.F. ¶ 279 (citing Exs. 24-26).[21]  Plaintiffs admit all these facts.

*See* S.A.C. ¶¶ 62, 63(c).  Despite the requirement of Federal Rule of Civil Procedure 9(b) to

plead fraud with particularity, Plaintiffs cannot point to any communication that led participants

to believe their returns would not be affected by the disclosed expense ratios.[22]

Although Plaintiffs allege that participants "would have to perform a complex

mathematical calculation to arrive at the actual amount they, personally, paid in fees and costs,"

S.A.C. ¶ 62, the actual process is simple arithmetic:  a participant need only multiply the amount

of her balance in a mutual fund by the expense ratio to determine the actual expenses paid by her

to that fund, S.F. ¶ 280.  As Plaintiffs themselves acknowledged in a brief seeking class

certification, once participants "obtained the relevant prospectus, the determination of how each

Plan participant['s] account was negatively impacted by the payment of fees and expenses was

formulaic."  Pls. Reply in Supp. of Mot. for Class Cert. (Dkt. No. 95) at 4.[23]  Accordingly, the

---

[21]   Mutual fund expense ratios also are available to the public through various public sources, such as the website of Yahoo Finance.  *See, e.g.*, http://finance.yahoo.com/q/pr?s=FCNTX (visited June 6, 2008) (reporting, under "profile" tab, that the Fidelity Contrafund mutual fund's total expense ratio is 0.89%).

[22]   Plaintiffs allege that the Summary Plan Description ("SPD") told participants that investment fees and expenses could be found Appendix I and that Appendix I failed to contain any fees and expenses.  S.A.C. ¶ 63(e).  Plaintiffs cannot dispute, however, that Appendix I of the SPD contained text that, in turn, expressly referred participants to mutual fund prospectuses for current information on fees and expenses.  Exs. 34-36.  Thus, if any participant believed that Appendix I contained fees and expenses and then actually read Appendix I, the participant would have learned how to obtain fee and expense information.  This statement in the SPD therefore is not materially misleading.

[23]   Plaintiffs contend that UTC should have provided a line-item in participants' quarterly statements showing the fees and expenses affecting the participants' returns on investment options, like the recordkeeping fees deducted

undisputed facts show that investment option expenses were accurately disclosed to participants. On this record, Plaintiffs fall far short of discharging their burden to show evidence of fraudulent and material misrepresentations.

        2.      Plan Communications Were Not Misleading With Respect to Sub-Transfer Agent Fees.

In Count V and portions of Count IV, Plaintiffs allege that the failure to disclose sub-transfer agent payments made by certain mutual funds to Fidelity rendered Plan communications misleading. *See* S.A.C. ¶¶ 79-80; *id.* ¶ 71(b), (d). Specifically, Plaintiffs assert that, because sub-transfer agent payments were allegedly unknown, participants were misled regarding the amount of Fidelity's compensation and the amount of investment management fees paid to mutual funds. *See id.* ¶ 79. These claims fail, however, because UTC was not required to disclose sub-transfer agent payments to participants, and the undisputed facts demonstrate that UTC made no misrepresentations to participants relating to such payments.

In dismissing Plaintiffs' fiduciary duty claim in the original complaint premised on the failure to disclose sub-transfer agent payments, the Court held that ERISA's fiduciary duty provisions do not affirmatively require the disclosure of such payments. Ruling on Defs.' Mot. Dismiss at 9 (Dkt. No. 87).[24] Counts IV and V purport, at least in part, to hold Defendants liable for the failure to disclose the amount of such payments. In Count IV, for example, Plaintiffs seek certain equitable relief that would require the disclosure of the amount of sub-transfer agent

---

from participant accounts. *See* S.A.C. ¶ 63(a), (b). Such a disclosure may itself be misleading because investment option fees are built into the returns of the option itself and are not directly deducted from participant accounts like recordkeeping fees. More importantly, Plaintiffs have not, and cannot, demonstrate how the failure do so led participants to believe their returns were not reduced by investment options.

[24]    *See also Taylor v. United Technologies Corp.*, No. 3:06cv1494 (WWE), 2007 WL 2302284, at *4 (D. Conn. Aug. 9, 2007) (Ex. 217) (reported ruling on motion to dismiss).

payments.  *See* S.A.C. at 21-23.  Accordingly, Counts IV and V must be dismissed insofar as Plaintiffs seek the affirmative disclosure of the amount of sub-transfer agent payments.

Although the Court's ruling left open the claim that UTC allegedly made misrepresentations to participants regarding sub-transfer agent payments, the undisputed evidence refutes this claim.  Plaintiffs do not dispute that participants were correctly informed of the amount of Fidelity's per-participant recordkeeping fee that was deducted from their accounts. *See* S.A.C. ¶ 78.  Before 2002, UTC paid the entire per-participant recordkeeping fee, and thus made no representations to participants about payments to Fidelity by the Plan.  S.F. ¶ 167. From 2002 to 2004, each participant paid $10 per quarter toward Fidelity's fees for administrative services, while UTC continued to pay the amount of fees in excess of $40 per year.  *Id.* ¶ 384.  UTC communicated to participants that their accounts would be charged $10 per quarter for "[a] portion of Fidelity's recordkeeping fee," and this charge was reflected on participants' quarterly and annual account statements.[25]  *Id.* ¶¶ 385-86.  The quarterly charge also appears when participants review their account statements online through Fidelity's website.  *Id.* ¶ 398.  In 2005, participants began paying all of Fidelity's recordkeeping fee, and UTC told participants that their accounts would now be charged the actual per-participant recordkeeping fee, which fluctuates each quarter due to discounts.  *Id.* ¶¶ 393-95.  The charge to each participant is shown on the participants' account statements.  *Id.* ¶ 396.  Thus, for example, Plaintiff Conlin was informed that his account was charged $8.21 in such fees during the third-

---

[25]   Between 2002 and 2004, discounts to Fidelity's base per-participant recordkeeping fee caused the fee to fall below $10 per quarter but participant accounts were nonetheless charged $10 per quarter.  S.F. ¶ 390.  This overcharge resulted in the Plan inadvertently paying for legitimate, non-recordkeeping services provided by Fidelity (*e.g.*, non-discrimination testing) that UTC had intended to continue to subsidize with corporate funds.  This did not overcompensate Fidelity (as Plaintiffs contend) but rather decreased the amount of UTC's subsidy.  In any event, when these facts came to UTC's attention, UTC used corporate funds to pay the Plan's entire recordkeeping expense for one quarter (*i.e.*, participant accounts were not charged for this quarter).  *Id.* ¶ 392.  During this time, participants were never charged more than the $10 per quarter fee that they were told would be charged, and the entire $10 fee was used only to pay legitimate Plan expenses.  *Id.* ¶ 391.

quarter of 2006.  Ex. 83.  None of these statements represented that the per-participant

recordkeeping fee constituted all of Fidelity's compensation or that Fidelity did not receive other

compensation relating to the Plan.

Moreover, as discussed above, Plaintiffs do not dispute that the total expense ratio of

each mutual fund was disclosed to participants.  *See* S.A.C. ¶ 62; S.F. ¶¶ 279, 299.  But none of

these communications represented that the entire expense ratio would be used to compensate the

mutual fund manager for investment management, rather than disbursed for other services.  Such

a representation would make little sense, since the fees collected by a mutual fund are used for a

number of expenses not directly related to investment management.  S.F. ¶¶ 295, 298.  Indeed,

all prospectuses must disclose the portions of the total expenses used for investment

management, distribution services (12b-1 fees), and other administrative fees.  *See* SEC Form N-

1A (Ex. 192), available at http://www.sec.gov/about/forms/formn-1a.pdf.  Further, some mutual

fund prospectuses expressly disclose that some money collected as part of the expense ratio will

be paid to other firms for sub-transfer agency fees.  For example, the First Eagle mutual fund's

2006 prospectus stated:  "The largest of these ['other'] expenses were fees paid … to parties

providing … services as sub-transfer agents in connection with maintaining omnibus and other

'street name' shareholder accounts with the Fund."  Ex. 24.[26]  Thus, these undisputed facts show

that UTC made no misleading communications to participants regarding sub-transfer agent

payments.

B.    The Allegedly Misrepresented or Undisclosed Information Was Not Material.

Counts III through V also fail because the allegedly misleading communications or non-

disclosures were not material.  *See Ballone*, 109 F.3d at 122 (misrepresentation only actionable

---

[26]    *See also* Ex. 24 (additional text in the First Eagle prospectus discloses that the mutual fund may pay sub-
transfer agency and other "revenue sharing" payments from money collected pursuant to the expense ratio).

under ERISA if it is material).  A misrepresentation is material if there is a "substantial

likelihood that it would mislead a reasonable employee in making an adequately informed

decision."  *Mullins v. Pfizer, Inc.*, 23 F.3d 663, 669 (2d Cir. 1994).  All of the evidence on this

issue establishes that the allegedly misrepresented or undisclosed information did not affect

participant actions.

> 1.    Investment Fund Expenses Were Admittedly Immaterial to Plaintiffs.

Every one of the named Plaintiffs testified that he did not consider expense ratios

important in choosing the funds in which to invest.  S.F. ¶¶ 400-02.  Rather, the Plaintiffs

testified that the most significant information to them is investment returns net of fees, and this

information is concededly disclosed.  *Id.*  Given this undisputed evidence, the amounts of

expenses collected by mutual funds, or how those amounts were disbursed by mutual fund

managers, were not material to participants.  Accordingly, Defendants are entitled to judgment as

a matter of law on Count III and those portions of Count IV relating to investment option

expenses (S.A.C. ¶ 71(a), (c), (e)).

> 2.    Sub-Transfer Agent Payments Are Immaterial to Investors.

Information regarding sub-transfer agent payments was also immaterial to participants.

As explained above, UTC communicates to participants the total expense ratio of each mutual

fund in the Plan.  S.F. ¶¶ 279, 297-98.  Sub-transfer agent payments are made (if at all) using a

portion of a mutual fund's total expense ratio, and therefore the existence of such a payment does

not increase the expenses paid by a participant to invest in a particular fund.  *Id.* ¶¶ 249, 255,

300.  For example, if a mutual fund has an expense ratio of 1.00%, the participants invested in

that fund will pay 1% of their balances in the fund for expenses, whether or not the fund pays

some portion of the 1% fee to Fidelity as the Plan's recordkeeper.  In this regard, sub-transfer

agent fees are no different than other overhead and operating costs of a mutual fund.  As courts

have recognized in non-401(k) investment contexts, because such payments by mutual funds do not affect either the expenses borne by investors or the investment returns earned by the investors, an objectively reasonable investor would not consider them material.  *See In re Smith Barney Fund Transfer Agent Litig.*, No. 05 Civ. 7583, 2007 WL 2809600, at *3 (S.D.N.Y. Sept. 26, 2007) ("The allocation of—or motivation behind—the fee arrangement is immaterial to a decision to purchase fund shares because it could have no effect on share price.") (internal quotation marks omitted).

Applying this reasoning, courts in securities cases have held information about how a fund allocates its fee to be immaterial as a matter of law:

> Where the total amount of fees paid by a mutual fund for various services is disclosed, other information about the fees, such as their allocation or the transfer agent's profit margin, is not material .…
> An individual who knows the amount of fees paid by a fund can compare it to its competitors in deciding whether to invest .…
> This is because it is the amount of fees, not their allocation or a transfer agent's profit margin, that is relevant to the price and value of the funds .…

*Id.* (citations omitted); *see also In re Merrill Lynch Inv. Mgmt. Funds Secs. Litig.*, 434 F. Supp. 2d 233, 238 (S.D.N.Y. 2006) ("Defendants disclosed the fees and commissions charged to shareholders.  The precise allocation of those fees is not material information under the securities laws."); *In re Morgan Stanley & Van Kampen Mut. Fund Secs. Litig.*, No. 03 Civ. 8208, 2006 WL 1008138, at *9 (S.D.N.Y. Apr. 18, 2006) ("The allocation of the fees is immaterial, because it could have no effect on share price.").  In addition, the SEC has not required the disclosure of transfer agent payments by mutual funds.  *See* SEC Form N-1A at 13-14 (Ex. 192), *available at* http://www.sec.gov/about/forms/formn-1a.pdf.   There is no principled reason why this information should be immaterial to a mutual fund investor in the retail marketplace yet material to a participant investing through a 401(k) plan.

Plaintiffs may argue that sub-transfer agent payments are material because a reasonable participant might not invest in a mutual fund if the participant knows that not all of the fund's expenses are used for investment management.  But this argument ignores common sense.  Mutual funds compete on performance and total cost; reasonable participants will determine whether the total cost of a mutual fund is justified by its performance, regardless of how the mutual fund uses its expenses.  Moreover, by Plaintiffs' logic, participants are entitled to know not just the amount of sub-transfer agent payments, but all expenses of a mutual fund that are not directly used for investment management.  Neither ERISA nor the securities laws imposes such a requirement.

In effect, Plaintiffs contend that ERISA fiduciaries have an uncodified duty to disclose to participants anything that a participant might want to know.  The Seventh Circuit recently rejected a similar contention:

> Thus the case boils down to an argument that an ERISA fiduciary has a duty to disclose, directly to a pension plan's participants, even non-material information that may affect the participants for reasons unrelated to the value of the investment. … [T]he materiality requirement entitles fiduciaries to limit their disclosures and advice to those facts that concern real economic values.

*Nelson v. Hodowal*, 512 F.3d 347, 350-51 (7th Cir. 2008).

Not surprisingly, Plaintiffs have adduced no evidence in this case on whether a reasonable participant would consider sub-transfer agent fees important.  Indeed, the named Plaintiffs all testified that they do not consider the expense ratio of mutual funds at all.  S.F. ¶¶ 400-02.  It follows, therefore, that they do not consider sub-transfer agent fees, which are merely a portion of the expense ratio, to be material.  Accordingly, the portions of Count IV relating to the disclosure of such payments and Count V in its entirety must be dismissed.

C.    Plaintiffs Cannot Establish That the Alleged Misrepresentations and Non-Disclosures Caused a Loss to the Plans.

Plaintiffs' misrepresentation claims also fail because the undisputed facts establish that participants did not detrimentally rely on any of the alleged misrepresentations.  A breach of fiduciary duty claim requires proof that the alleged breach caused a loss to the plan.  *See Silverman*, 138 F.3d at 104 (plaintiff must establish a causal link between alleged breach of fiduciary duty and loss to the plan).  The Court already has recognized this rule in its decision on the motion to dismiss in this case:  "A fiduciary may only be liable for losses that would not have occurred but for the fiduciary's breach."  Dkt. No. 87, slip op. at 9 (citing *Silverman*, 138 F.3d at 105)).[27]

None of the named Plaintiffs in this case testified that the allegedly undisclosed and misrepresented information about fees and expenses of investment options actually affected their actions with respect to the Plan.  S.F. ¶¶ 400-02.  To the contrary, they generally testified that they chose investments based on net returns and other considerations.  *Id*.  Moreover, Plaintiffs have no evidence that the alleged misrepresentations or non-disclosures affected the actions of any other participant in the Plan.  Accordingly, UTC is entitled to judgment as a matter of law on Counts III through V.

## V.    UTC Did Not Breach Its Fiduciary Duties by Failing to Capture Float (Count VI).

In Count VI of the Complaint, Plaintiffs allege that UTC breached its fiduciary duties by failing to capture "float" for the Plan.  *See* S.A.C. at 26-27.  The term "float" refers to interest earned by Plan assets held briefly in cash-equivalent accounts (*e.g.*, money market funds) while such assets are in the process of being contributed from UTC payrolls to the Plan or being disbursed to individual participants as distributions.  S.F. ¶ 407.  Although ERISA does not

---

[27]    *See also Taylor*, 2007 WL 2302284, at *5 (Ex. 217) (reported ruling on decision).

prohibit retention of float *per se* by a plan trustee, *see* DOL, Field Assistance Bulletin 2002-3 (Ex. 211) (recognizing that fiduciaries may agree to allow vendors to retain float as compensation), all of the material facts on this issue refute Plaintiffs' allegation because float is not retained by the Plan's vendors, but is instead used for the benefit of the Plan.

As Moody testified, UTC, Fidelity, and the Plan's trustee (then Bankers Trust, and now State Street) agreed in 1996 to procedures whereby any float earned would be paid into the Plan trust and used for the Plan's benefit.  S.F. ¶¶ 417-18.  Pursuant to these procedures, the float earned on contributions and distributions have actually been paid to the Plan trust since that time. *Id.* ¶¶ 419-21, 427.  The value of the interest earned on a contribution by a participant is deposited into that participant's account along with the contribution, and the value of the interest earned by distributions to participants is deposited periodically into the Plan trust by Fidelity. *Id.*[28]  Thus, it is undisputed that during the period at issue neither Fidelity nor the trustee has retained float or received any benefit from such float generated by Plan assets.

Plaintiffs have no evidence to support a contrary conclusion.  Indeed, in his February 2008 report, Plaintiffs' expert Otto based his opinion on float on "the lack of evidence of any discussion on the topic of float in any fee negotiations."  Otto Supp. Rpt. (Ex. 131) ¶ 21. Apparently, Otto did not review all the business records on this topic, and he opined without the benefit of Moody's later testimony on this topic.  *See* S.F. ¶¶ 420, 422; *e.g.*, Ex. 72 (at -898).  In his earlier November 2007 report (Ex. 130), Otto cited a 1983 contract that he construed to allow the Plan's trustee to keep the interest earned on contributions and distributions.  S.F. ¶ 413.  In fact, that 1983 document is a declaration of trust to establish a commingled investment fund for

---

[28]     Under the terms of the document establishing and governing the Plan, individual participants themselves are not entitled to interest earned by a distribution between its valuation date and its receipt by the participant.  S.F. ¶¶ 425-26.

potential Bankers Trust clients; it is *not* the trust agreement for the Plan and is not even signed by

UTC.  *Id*. ¶ 414.  (By coincidence, however, the actual 1989 trust agreement for the Plan has a

similar provision authorizing short-term cash investment by the trustee.  *Id.* ¶ 415.)  In any event,

given the clear evidence on the treatment of float since 1996, a contract provision *permitting* (but

not requiring) different treatment of float does not create a genuine factual dispute about the

disposition of float during the period in question.  Because Plaintiffs' claim regarding float has

no factual support, UTC is entitled to judgment as a matter of law on Count VI.

## VI.   ERISA's Statute of Limitations Bars Counts I, VII, and VIII.

Independent of their lack of merit, Plaintiffs' central claims are time-barred by the statute

of limitations codified in ERISA Section 413 for breach of fiduciary duty claims.  *See* 29 U.S.C.

§ 1113; *Young v. Gen. Motors Inv. Mgmt. Corp.*, __ F. Supp. 2d __, No. 07-cv-1994, 2008 WL

1971544, at *2 (S.D.N.Y. Mar. 24, 2008) (Ex. 200) (dismissing claims).  Where, as here, the

factual circumstances that give rise to the complaint were clearly disclosed in Plan

communications, giving participants actual knowledge of the relevant facts, a cause of action

accrues that must be brought within three years. 29 U.S.C. § 1113.

In this case, Plaintiffs filed suit in September 2006, challenging decisions concerning the

Plan made long before September 2003.  Specifically, as discussed above, Plaintiffs complain

that UTC should not have added any actively managed mutual funds to the Plan's investment

options; those additions occurred in 1997.  S.F. ¶ 63.  Also, Plaintiffs complain that the UTC

Stock Fund should not have held cash; that fund has done so since daily valuation began in 1997.

*Id.* ¶ 131.  Finally, Plaintiffs complain that mutual funds' expenses are inherently excessive for

large 401(k) plans; the fee structures of mutual funds were established and communicated to

participants well before September 2003.

None of Plaintiffs' contentions stem from circumstances that could be said to have been concealed.  Instead, the presence and nature of the challenged investment alternatives have been obvious since 1997, and mutual funds' expense ratios are readily available and plainly disclosed to investing participants.  Given Plaintiffs' *per se* objections, which do not depend on any nuanced facts about the investment alternatives, the factual circumstances giving rise to these claims were open and notorious long before September 2003.

A.   <u>The Applicable Statute Of Limitations For Plaintiffs' Breach of Fiduciary Duty Claims Is Three Years.</u>

Section 413 provides, in pertinent part, that actions alleging breaches of fiduciary duty must be brought within three years of "the earliest date on which the plaintiff had actual knowledge of the breach or violation."  29 U.S.C. § 1113.  The Second Circuit has held that a plaintiff has such actual knowledge when he or she has knowledge of the "material facts necessary to understand that an ERISA fiduciary has breached his or her duty."  *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 193 (2d Cir. 2001).  The plaintiff, however, "need not have knowledge of the relevant law."  *Id.*  Moreover, "where the alleged breach stems from a transaction that a plaintiff claims is 'inherently a statutory breach of fiduciary duty,' knowledge of the transaction 'standing alone' may be sufficient to trigger the obligation to file suit."  *Young*, 2008 WL 1971544, at *2 (quoting *Caputo*, 267 F.3d at 193) (dismissing time-barred ERISA challenge to 401(k) plan investments); *accord Chao v. Emerald Capital Mgmt., Ltd.*, No. 01-CV-6356T, 2006 WL 2620055, at *6 (W.D.N.Y. Sept. 13, 2006) (Ex. 201) ("[I]n cases where the transaction is facially illegal, awareness of the occurrence of the transaction itself does constitute knowledge of facts necessary to understand that breach of a fiduciary duty occurred."); *Brown v. Am. Life Holdings, Inc.*, 190 F.3d 856, 859 (8th Cir. 1999) ("[I]f the fiduciary made an illegal investment … knowledge of the investment would be actual knowledge of the breach.").

In determining whether a plaintiff had actual knowledge for purposes of ERISA's statute of limitations, "this Circuit has focused on whether the documents provided to plan participants sufficiently disclosed the alleged breach of fiduciary duty." *Young*, 2008 WL 1971544, at *2 n.3 (citing *Frommert v. Conkright*, 433 F.3d 254, 272 (2d Cir. 2006)).  Section 413 does not "require proof that the individual Plaintiffs actually saw or read the [plan] documents" in question.  *Id.* This is because "[a]ny interpretation of the term 'actual knowledge' that would allow a participant to disregard information clearly provided to him/her would effectively provide an end run around ERISA's limitations requirement."  *Id.*; *accord Edes v. Verizon Commc'ns, Inc.*, 417 F.3d 133, 142 (1st Cir. 2005) ("Congress [did not intend] the actual knowledge requirement to excuse willful blindness by a plaintiff.").  Thus, a plaintiff is deemed to have actual knowledge of all facts adequately disclosed in plan communications.

Section 413 creates an exception to the three year limitations period in "the case of fraud or concealment" under which a plaintiff may bring suit within six years of the discovery of a fiduciary breach.  *See* 29 U.S.C. § 1113.  This "exception effectively tolls the statute of limitations until the plaintiff in the exercise of reasonable diligence should have discovered the alleged fraud or concealment."  *Burgin v. Gen. Motors Corp.*, No. 04-CV-503S, 2006 WL 469355, at *4 (W.D.N.Y. Feb. 26, 2006) (Ex. 202) (internal quotation marks omitted).  The exception, however, applies only in cases where a fiduciary "(1) breached its duty by making a knowing misrepresentation or omission of a material fact … or (2) engaged in acts to hinder the discovery of a breach of fiduciary duty."  *Caputo*, 267 F.3d at 190.[29]  As explained below, neither circumstance exists here.

---

[29]    A plaintiff bears the burden of proving "fraud or concealment" triggering this exception.  *Cf. City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 461 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 204 F.3d 43 (2d Cir. 2000); *Connors v. Beth Energy Mines, Inc.*, 920 F.2d 205, 211 (3d Cir. 1990) ("The burden of proving fraud or concealment, whether intentional or not, rests upon the party making the claim."); *Cent.*

B.      Count VIII Is Time-Barred.

In Count VIII, Plaintiffs allege that Defendants breached their duty to select prudent

investment options "by including with the Savings Plan actively managed mutual funds."  S.A.C.

¶ 101.  Plaintiffs' theory is that all actively managed funds are *per se* imprudent, rather than a

claim that the particular mutual funds selected by UTC were imprudent for fund-specific reasons.

*Id.* ¶ 103; *see also* p. 28, *supra*.  It cannot be validly disputed that Plaintiffs have had requisite

knowledge of the presence of actively managed funds in the Plan since 1997.

Plaintiffs were notified by UTC that the Plan was going to offer actively managed funds

beginning on January 1, 1997.  For instance, in November 1996, UTC provided participants with

an Investment Brochure in anticipation of adding the new alternatives.  That brochure contained

an entire page devoted to the differences between active and passive management, and clearly

notified participants that the Plan would be offering a number of actively managed mutual funds:

> You also have the choice of 10 mutual fund investment options,
> each with different investment strategies.  Each of these mutual
> funds invests in different types of stocks, and some offer a
> combination of stocks and bonds .…  Unlike index funds, they
> don't attempt to achieve the investment results of a broad-based
> investment index.  Instead, a mutual fund investment manager
> selects the individual investments that he or she believes will
> outperform the market.  Because the investment manager exercises
> discretion when choosing the investments, these funds are called
> actively managed funds.
>
> The mutual funds have a higher investment expense than a passive
> index fund because investment managers receive higher fees for
> active management.

Ex. ¶ 37.  The same information about the presence and character of active management was

reiterated to participants in several later communications.  *Id.* ¶¶ 272-76.  Thus, (1) the fact that

---

*States, Se. and Sw. Areas Pension Fund v. Miss. Warehouse Corp.*, No. 91 C 1332, 1992 WL 683777, at *9 (N.D.
Ill. Oct. 1, 1992) (Ex. 218) ("[T]he burden at trial would be on [plaintiff] to show that it is entitled to relief from the
limitations period, and so it is incumbent upon [plaintiff] to show that, on the record before the court, a reasonable
trier of fact could find fraud or concealment.").

the Plan offered actively managed mutual fund options, (2) the nature of actively managed funds, and (3) the fact that actively managed funds generally have relatively higher rates of expense, were unconcealed and obvious at all times since 1997.[30]

Given these incontrovertible facts, there can be no dispute that Plan documents "sufficiently disclosed the alleged breach of fiduciary duty"—that is, the inclusion of actively managed funds among the Plan's investment options—years before September 2003.  *See Young*, 2008 WL 1971544, at *2 n.3.  Thus, Plaintiffs have had "actual knowledge" of this fact for far more than three years.  *See id.*  Because the inclusion of actively managed funds in the Plan was, according to Plaintiffs, inherently a breach of fiduciary duty, knowledge of this fact, "standing alone," was sufficient to trigger the applicable three year statute of limitations.  *See id.* at *2. Plaintiffs' claim that it was imprudent to offer actively managed funds is therefore time-barred in its entirety.[31]

C.      Count I Is Time-Barred.

As discussed above, Plaintiffs assert in Count I that offering a unitized stock fund with a cash component was *per se* imprudent.  *See* S.A.C. ¶ 38; p. 18, *supra*.  This *per se* claim is time-barred because Plaintiffs have had requisite knowledge since 1997 of the fact that the UTC Stock Fund holds cash.

---

[30]    The precise fees charged by each mutual fund, the past performance of each fund, and the precise investment strategy of each fund were also openly disclosed in the funds' respective prospectuses.

[31]    Plaintiffs allege, presumably with the aim of invoking the exception to ERISA's six-year limitations period for cases of fraud or concealment, that they "did not discover" the alleged fiduciary breaches set forth in Count VIII "until shortly before the filing of this litigation" due to unspecified "acts of fraud and concealment" on the part of Defendants.  S.A.C. ¶ 98.  As the party bearing the burden of proof on this issue, it is Plaintiffs' burden to come forward with evidence of fraud or concealment to avoid summary judgment.  *See Grain Traders, Inc. v. Citibank, N.A.*, 160 F.3d 97, 100 (2d Cir. 1998).  In fact, however, there is no evidence whatsoever supporting Plaintiffs' conclusory allegation that Defendants concealed any fact that is material to Count VIII.

Since the beginning of 1997, the UTC Stock Fund has continuously held both UTC stock and a small amount of cash.  UTC has clearly and consistently communicated this fact to Plaintiffs and other participants.  The 2003 Summary Plan Description is representative of these regular communications:

> The UTC stock fund invests in a single stock, UTC Common Stock.  The value of units credited to your UTC Common Stock Fund account reflects the value of UTC Common Stock, but not exactly.  There is a small difference because the UTC Common Stock Fund must hold certain "highly liquid" short-term investments, which provide readily available cash to fund participant's distributions, loans, or investment exchanges.  Having these liquid investments on hand enables the plan to credit participant's transactions using the closing price of UTC stock on that day.

S.F. ¶ 128 (quoting Ex. 35); *see also* Ex. 37 (November 1996 Investment Brochure, informing participants that the UTC Stock Fund "maintains a cash position").

Given these facts, there can be no valid dispute that Plan documents "sufficiently disclosed the alleged breach of fiduciary duty"—that is, the fact that the UTC Stock Fund was unitized—years before September 2003.  *See Young*, 2008 WL 1971544, at *2 n.3.  Thus, Plaintiffs have had "actual knowledge" of this fact for far more than three years.  *See id.* Because the inclusion in the Plan of a unitized employer stock fund holding some cash was, according to Plaintiffs' theory of Count I, inherently a breach of fiduciary duty, knowledge of this fact before September 2003 was sufficient to cause the claim to accrue for Section 413 purposes.  *See id.* at 2.  Count I therefore is time-barred because it was filed after the three year limitations period.

Plaintiffs might argue that the six year limitations period for cases involving fraud or concealment applies to Count I based upon their allegation that Defendants led "Plan participants to falsely believe that it was *necessary* to hold cash in the UTC Common Stock Fund."  S.A.C.

¶ 43 (emphasis added).  Yet the statement that "the UTC Common Stock Fund must hold certain 'highly liquid' short-term investments" and similar statements in other Plan communications, however, are neither false nor material.  Therefore, Plaintiffs will be unable to come forward with evidence of fraud or concealment sufficient to meet their burden on summary judgment.

First, the statement is true because, with one exception, Plaintiffs have failed to come forward with any evidence of an accepted, commercially reasonable plan design that does not require the plan to hold some cash (or its equivalent).  The one exception is a plan under which the plan sponsor maintains a pool of stock in its corporate treasury to trade with the Plan.  S.F. ¶ 123.  It cannot be disputed, however, that this approach creates administrative costs for the plan sponsor.  Importantly, the decision to absorb—or not to absorb—these costs is a settlor function, *not* a fiduciary one.  *See Hughes Aircraft*, 525 U.S. at 444 (sponsor decisions regarding the "form or structure" of a plan do not implicate ERISA's fiduciary duties).  Thus, as Plaintiffs' own expert Miller agrees, UTC was not obligated to adopt this approach and its failure to do so was not a breach of fiduciary duty.  S.F. ¶ 125; Ex. 235 (Miller Dep.) at 46-47.  Given that UTC had made the decision, as settlor, not to do so, the UTC Stock Plan in fact was required to hold at least some cash (or its equivalent).

Second, even if the claim that the UTC Stock Fund "must hold" some cash were false, it is not material.  *See Caputo*, 267 F.3d at 190 (holding that a "misrepresentation or omission of a *material* fact" is required to trigger the "fraud or concealment exception" (emphasis added)).  There is no dispute that Plaintiffs were fully informed of the fact that the UTC Stock Fund was unitized.  With this knowledge, they were in possession of all facts material to their assertion that such plans are inherently imprudent.  Thus, it is clear that the "fraud or concealment" exception

does not apply and that Count I must be dismissed as time-barred under the applicable three year limitations period.[32]

D.      Count VII Is Time-Barred.

In Count VII, Plaintiffs allege that the expenses incurred by participants who invest in mutual funds are unreasonable.  S.A.C. ¶ 96.  Plaintiffs, however, have had requisite knowledge of the expense ratios of all the mutual funds in the Plan (excluding only recently-added ones) since before September 2003.[33]  The expense ratios associated with each mutual fund investment option in the Plan are regularly disclosed to participants through prospectuses.  S.F. ¶ 279.

Given these facts, there can be no dispute that Plan documents "sufficiently disclosed the alleged breach of fiduciary duty"—that is, the fee structures of various mutual funds at issue— years before September 2003.  *See Young*, 2008 WL 1971544, at *2 n.3.  Thus, Plaintiffs have had "actual knowledge" of the facts relevant to this claim for more than three years.  *See id.* Plaintiffs' knowledge of the expense ratios of the Plan's mutual funds  standing alone was sufficient to trigger the applicable three year statute of limitations.  *See id.* at *2.  Insofar as Count VII complains of mutual funds in the Plan before September 2003, its claim is barred by Section 413 as well.

Count VII here echoes a claim dismissed by the district court in *Young*.  There, the plaintiffs alleged that mutual funds in General Motors's 401(k) plans "carried fees in excess of similar investment products available to large, institutional investors like the Plans and that

---

[32]    Moreover, even if the six-year limitations period for cases of fraud or concealment applied, Plaintiffs' claim would still be time-barred.  That limitations period begins to run from that date on which the plaintiff, in the exercise of reasonable diligence, should have discovered the alleged fraud or concealment.  *Burgin*, 2006 WL 469355, at *4. Here, Plaintiffs in the exercise of reasonable diligence should have discovered each of the facts allegedly supporting their claim before September 2000.

[33]    The Prudential Target Small-Capitalization Value Portfolio, the Vanguard Explorer Fund, and the ten Vanguard Target Retirement Funds were added to the Plan after September 2003.  S.F. ¶¶ 331, 333.

permitting investments in these funds caused the plans to pay 'millions of dollars' that could have been avoided by selecting cheaper, alternative investments." *Id.* The court held that this claim was time-barred by Section 413 because "[t]he allegedly excessive fees that form the central basis of this claim were readily apparent from the information provided to all Plan participants more than three years before Plaintiffs filed this suit." *Id.* at *3.

Again, Plaintiffs might argue that the six year limitations period for cases involving fraud or concealment applies, as they allege in Count VII that Defendants "concealed from Savings Plan participants that money paid to mutual fund investment managers was being passed on to Fidelity." S.A.C. ¶ 56. Even if true, however, this allegation would not justify imposition of Section 413's longer limitations period. The Second Circuit has made clear that, in order for this exception to apply, the allegedly concealed fact must have been material. *See Caputo*, 267 F.3d at 190. As discussed above, numerous courts have concluded in securities law cases under the '40 Act that how an investment manager spends or distributes the income it collects from mutual fund investors is not material to investors. *See* p. 69, *supra*. Because Plaintiffs cannot dispute that the *total* fees charged to Plan participants were accurately disclosed by the mutual fund expense ratios, it is clear as a matter of law that Defendants did not conceal any *material* fact with respect to mutual fund fees. Therefore, Plaintiffs will be unable to genuinely dispute that ERISA's three year statute of limitations applies to bar relief sought in Count VII.

## VII.   ERISA Section 404(c) Prevents Recovery on Counts I, VII, and VIII.

Plaintiffs contend that the Plan has suffered investment "losses" since the beginning of 1997 in the sense that its assets would have grown (even more than they did) if participants had not been allowed to invest in the UTC Stock Fund or in actively managed mutual funds. Although those claims fail because Plaintiffs cannot establish any fiduciary breach, summary judgment for UTC also is proper for an independent reason: ERISA Section 404(c) provides an

affirmative defense to these claims because the alleged losses were the result of investment
decisions made by participants who directed Plan assets into the UTC Stock Fund or mutual
funds.

ERISA Section 404(c) provides in relevant part:

> (1) In the case of a pension plan which provides for individual
> accounts and permits a participant or beneficiary to exercise
> control over the assets in his account, if a participant or beneficiary
> exercises control over the assets in his account (as determined
> under regulations of the Secretary)—
>
> …
>
> (B) no person who is otherwise a fiduciary shall be liable under
> this part for any loss, or by reason of any breach, which results
> from such participant's or beneficiary's exercise of control.

29 U.S.C. § 1104(c)(1).  As two courts of appeals have recognized, this statutory provision
provides a defense to liability even though a fiduciary may have committed a breach of duty.  *In
re Unisys Sav. Plan Litig.*, 74 F.3d 420, 445 (3d Cir. 1996); *Langbecker v. Elec. Data Sys. Corp.*,
476 F.3d 299, 311-12 (5th Cir. 2007).[34]  *But see DiFelice*, 497 F.3d at 418 n.3 (*dicta*).
Interpreting the "plain language" of Section 404(c), the Third Circuit ruled that "the statute
allows a fiduciary, who is shown to have committed a breach of duty in making an investment
decision, to argue that despite the breach, it may not be held liable because the alleged loss
resulted from a participant's exercise of control."  *Unisys*, 74 F.3d at 445.[35]

---

[34]    *See also Hecker v. Deere & Co.*, 496 F. Supp. 2d 967, 976 (W.D. Wis. 2007) (dismissing claims on basis of
Section 404(c)), *mot. to amend judgment denied*, 2007 U.S. Dist. Lexis 78959, at *14 (W.D. Wis. Oct. 19, 2007)
(Ex. 203) (stating "*Unisys* and *Langbecker* are the better reasoned view of the statute").

[35]    Given the unambiguous statutory text, the Fifth Circuit expressly rejected an interpretation of Section 404(c)
proffered by the DOL, in a footnote to a regulatory preamble, that would preclude the provision's application where
a fiduciary's selection of an investment option was deemed imprudent.  *Langbecker*, 476 F.3d at 311-12.

A.      The Plan Complies With ERISA Section 404(c).

"[I]n order to qualify as a participant-directed plan eligible for the liability shield of section 404(c), a plan must meet a number of conditions; prominent among them is that it must provide at least three investment options and it must permit the participants to give instructions to the plan with respect to those options at least once every three months."  *Jenkins v. Yager*, 444 F.3d 916, 923 (7th Cir. 2006) (citing 29 C.F.R. § 2550.404c-1(b)(2)); *see also* 29 C.F.R. § 2550.404c-1(b) (summarizing requirements for a Section 404(c) plan).  The Plan plainly satisfies those basic requirements, because it is an individual account plan that has offered participants between 16 and 29 diversified investment options since 1996, S.F. ¶¶ 41, 69, and the opportunity to change allocations among those options every business day, *id.* ¶¶ 24-26; *see also* pp. 5-6, *supra* (surveying Plan's investment options).[36]

Section 404(c) specifies that its defense applies when participants have exercised control in directing investments, and authorizes the Secretary of Labor to define when requisite control has been exercised.  29 U.S.C. § 1104(c)(1).  In doing so, the DOL focused on whether participants have been given sufficient information to make meaningful investment choices.  *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B).  For example, the regulations require a plan to provide, "upon request," prospectuses for investment alternatives.  *Id.* § 2550.404c-1(b)(2)(i)(B)(2)(ii). With regard to investment costs, the regulations specify that satisfaction of Section 404(c)'s control element requires the disclosure to participants of transaction fees (*e.g.*, sales loads) and aggregate fund-level operating charges expressed "as a percentage of average net assets" (*i.e.*, the expense ratio).  *See id.* § 2550.404c-1(b)(2)(i)(B)(1)(v); *id.* § 2550.404c-1(b)(2)(i)(B)(2)(i).

---

[36]    The Plan's investment alternatives include varied equity funds (including both domestic and foreign stock funds, and both active and passive management), blended funds that include equities and bonds, and a stable value fund that offers liquidity (like cash) and capital preservation (like bonds).  S.F. ¶¶ 41-55, 63-70.  These alternatives clearly include at least three diversified alternatives with materially different risk and return characteristics.  *See* 29 C.F.R. § 2550.404c-1(b)(3)(B) (defining Section 404(c) requirement for range of investment alternatives).

Plaintiffs cannot dispute that these disclosure requirements have been made to Plan participants through the availability (via the Fidelity website or upon telephonic request) of prospectuses for every mutual fund offered through the Plan.  S.F. ¶¶ 33-34.[37]

UTC repeatedly informed participants that the Plan was intended to be subject to Section 404(c).  S.F. ¶¶ 404-06.  For example, the Investment Brochure provided to participants in November 1996, in anticipation of the addition of mutual funds to the Plan, stated:

> The Plan is intended to qualify as a participant-directed plan under Section 404(c) of ERISA.  This means that you are responsible for your investment decisions under the Plan.  The Plan fiduciaries, including [the trustee] Bankers Trust and United Technologies Corporation are not responsible for any losses incurred as a result of your investment decisions.

Ex. 37.  This disclosure was reiterated in similar form in later Summary Plan Descriptions and brochures.  *Id.* ¶¶ 404-05; *see*, *e.g.*, Ex. 36 (2004 SPD:  "The Savings Plan is a 'participant directed individual account plan' within the meaning of Section 404(c) of ERISA.  As a result, the fiduciaries of the plan may be relieved of liability for any losses that result from your investment decisions.").  The notice appeared in other types of communications to Plan participants as well.  S.F. ¶ 406.

In their pleadings, Plaintiffs have challenged the Plan's compliance with Section 404(c) by alleging that various other DOL requirements have not been satisfied.  Plaintiffs characterize the regulations as establishing a myriad of prerequisites, every one of which must be proven to be satisfied in order for Section 404(c) to apply.  It should be noted, however, that the regulations specify that compliance with Section 404(c) should be determined on a transaction-specific

---

[37]   UTC's communications repeatedly admonished participants to consult mutual fund prospectuses before making investment decisions.  S.F. ¶¶ 277.  For example, the Plan's Investment Brochure stated:  "Before investing in any mutual fund, please carefully consider the investment objectives, risks, charges, and expenses.  For this and other information, call or write the UTC Participant Service Center at Fidelity for a free prospectus.  Read it carefully before you invest."  Ex. 45.

basis.  *See* 29 C.F.R. § 2550.404c-1(a)(2).  It therefore is appropriate to focus solely on provisions that are germane to the transaction at hand.  For example, insofar as the transactions at issue here are participants' investments in mutual funds, it is immaterial that Plaintiffs dispute whether UTC has adequately explained its procedures for maintaining the confidentiality of participants' voting of proxies for UTC stock held through the Plan, *id.* § 2550.404c-1(b)(2)(B)(1)(vii), or whether the Plan has a specific procedure concerning participants found to be legally incompetent, *id.* § 2550.404c-1(c)(2)(iii).[38]

B.      The Alleged Investment Losses Resulted from Participants' Exercise of Control Over Investment Decisions.

1.      The Plan's Alleged Experience of Cash Drag Resulted From Participant Control.

The UTC Stock Fund provided the Plan an annualized investment return of more than 15% between the end of 1996 and beginning of 2007.  S.F. ¶ 363. As already discussed, Plaintiffs nonetheless complain in Count I that investment in the UTC Stock Fund caused investment losses in the form of slightly-higher returns not realized due to so-called cash drag. *See* p. 18, *supra*.

It cannot be disputed, however, that UTC informed participants that the Stock Fund invests in some cash, and that its investment experience therefore would not exactly match the returns of UTC stock alone.  S.F. ¶ 128; *e.g.*, Ex. 45 ("This fund maintains a small cash position"); Ex. 35 ("The value of the units credited to your UTC Common Stock Fund accounts reflects the value of UTC Common Stock, but not exactly").  Moreover, participants are not

---

[38]     Plaintiffs have disclosed a putative expert who, although not a lawyer, opined as to the requirements of DOL's regulations concerning Section 404(c).  Such testimony on a question of law is not admissible, *see* Defs.' Motion to Exclude Testimony of David Witz (filed contemporaneously herewith), and cannot create an issue of fact precluding summary judgment, *see Raskin*, 125 F.3d at 66 (affirming exclusion of expert testimony and of summary judgment decision:  "only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment").

required to invest any part of their accounts in the UTC Stock Fund; neither Plaintiff Conlin nor Plaintiff Taylor ever did so.  S.F. ¶ 86.  Thus, to the extent that certain participants elected to invest Plan assets in the Stock Fund, rather than in the various alternative options, they did so after disclosure of the relevant facts and in the exercise of their own discretion and control.

Even though UTC offered the Stock Fund as an option, the supposed investment loss "could not have occurred but for" participants' choices to invest in that fund despite the disclosure of its cash holdings.  *Langbecker*, 476 F.3d at 310.  The Plan's experience of cash drag therefore "results from such participant[s'] … exercise of control," 29 U.S.C. § 1104(c)(1)(B), and is "the direct and necessary result" of participants' control, 29 C.F.R. § 2550.404c-1(d)(2)(i).  Even assuming, *arguendo*, that offering a unitized stock fund with a cash component were imprudent, "[Section] 404(c) recognizes that participants are not helpless victims of every error."  *Langbecker*, 476 F.3d at 312; *see also id.* (stating "that in participant-directed plans, the plan sponsor cannot be a guarantor of outcomes for participants").  Given what the Third Circuit held to be the plain language of Section 404(c), *Unisys*, 74 F.3d at 445, Section 404(c) precludes the imposition on UTC of liability for the investment loss alleged in Count I.

> 2. The Plan's Alleged Losses Due to Mutual Fund Investments Resulted From Participant Control.

Similarly, any losses allegedly caused by the Plan's investment in actively managed mutual funds (about which Plaintiffs complain in Counts VII and VIII) resulted from participants' exercise of control over their individual accounts.

First, it is indisputable that UTC complied with the DOL requirement for disclosing the expense ratios of the Plan's mutual funds.  Prospectuses for every mutual fund in the Plan have been available upon request—indeed, they can be viewed online at any time—and those

prospectuses disclose each fund's total expense ratio.  S.F. ¶ 34; *see*, *e.g.*, Ex. 144 at 2 (Vanguard

Explorer Admiral Class prospectus, disclosing expense ratio of 0.41%); Ex. 25 at 4 (Fidelity

Contrafund expense ratio: 0.89%); Ex. 24 at 20 (First Eagle Global Class A expense ratio:

1.20%).  Participants were told to review such prospectuses before investing.  S.F. ¶ 277.

Moreover, neither the presence or absence of sub-transfer agent payments by a mutual fund to

the Plan's recordkeeper changes the expense ratio collected from a participant's investment in

the fund.  *See* pp. 41-42, *supra*.  As a result, while Plaintiffs contend that all of the Plan's mutual

funds have unreasonably high fees, detracting from their investment returns, every participant

was given notice of the total expenses that would be collected from his or her investment in each

mutual fund.

Second, Plan participants are not required to invest in the Plan's actively managed mutual

fund options and can choose instead a variety of non-mutual fund alternatives.  The Plan offers

seven passively managed index funds (structured as trust accounts) with expense ratios ranging

from a maximum of 0.29% (for the International Index Fund) to as little as 0.01% (for the S&P

500-indexed Equity Fund).  S.F. ¶¶ 56-62.[39]  Underscoring these lower-cost alternatives, UTC

repeatedly stated in Plan communications that active management costs more than passive

management.  *Id*. ¶¶ 271-76.  Many participants resemble Plaintiff Todd, who has invested his

entire account balance in index funds.  *Id*. ¶ 90.  Participants also have the option to invest in the

Income Fund, which protects principal while providing a stated rate of return.  *Id*. ¶ 43.

Participants, in fact, have consistently exercised their discretion in such a way that the vast

majority of Plan assets have not been invested in mutual funds; since the addition of mutual

---

[39]    The Plan offered four index funds from 1997 through 2000, and added three more in 2001.  S.F. ¶¶ 45-46.

funds in 1997, mutual fund holdings have generally represented no more than 12% of Plan

assets, and usually considerably less.  S.F. ¶¶ 73-83.

Given these indisputable facts, any alleged losses attributable to Plan investment in

actively managed mutual funds result from participants' exercise of control, 29 U.S.C.

§ 1104(c)(1)(B), and are the direct and necessary result of such control, 29 C.F.R. § 2550.404c-

1(d)(2)(i).  *See Langbecker*, 476 F.3d at 312.

In another lawsuit filed by Plaintiffs' counsel, the district court relied on Section 404(c)

to dismiss similar claims of losses allegedly caused by supposedly overpriced mutual funds.

*Hecker v. Deere & Co.*, 496 F. Supp. 2d 967, 976 (W.D. Wis. 2007), *mot. to amend judgment*

*denied*, 2007 U.S. Dist. Lexis 78959 (W.D. Wis. Oct. 19, 2007) (Ex. 203).[40]  In reasoning that

applies to the contentions made by Plaintiffs here, that court rejected the argument that

participants lacked control because "revenue sharing" payments (including sub-transfer agent

fees) were not disclosed to participants:  "there is nothing to suggest that receiving this additional

non-prescribed information would effectively enhance investment decisions."  496 F. Supp. 2d at

975; *see also* pp. 68-70, *supra* (explaining immateriality of sub-transfer agent payments to

investors).  Because participants in Deere's 401(k) plans had investment alternatives with

expense ratios ranging "from just over 1% to as low as .07% … participants were in a position to

consider and adjust their investment strategy based in part on the relative cost of investing in

these funds."  *Hecker*, 496 F. Supp. 2d at 976.  "The only possible conclusion is that to the extent

participants incurred excessive expenses [by investing in mutual funds], those losses were the

result of participants exercising control over their investments within the meaning of [Section

---

[40]     The losing plaintiffs in the *Hecker* case have appealed, relying in part on the argument that the district court erred in considering the Section 404(c) defense at the Rule 12 stage.  That objection is not applicable to this Rule 56 motion.

404(c)]."  *Id.*; *see also* 2007 U.S. Dist. LEXIS 78959, at *14 ("The point of [Section 404(c)] …

is to preclude claims that, although there was a broad array of fully described options in which to

invest, participants might have achieved a better return (or lost less) if only the plan sponsor had

chosen different options with better returns or lower costs.  That aptly describes the allegations

of the second amended complaint.").  This analysis was correct and applies with equal force in

this case to the allegations of investment losses in Counts VII and VIII.  Summary judgment on

the basis of Section 404(c) is therefore warranted.

## **CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment should be

granted, and judgment should be entered in favor of Defendants on all of Plaintiffs' claims.


Respectfully submitted,


*Of Counsel:*                                    /s/ Thomas L. Cubbage
Zachary R. Osborne (ct19988)                     Jeffrey G. Huvelle (phv01440)
UNITED TECHNOLOGIES CORPORATION                  Thomas L. Cubbage III (phv01441)
One Financial Plaza                              Peter A. Swanson (phv01442)
United Technologies Building                     COVINGTON & BURLING LLP
Hartford, CT 06103-2703                          1201 Pennsylvania Ave., N.W.
(860) 728-7821                                    Washington, D.C. 20004
(860) 998-4751 (fax)                             (202) 662-6000
zachary.osborne@utc.com                          (202) 662-6291 (fax)
                                                 jhuvelle@cov.com
                                                 tcubbage@cov.com
                                                 pswanson@cov.com

                                                 Steven M. Greenspan (ct00380)
                                                 DAY PITNEY LLP
                                                 242 Trumbull St.
                                                 Hartford, CT 06103
                                                 (860) 275-0100
                                                 (860) 275-0343 (fax)
                                                 smgreenspan@daypitney.com

                                                 *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on June 7, 2008, a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

/s/ Thomas L. Cubbage
Thomas L. Cubbage (phv01441)