### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DAVID S. TAYLOR, JIM CONLIN, and KARL TODD, | : | |
|       individually and on behalf of all similarly situated persons, | : : : | |
| | : | |
|       Plaintiffs, | : | |
| | : | |
| v. | : | 3:06cv1494 (WWE) |
| | : | |
| UNITED TECHNOLOGIES CORPORATION, UNITED TECHNOLOGIES CORPORATION PENSION AND INVESTMENT COMMITTEE, UNITED TECHNOLOGIES CORPORATION PENSION AND ADMINISTRATION COMMITTEE, | : : : : : : : : | |
| | : | |
|       Defendants. | : | |

### MEMORANDUM OF DECISION ON DEFENDANTS'
### MOTION FOR SUMMARY JUDGMENT

_____Plaintiffs David Taylor, Jim Conlin and Karl Todd, individually and on behalf of all similarly-situated persons, have filed this action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"). Specifically, plaintiffs allege that defendants United Technologies Corporation ("UTC"), its Pension and Investment Committee ("PAIC"), and its Pension Administration Committee ("PAC") breached their fiduciary duties pursuant to ERISA with regard to an employee benefit plan. Defendants now

move for summary judgment.[1]  For the following reasons, defendants' amended motion for summary judgment will be granted.

## BACKGROUND

The parties have submitted statements of fact with supporting exhibits that reveal the following undisputed factual background.

UTC's Employee Savings Plan

UTC offers eligible, salaried employees a "defined contribution plan" as set forth in ERISA § 3(34), 29 U.S.C. § 1002(34), known as the Employee Savings Plan, Plan 017 (the "Plan").   UTC serves as the Plan Administrator and fiduciary to the Plan.

PAIC, a committee of UTC employees, is a named fiduciary to the Plan.  PAIC delegates certain responsibilities with respect to the Plan to UTC's Human Resources Department and the Pension Investments Group of the Treasury Department.  PAIC has also worked with outside consultants regarding aspects of the Plan.

Participants are authorized to make voluntary contributions to the Plan for each pay period on a tax-deferred or after-tax basis.  UTC's matching contributions are made through the separate UTC Employee Stock Ownership Plan ("ESOP").

Under the terms of the ESOP, UTC matches employee contributions with ESOP shares of company stock equal in value to 60% of participating contributions. Participants may not direct their contributions into the ESOP, although they may transfer their matching contributions out of the ESOP.

---

[1]Defendants have filed a separate motion for summary judgment against the "released claims" of plaintiffs Taylor and Todd.   This motion will be denied as moot.

The assets of the Plan are held in a master trust by a third-party trustee. [2] Participant contributions are allocated among the investment choices available to the Plan in accordance with each individual participant's investment instructions. Participants may direct changes to their investment accounts on a daily basis.  As stated in a November 1996 brochure, participant investment options "fall into two groups: Core funds and mutual funds."

Since 1997, participant accounts are valued on a daily basis, with Fidelity Institutional Retirement Services Company providing administrative and recordkeeping services to the Plan.   Fidelity has provided a range of services including recordkeeping, loan services, and non-discrimination testing pursuant to a "Recordkeeping and Administrative Services Agreement" effective January 1, 1997.

Prior to 1997, participants could allocate their investment among four options: the Income Fund, the Equity Fund, the UTC Stock Fund, and Global Fund.  The Income Fund is a stable value fund providing participants with a stated rate of return based on guaranteed investment contracts with insurance companies.

The UTC Stock Fund is structured as a unitized stock fund and each investor owns "units" of the Stock Fund, which consists of UTC common stock shares and cash. Unit trades of the Stock Fund settle in one business day;[3] the units are valued at the end of each business day based on the day's closing prices of UTC common stock.

---

[2]The Plan's third-party trustee is State Street Bank & Trust Co.

[3]If, on a particular day, participant sales of the unitized stock fund exceed the amount of cash held by the Stock Fund, the Stock Fund borrows cash in order to cover the sales.

James Moody, Director of Portfolio Investments for the UTC Pension Group, stated that the decision to provide for a one-day settlement period was made after an analysis of impact of the "cash drag" on the portfolio, consideration of the "cash drag" in mutual funds, and alternatives to a unitized stock fund.

Between January 1997 and December 2006, the UTC Stock Fund had the highest cumulative and annualized returns, net of fees, of any Plan investment option. During that period, it yielded average annualized returns, net of fees, of 15.38% from a cumulative return, net of fees, of 318.26%.

From 1997 until 2001, the Plan offered sixteen investment options, including the following ten actively-managed mutual funds: INVESCO Total Return Fund, Fidelity Growth & Income Fund, Fidelity Growth & Income Portfolio, Putnam Fund for Growth and Income, Fidelity Contrafund, Fidelity Low-Priced Stock Fund, PBHG Growth Fund, Putnam New Opportunities Fund, SoGen International Fund, Inc., Templeton Foreign Fund, and Templeton Developing Markets Trust.

The INVESCO Total Return Fund was eliminated as an investment option as of July 13, 2005; and the PBHG Growth Fund was removed as an investment option as of November 1, 2005. Effective November 1, 2005, the Vanguard Explorer Fund was added as an investment option, and effective January 2006, the Prudential Target Small-Capitalization Value Portfolio was added as an investment option.

In January 2006, participants had the option of choosing from among five Vanguard Target Retirement Funds, each with a different target retirement date. Thus, participants had a total of 24 investment options.

At the end of 2006, net assets in the Plan totaled $13.7 billion, of which no more than $1.6 billion or 11.6% was invested in mutual funds; at the end of 2005, net assets totaled $12.5 billion, of which no more than $1.2 billion (9.6%) was invested in mutual funds; at the end of 2005, net assets in the Plan totaled $11.8 billion, of which no more than $1 billion (8.5%) was invested in mutual funds; at the end of 2003, net assets in the Plan totaled $11.1 billion, of which no more than 0.8% was invested in mutual funds; at the end of 2002, net assets in the Plan totaled $8.6 billion, of which no more than $0.5 billion (5.8%) was invested in mutual funds; at the end of 2001, net assets in the Plan totaled $8.9 billion, of which no more than $0.7 billion (7.9%) was invested in mutual funds; at the end of 2000, net assets in the Plan totaled $9.6 billion, of which no more than $0.8 billion (8.3%) was invested in mutual funds; at the end of 1999, net assets in the Plan totaled $8.7 billion, of which no more than $0.7 billion (8%) was invested in mutual funds; at the end of 1998, net assets in the Plan totaled $7.6 billion, of which no more than $0.5 billion (6.6%) was invested in mutual funds; and at the end of 1997, net assets in the Plan totaled $6 billion, of which no more than $0.3 billion (5%) was invested in mutual funds.

In summer 2007, five additional Target Retirement Funds were added to the menu of Plan investment options, each with a different target retirement.

The mutual funds offered in the Plan represent a variety of asset classes and investment styles, including international stocks, small-capitalization stocks, mid-capitalization stocks, growth stocks, and large-capitalization stocks.

Plaintiffs

Plaintiffs Taylor, Conlin, and Todd are all participants of the Plan.

Taylor is a former employee of Carrier Corporation, a wholly-owned subsidiary of UTC.  In August 2005, Taylor left Carrier, and entered into an agreement in which he released certain claims stemming from his employment.  He received a severance package, which included more than $43,000 in compensation and benefits.  Prior to signing the release, Taylor consulted with an attorney.

The release states, in relevant part:

> The Employee unconditionally releases and discharges Carrier . . . from any and all causes of action, suits, damages, claims, proceedings, and demands that the Employee has, or may have, against the Releasees, whether asserted or unasserted, whether known or unknown, concerning any matter occurring up to and including the date of the Signing of this Agreement.

In the agreement, Taylor acknowledged that he released all claims "arising out of, or related in any way to, his/her employment with Carrier or the termination of that employment, including (but not limited to) any and all . . . claims under . . . the Employee Retirement Income Security Act . . . ."

Taylor has invested in such mutual funds as Fidelity Contrafund, Fidelity Growth & Income, Fidelity Low-Priced Stock Fund, Putnam Fund for Growth and Income, Prudential Target Small Cap Value Fund, Putnam New Opportunities Fund, First Eagle Templeton Developing Markets.

Todd is a former employee of Otis Elevator Company, a wholly-owned subsidiary of UTC.  He worked for Otis from 1969 until he retired in 2000.  Upon leaving UTC in

January 2000, Todd entered into an agreement with Otis, in which he released certain claims against his employer. He received additional severance benefits, including more than $100,000 in compensation and other benefits.

Todd's release provides that he agreed:

> to release the Company from all claims, demands, actions, or liabilities you have, may have or may have had based on your employment with the Company or the termination of that Employment. You further agree to waive any right you may have with respect to the claims or demands from which the Company is herewith released.

His release includes, "but is not limited to," any rights or claims Todd may have under a series of enumerated labor laws as well as "any other federal, state, or local laws or regulations relating to or regulating your employment."

He has invested in Templeton Developing Market, Fidelity Contrafund, Fidelity Growth & Income, and Fidelity Low-Price Stock Fund. However, Todd has not invested in any mutual funds offered by the Plan since January 1998.

Conlin has only invested in one mutual fund, the Putnam New Opportunities Fund.

<u>Recordkeeping and Administrative Services Fees</u>

UTC and Fidelity negotiated a base annual fee for recordkeeping and administrative services of $40 per participant. However, as reflected in the Recordkeeping Agreement, UTC received a per participant credit calculated at a rate equal to $1.50 per every $100 million invested in Fidelity actively-managed mutual funds.

From 1997 through 2001, UTC paid the recordkeeping fee owed to Fidelity under

7

the Recordkeeping Agreement. On certain occasions, the Plan paid part of the recordkeeping fees or non-recordkeeping administrative fees from Plan assets unallocated to individual participant accounts.

In the Second Amendment to the Recordkeeping Agreement executed on April 1, 2000, UTC and Fidelity agreed to an annual fee of $47 per participant with a per participant credit calculated at a rate equal to $1.5 per $100 million invested in Fidelity actively-managed mutual funds. The credit was to be further calculated at a rate equal to $2.00 per $100 million of assets managed by Fidelity in excess of $300 million.

In the fall 2001, UTC solicited a fee proposal from The Vanguard Group for recordkeeping administration services for UTC's domestic savings plans. Vanguard submitted a proposal, which contemplated offering only Vanguard mutual funds and bundled recordkeeping and investment management over several Vanguard investment options for a total fee of $16.2 million per year.

UTC's Mike Sanker compared Vanguard's 2001 proposal with Fidelity's 2001 proposal. He concluded that Fidelity's proposal was less expensive.

In 2002, UTC assessed participant accounts a fee of $10 per quarter to pay a portion of Fidelity's recordkeeping fee.

UTC subsequently renegotiated the base fee for the 2003 contract renewal at $46 per participant. UTC continued to maintain its agreement with Fidelity to perform recordkeeping and administrative services.

In 2004, UTC discovered that as a result of credits received in connection with reduced call volume and increased investment in Fidelity funds, Fidelity's recordkeeping

8

fee had fallen below $10 per quarter.  Thus, the $10 fee was waived for all participant accounts in the fourth quarter of 2004.

Commencing in 2005, UTC stopped charging participants a flat fee of $10 per quarter and instead charged the actual recordkeeping costs incurred in the previous quarter.  The amount of the recordkeeping fee charged to participants each quarter fluctuates depending on the credits UTC receives from Fidelity.

Mutual Funds

Many mutual funds invest in a specific category of assets, such as stocks of large-capitalization companies, small-capitalization companies, or foreign companies. A mutual fund advisor provides numerous services to the fund.  The mutual fund's expense ratio reflects all the expenses a participant will incur by investing in a particular mutual fund.  The expense ratio disclosed in a prospectus includes the investment management fee and other expenses, such as custodian fee or a transfer agent fee.

In 1996, in connection with selecting a recordkeeper, UTC evaluated the possibility of offering employees additional investment options, including mutual funds. PAIC determined that up to twelve mutual funds should be added to the options available to Plan participants.

The members of the Pension Investment staff, led by Moody, selected the funds for the Plan by first determining the asset class and style of investment that should be included.  After considering diversification issues, the mutual fund selection team formulated "key decision criteria."  Specifically, the selection team was looking for large, established funds; funds with stable performance relative to peer funds; well-known organizations that would attract employee involvement; administrative efficiency to

9

guarantee accurate recordkeeping and trading procedures; and funds having financial information widely available in public resources. The criteria used to narrow down the list of managers included the investment manager's investment process; the employees' experience; performance track record; fees charged; performance record net of fees; and the future expectation of the investment manager's process.

In the summer 1996, members of the mutual fund selection team met with fund managers of the recommended funds. The mutual fund team recommended a list of ten "preferred funds" to the PAIC during a presentation. In selecting mutual funds, one of UTC's objectives was to foster savings participation among employees by attracting their attention to name-brand fund families backed by substantial management and marketing resources.

The PAIC meeting minutes from July 30, 1997, July 24, 1998, and February 13, 2003 reflect that the Committee discussed the merits of passive and active management.

### Sub-Transfer Agent Payments by Mutual Funds

Mutual funds employ transfer agents to provide services to the shareholders. In the 401(k) context, the transfer agent function is performed by the plan's recordkeeper. In return, some mutual funds pay recordkeepers sub-transfer agent fees for that function. Sub-transfer agent fees are made using a portion of a mutual fund's total expense ratio.

Twelve of the funds currently offered through the Plan do not pay sub-transfer agent fees to Fidelity as the Plan's recordkeeper, while seven mutual funds do pay such fees.

The Putnam funds included in the Plan pay Fidelity at a rate of 4.5 basis points. Putnam had given UTC the option of selecting either the Y-share class, which had a lower fee or the A-share class, in which Fidelity would receive a portion of the fee income for the services provided. Fidelity had requested sub-transfer agent fees from Putnam, but Putnam argued that it could not afford to offer the less expensive Y-share class demanded by UTC and make payments to Fidelity. Putnam and Fidelity eventually agreed upon the 4.5 basis point for administering a Putnam fund without changing the expense ratio.

The Seventh Amendment to the Recordkeeping Agreement explained that "Non-Fidelity Mutual Fund vendors shall pay fees directly to Fidelity or its affiliates equal to such percentage (generally 25 or 50 base points) of plan assets invested in such Non-Fidelity Mutual Funds as may be disclosed periodically . . . ."

The Eleventh Amendment to the Recordkeeping Agreement stated: "Fees paid directly to Fidelity or its affiliates by Non-Fidelity Mutual Fund vendors shall be posted and updated quarterly on Plan Sponsor Webstation at https://psw.fidelity.com or a successor site."

<u>Disclosures to Participants Regarding Mutual Funds and Recordkeeping Fees</u>

Plan communications have instructed participants to read the prospectus of each mutual fund before making investment decisions. The 1996, 1998, 2000, 2002, and 2003 Investment Brochures and the 1999 Summary Plan Description explained that mutual funds have higher investment expenses than passive index funds because investment managers receive higher fees for active management. Plan

communications also described risks associated with each investment option offered in the Plan.

In 2001, UTC notified participants when investment management fees began to be charged for the "Core Options" in October of that year.

In 2002, Plan participants received notice that their accounts would be assessed a fee of $10 per quarter commencing in 2002 to pay a portion of Fidelity's recordkeeping fee. The fee was also reflected on each participant's annual statement. Prior to implementing the fee assessment change in 2005, UTC notified participants that the amount of the recordkeeping fee that would be charged to participants on a quarterly basis would fluctuate depending on the credits received from Fidelity.

Individual quarterly account statements disclose the assessment of recordkeeping fees on a quarterly basis, and the total recordkeeping fees paid that year are reflected on a participant's individual statement.

Through the NetBenefits website, Plan participants can view a statement for any date, month, quarter, or custom date range within the previous 24 months.

<u>Monitoring of Mutual Funds</u>

In 2004, UTC engaged CTC Consulting to provide an analysis of the Plan's mutual funds. CTC evaluated each of the ten mutual funds offered according to five categories: (1) retain; (2) potential retain; (3) neutral; (4) consider replacement; and (5) replace.

The PBHG Growth Fund was the only fund identified as a "replace" fund. CTC categorized as "consider replacement" the Fidelity Low-Priced Stock Fund, the Invesco Total Return Fund, and the Putnam New Opportunities Fund. Templeton Developing

12

Markets Fund was placed in the "neutral" category.  Fidelity Contrafund, the Fidelity Growth & Income Fund, the First Eagle Global Fund, the Franklin Templeton Foreign Fund, and the Putnam Fund for Growth & Income were classified in the "retain" category.

In 2005, PAIC considered removing the PBHG Fund and the AIM Total Return Fund, formerly the Invesco Total Return Fund; and adding an alternative to the Fidelity Low Priced Stock Fund because that Fund was closed to new investors.  PAIC delegated authority to Natalie Morris and Robin Diamonte to determine the manner for closing the PBHG Growth Fund and the AIM Total Return Fund; to select replacement funds; and to supplement other investment options.  Kevin Hanney of the Treasury Department analyzed potential investment alternatives to replace the PBHG Growth Fund and the AIM Total Return Fund.

The PAIC meeting minutes of October 3, 2005 stated: "Utilizing a disciplined analytical due diligence process that included Natalie Morris of the Benefits Administration group, the Vanguard Explorer Fund (growth) and a Prudential Target Small Capitalization Value Fund were selected as the small cap replacement."

In a July 2005 notice, UTC informed participants that if they did not actively change their investments out of the AIM Total Return Fund, UTC would automatically place those investments into the following funds: 65% into the Equity Fund, and 35% into the Income Fund.

In September 2005, UTC sent a letter to participants who had invested in the PBHG Growth Fund, informing them that neither new elections to invest in the PBHG Growth Fund nor exchanges out of the Fund would be permitted after December 30,

2005.  UTC further explained that any remaining balances in the PBHG Growth Fund would be routed to the Vanguard Explorer Fund.

In October 2005, UTC sent out a notice to participants explaining that it was accelerating the elimination of the PBHG Growth Fund from the Plan in light of management changes within PBHG.

On certain occasions, UTC participated in a survey administered by Cost Effective Management Benchmarking ("CEM") to receive summary results of benchmarking data for defined contributions.

Float

Float is interest earned by cash while invested before participant contributions are allocated to investments or before distributions are processed.

The Recordkeeping Agreement specifies that "any short-term interest earned on the contribution monies held in the FPRS Depository Account for the Funds shall be transferred by Fidelity to the Trustee in a manner consistent with Fidelity's procedures for interest allocation.  Fidelity shall allocate short term interest and shall wire such interest to the Trustee by no later than the 10th Business day of the following month."[4]

The 1994 Plan Document states:

> Amounts distributed from a Participant's Accounts, whether by reason of termination or by a request for withdrawal under the provision of Article Eight, shall not be credited with interest nor share in any gains or losses after the Valuation Date specified for such distribution.

---

[4]In 1997, Fidelity Management Trust Co. became the sub-trustee of the portion of the Plan invested in the UTC Common Stock Fund.

14

The 2001 Plan Document states:

> A participant may receive a distribution in accordance with the
> following subsections if the Plan Administrator receives the
> Participant's request for distribution on or before a date established
> by the Plan Administrator and the Participant is otherwise eligible to
> receive a distribution. (A) A distribution of up to 100% of the value
> of the Accounts, to the extent such Accounts may be withdrawn,
> will be paid as soon as practicable following the Plan
> Administrator's timely receipt of the request.  Such distribution shall
> be based on the Valuation Date on which such request is received,
> and shall be distributed as soon as practicable after such Valuation
> Date.

## DISCUSSION

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  Bryant v. Maffucci, 923 F. 2d 979, 982 (2d Cir. 1991).

The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute.  Am. Int'l Group, Inc. v. London Am. Int'l Corp., 664 F. 2d 348, 351 (2d Cir. 1981).  In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then summary judgment is appropriate.  Celotex Corp., 477 U.S. at 323.  If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met.  Liberty Lobby, 477 U.S. at 24.

15

On behalf of the class as a whole, plaintiffs allege breach of fiduciary duty for damages resulting from cash in the Stock Fund (count I); breach of fiduciary duty for damages resulting from payment of excessive recordkeeping and administrative fees (count II); breach of fiduciary duty for damages resulting from misleading representations regarding fees and expenses (count III); breach of fiduciary duty for equitable relief including a declaration that defendants provided participants with confusing, false and misleading information (count IV); on behalf of the subclass, breach of fiduciary duty for damages resulting from false representation regarding payments to Fidelity (count V); breach of fiduciary duty for damages resulting from failure to capture "Float" (count VI); breach of fiduciary duty for damages resulting from payment of excessive investment management and brokerage fees (count VII); and breach of fiduciary duty for inclusion of imprudent investment options (VIII).

Count I

In their first count, plaintiffs assert that UTC breached its fiduciary duties (1) by choosing to have the Stock Fund hold cash.  Plaintiffs maintain the amount of cash held and fees incurred between 1997 through 2005 caused the participants to lose $69 million worth of gains in UTC stock.[5]

Section 404(a)(1)(B) of ERISA requires a fiduciary to "discharge his duties with respect to the plan ... with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with

_____

[5]Hereinafter defendants are referred to, collectively, as UTC or defendant.

16

like aims . . . ." 29 U.S.C. § 1104(a)(1)(B).  In making investment decisions, plan

trustees must conduct a careful and impartial investigation with "an eye to the interests

of the participants and beneficiaries."  Flanigan v. General Elec. Co., 242 F.3d 78, 86

(2d Cir. 2001).  Whether a fiduciary's actions are prudent cannot be measured from the

vantage point of hindsight; the prudent person standard is not concerned with results

but is a test of how the fiduciary acted when viewed from the perspective of the time of

the challenged decision.  DiFelice v. U.S. Airways, Inc., 497 F.3d 410, 424 (4th Cir.

2007).  The court must inquire into whether the fiduciary, "at the time of the challenged

transaction, employed the appropriate methods to investigate the merits of the

investment to structure the investment."  Katsaros v. Cody, 744 F.2d 270, 279 (2d Cir.

1984).  The prudent person standard does not require the fiduciary to take any

particular course of action even if another approach seems preferable.  Chao v. Merino,

452 F.3d 174, 182 (2d Cir. 2006).

The Department of Labor ("DOL") regulations provide that section 404(a)(1)(B) is

satisfied with respect to an "investment or investment course of action" if the fiduciary:

> (i) Has given appropriate consideration to those facts and
> circumstances that, given the scope of such fiduciary's
> investment duties, the fiduciary knows or should know are
> relevant to the particular investment or investment course of
> action involved, including the role the investment or
> investment course of action plays in that portion of the plan's
> investment portfolio with respect to which the fiduciary has
> investment duties; and
>
> (ii) Has acted accordingly.

29 C.F.R. § 2550.404a-1(b)(1)(i)-(ii).  In section 2, 29 C.F.R. § 2550.404a-1(b) provides

further that: "'appropriate consideration' shall include, but is not limited to:

17

> A determination by the fiduciary that the particular investment or
> investment course of action is reasonably designed, as part of the
> portfolio . . . to further the purposes of the plan, taking into
> consideration the risk of loss and the opportunity for gain (or other
> return) associated with the investment or investment course of
> action. . . .

Plaintiff's expert, Ross Miller, posits that the holdings decreased the performance of the Stock Fund. Defendant maintains that Stock Fund, a unitized stock fund, holds cash to facilitate more transactional liquidity than ordinary common stock ownership. Specifically, the cash allows for a one-day settlement period for participants' stock transactions (T+1) rather than a three-day settlement period (T+3), at which time the seller is no longer invested in the stock and cannot invest proceeds elsewhere.

The evidence indicates that UTC's evaluation of the merits of retaining cash to provide transactional liquidity satisfies the prudent person standard. Although an expert may have proposed a better alternative to UTC's unitized stock plan, UTC was not obligated to proceed with that alternative since its decision to proceed with the extant unitized stock plan was prudent. See Merino, 452 F.3d at 182.

Further, plaintiffs have not provided evidence that UTC imprudently retained an excessive amount of cash in the Stock Fund. Defendant asserts, and plaintiffs do not dispute, that plaintiffs must establish: (1) UTC acted imprudently in setting the cash level of the Stock Fund, and (2) this imprudent conduct resulted in the holding of an unreasonable amount of cash in the Fund. See Roth, 16 F.3d at 918-919.

UTC's evidence demonstrates that it evaluated and monitored the amount of cash necessary to cover participant sales without having significant adverse effect upon the Fund returns. In anticipation of a Y2k sell off, UTC raised the cash level from 1% to

18

4% in December 1999.  However, after if became apparent that no crisis occurred, UTC

lowered the cash level to 1.5% in January 2000.   After September 11, 2001, UTC was

concerned that another sell-off might occur and raised the cash level to 3%.  The Court

finds that UTC engaged in prudent decisionmaking to set the cash amount.   The fact

that plaintiffs may have been able to enjoy a greater Fund performance without the

cash retention is not sufficient to support a claim of fiduciary breach where a defendant

has engaged in prudent analysis of its decision.  See Bunch v. W.R. Grace & Co., 532

F. Supp. 2d 283, 290 (D. Mass. 2008).

Accordingly, the evidence adduced raises no inference that defendant breached

its fiduciary duties by deciding to maintain cash in the Stock Fund, or in setting the cash

amounts.  The Court will grant summary judgment on count I in favor of defendant.

Counts VII and VIII

Plaintiffs assert that defendant breached its fiduciary duties by offering mutual

funds with unreasonable fees and expenses (count VII); and by offering actively

managed investment options (count VIII).   Plaintiffs argue that a prudent fiduciary

should engage in extensive investigation prior to selecting an actively-managed mutual

fund given the "near certainty" that an actively-managed mutual fund will not outperform

lower-fee index funds.  They assert further that UTC failed to undertake such a process

to evaluate the specific mutual funds selected and the impact of the trading fees and

expenses of the mutual fund options.  Plaintiffs suggest that defendant did not afford

adequate consideration to the utilization of separate accounts, which presented a less

expensive option.

The Court finds plaintiffs' position to be unpersuasive.  Plaintiffs rely on expert

19

opinion that actively-managed mutual funds generally underperform passive index funds.  However, plaintiffs have not addressed the imprudence of selecting any particular actively-managed mutual funds.  Plaintiffs ignore the fact that two of the selected mutual fund options outperformed market benchmarks.  Further, the undisputed facts detail the evaluation and analytical process or "appropriate consideration" by which UTC selected the mutual funds.

Plaintiffs' argument that the mutual funds are imprudent because of fees and expenses also fails.  Plaintiffs do not attack the fees of any specific mutual fund as unreasonable in light of other analogous mutual fund fees; instead, plaintiffs rely on expert opinion that less-costly managed separate trust accounts outweigh the advantages of mutual funds.  However, the evidence demonstrates that UTC's selection process included appropriate consideration of the fees charged on the mutual fund options, and of the returns of each mutual fund net of its management expenses.  ERISA does not require a fiduciary to take "any particular course" so long as the fiduciary's decision meets the prudent person standard.  Merino, 452 F.3d at 182.  Plaintiffs' expert, Al Otto, faults UTC for failing to create a written Investment Policy Statement ("IPS").  However, ERISA does not require a fiduciary duty to create such a document.

Plaintiffs have not demonstrated that the such separate trust accounts are equivalent investment vehicles to the mutual funds offered.  See Gartenberg v. Merrill Lynch Asset Mgmt., Inc., 694 F.2d 923, 930 n.3 (2d Cir. 1982) (rejecting comparison between large pension funds and money market funds where nature and extent of services required by each fund was different); Strougo v. Bea Assocs., 188 F. Supp. 2d

373, 384 (S.D.N.Y. 2002) (other mutual funds provide the relevant comparison).

Further, plaintiffs evidence fails to evince that defendant was motivated by a potential

discount to its recordkeeping fee when it selected three Fidelity mutual funds.

Accordingly, the Court will grant summary judgment in UTC's favor on counts VII

and VIII.

Count II

Plaintiffs' second count asserts that UTC allowed for the Plan to pay

unreasonably high compensation to its recordkeeper, Fidelity, and thereby breached its

fiduciary duties.  Plaintiffs assert that, pursuant to 29 U.S.C. § 1104(a)(1), the Plan

fiduciary cannot allow the direction of Plan assets to any purpose other than providing

benefits to Plan participants or defraying reasonable expenses of administering the

Plan, and it is obligated to exercise the care, skill, prudence and diligence of a prudent

fiduciary in negotiating administrative fees and monitoring Fidelity.  Plaintiffs' brief

elucidates that they attack the "sub-transfer fees" or "revenue sharing fees" allegedly

paid to Fidelity from Plan assets.  UTC counters that such fees were not paid from Plan

assets.  Further, UTC maintains that plaintiffs have not demonstrated evidentiary

support for their contention that Fidelity's compensation was above-market and that it

failed to act prudently in determining and monitoring Fidelity's compensation.

UTC maintains that fees paid by a mutual fund out of its own assets cannot be

construed as a Plan asset pursuant to 29 U.S.C. § 1101(b), which provides:

> In the case of a plan which invests in any security issued by an
> investment company registered under the Investment Company Act
> of 1940 . . ., the assets of such plan shall be deemed to include
> such security but shall not, soley by reason of such investment, be
> deemed to include any assets of such investment company.

21

See also 29 C.F.R. § 2510.3-101(a)(2).  Plaintiffs contend that mutual fund assets that pay a fund's fees to Fidelity for administrative services are UTC Plan assets because they are made "at the expense of the participants to defray Fidelity's expenses of administration of the Plan."  Plaintiffs advance this assertion in reliance upon Haddock v. Nationwide Financial Services, Inc., 419 F. Supp. 2d 156, 170 (D. Conn. 2006), in which the district court found that a genuine issue of material fact existed as to whether such fees constitute plan assets.   In so holding, the district court applied a functional test to determine that plan assets include items held by a defendant "(1) as a result of its status as a fiduciary or its exercise of fiduciary discretion or authority, and (2) at the expense of plan participants or beneficiaries."  Id.

As an initial matter, the Court notes that the sub-transfer fees fail the first prong of Haddock's two-part functional test since Fidelity is not a fiduciary of the UTC Plan. Accordingly, the Court finds that summary judgment should enter on this ground in favor of defendant.

Further, the Court agrees with defendant that plaintiffs have failed to proffer evidence evincing that Fidelity's receipt of its negotiated base fee and sub-transfer agent fees was materially unreasonable and beyond the market rate.  By contrast, UTC's evidence included proposals from other service providers, such as Bankers Trust and Vanguard, that would have charged comparable sub-transfer fees.

Similarly, plaintiffs have adduced no support for their assertion that UTC failed to monitor or account for sub-transfer fees, while UTC has submitted evidence that it

evaluated proposed recordkeeping service contracts according to base fee and income received from mutual funds.

Summary judgment will enter in defendant's favor on count II.

Count III, IV and V

Counts III, IV and V concern allegedly misleading statements to participants regarding Plan fees and expenses.  Count III and V assert claims, respectively, for damages based on allegedly misleading disclosure of fees and expenses of the investment options and based on sub-transfer agent payments.  In count IV, plaintiffs seek an injunction to compel defendant to disclose all information to the participants regarding fees and expenses.

UTC argues that (1) it accurately disclosed all information relating to the Plan fees as required; (2) plaintiffs have not proved that any alleged misrepresentations or non-disclosure represented material information; and (3) plaintiffs have not proved that such alleged misrepresentations or non-disclosures caused a loss to the Plan.

A plan fiduciary is not permitted to misinform employees through material misrepresentations.  Caputo v. Pfizer, Inc., 267 F.3d 181, 192 (2d Cir. 2001).  Thus, to prevail on their claims, plaintiffs must establish that fiduciary communication to participants was affirmatively false or misleading by omission, and that any such misrepresentation was material.  Ballone v. Eastman Kodak Co.,109 F.3d 117, 122 (2d Cir. 1997).  Such material misrepresentations must cause a loss to the Plan.  Silverman v. Mut. Benefit Life Ins. Co., 138 F.3d 98, 104 (2d Cir. 1998).

Plaintiffs maintain that the UTC Summary Plan Description misrepresented the nature of administrative fees by indicating that UTC paid the fees for "administrative

23

and recordkeeping services" that Fidelity provided to the Plan.  According to plaintiffs,

UTC failed to disclose that the participants, rather than UTC, paid for such fees through

the revenue sharing fee or sub-transfer agent fees that the mutual funds paid to Fidelity

for administrative costs.

According to the undisputed facts, participants were informed that investment

management fees for mutual funds "are charged against the assets" and reflected in

the funds' value.  The Summary Plan Description and Investment Brochure also

instructed participants to examine fund prospectuses, which included the expense

ratios for such funds.

In ruling on the motion to dismiss filed in this action, this Court held that ERISA

does not affirmatively require defendant to disclose sub-transfer agent fees but allowed

plaintiffs to proceed under a theory that defendant allegedly made misrepresentations

to participants regarding sub-transfer agent payments.  UTC represents that it disclosed

the total expense ratios to each mutual fund; and that all prospectuses must disclose

the portions of the total expenses used for investment management, distribution

services, and other administrative fees.[6]  Upon review, the evidence indicates that

defendant did not make misleading communications to the Plan participants, and it

disclosed information as required pursuant to ERISA.

Plaintiffs have also failed to demonstrate the materiality of the alleged non-

disclosure concerning investment fund fees and sub-transfer agent fees.  A

_____

[6]UTC represents that it did not indicate that the entire expense ratio would be
used to compensate the mutual fund for investment management, because it is used
for various expenses.

misrepresentation is material if there is a "substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision." Mullins v. Pfizer, Inc., 23 F.3d 663, 669 (2d Cir. 1994). Summary judgment on the issue of materiality, which presents mixed questions of law and fact, is appropriate if reasonable minds cannot differ. Fischer v. The Philadelphia Electric Co., 994 F.2d 130, 135 (3d Cir. 1993). In their depositions, plaintiffs Taylor and Conlin represented that they decided upon investments according to returns or the amount of risk. Plaintiff Todd stated that he did not consider the expense ratio when considering his investment options.

Further, in the context of securities law, several district courts within this Circuit have concluded that sub-transfer agent fees do not affect the share price and therefore are not material to an objectively reasonable investor. See In re Smith Barney Fund Transfer Agent Litig., 2007 WL 2809600, *3 (S.D.N.Y. 2007) (collecting cases); see also Mullins, 23 F.3d at 669 n.4 (standard for materiality under ERISA is similar to that applied pursuant to securities law). Accordingly, the Court finds that summary judgment is appropriate on the issue of materiality of the alleged misleading disclosures or nondisclosures related to fees.

Plaintiffs submit that participants could only derive the actual amount paid in fees and costs relevant to their account by performing a complex calculation. According to Laurie Havanec, Vice President of Human Resources at UTC, a participant could determine the impact of expenses on their account by multiplying the account balance by the mutual fund's expense ratio. Since each fund's prospectus included the expense ratio, it does not appear that defendant has failed to provide the relevant information for participants to determine the affect of the funds' expenses. As

25

previously discussed, such investment expenses or investment ratios were not material to the plaintiffs' investment decisions.

Plaintiffs contend further that UTC should have disclosed its conflict of interest stemming from the inclusion of Fidelity mutual funds as Plan options and Fidelity's discount to the fees that UTC owed based on investments that participants made in such Fidelity mutual funds. Plaintiffs argue that "it was material to a participant to know that a mutual fund option was included in the Plan not because it was a prudent investment, but because of the benefit UTC would receive if the participant invested in the fund." Plaintiffs maintain that UTC is liable for breach of fiduciary duty because it did not disclose that, between 1997 and 2000,[7] UTC's recordkeeping fee expense was diminished by participant investment in the Fidelity mutual funds. Plaintiffs contend that the fee-offset gave rise to a conflict of interest in UTC's decision to include Fidelity funds in the Plan. However, the fact that a fiduciary's action or decision "incidentally benefits an employer does not necessarily mean that the fiduciary has breached his duty." Donovan v. Bierwirth, 680 F.2d 263, 271 (2d Cir. 1982); see also Siskind v. Sperry Ret. Program, 47 F.3d 498, 506 (2d Cir. 1995) (ERISA "expressly contemplates fiduciaries with dual loyalties"). The fiduciary must, after careful and impartial investigation, reasonably conclude that the action best promotes the interests of participants and beneficiaries. Donovan, 680 F.2d at 271.

---

[7]Thereafter, UTC ceased paying the recordkeeping fees on behalf of the participants. Participants now benefit from the fee offset arrangement.

26

In this instance, the evidence relevant to the mutual fund selection process indicates that defendant's decisionmaking process turned on consideration of the participants' and beneficiaries' best interests rather than the incentive of the fee discount.[8]

Plaintiffs fault UTC for characterizing actively-managed mutual funds as having "higher investment expense" that provide "the opportunity to invest in a fund that you believe may return superior investment performance."  Plaintiffs assert that such statements were misleading because (1) actively-managed mutual funds do not generally outperform passively-managed funds, after fees; (2) the mutual funds' revenue sharing or sub-transfer agent fees paid a substantial part of Fidelity's administrative expenses.   Plaintiffs posit that defendant should have made disclosures relative to the "lack of necessity of cash in the company stock fund, the additional drag on performance caused by fees in the stock fund, and the easily available alternatives . . . ."  These claims are dependent upon plaintiffs' assertion that defendant breached its fiduciary duty by maintaining a unitized stock fund and an allegedly high amount of cash in that fund, and in selecting and offering actively-managed mutual funds.  The Court has already held that defendant did not breach its fiduciary duty in these respects.

Accordingly, summary judgment is also appropriate on such claims.

Count VI

In count VI, plaintiffs allege that UTC breached its fiduciary duty by failing to

---

[8]Plaintiffs' assertion that defendant should have disclosed the fee discount also fails because the discount does not represent a motivating factor in the selection of the mutual funds, and because the discount did not affect the investment value of the Fidelity funds.

27

capture float.  Defendant argues that plaintiff has not adduced sufficient evidence to survive summary judgment.

In his deposition, Moody averred that the float is distributed into the Plan's funds. Plaintiffs advance their claim in reliance upon an expert's opinion that float was improperly retained by the trustee, State Trust, based on "the lack of evidence of any discussion on the topic of float in any fee negotiations."  Accordingly, plaintiffs' evidence appears to be based upon conjecture.  In light of Moody's averments as to the procedure used since 1996 to distribute float among the Plan funds, plaintiffs' evidence is insufficient to raise a genuine issue of material fact that float is improperly retained by either the trustee or Fidelity.  The Court will grant summary judgment on count VI.

## CONCLUSION

For the foregoing reasons, defendants' amended motion for summary judgment [#158] is GRANTED; defendants' motion for summary judgment against the released claims of plaintiffs Taylor and Todd [#153] is DENIED as moot.  The clerk is instructed to close this case in favor of defendants.

_____/s/_____
Warren W. Eginton
Senior U.S. District Judge

Dated this _3rd_ day of March, 2009 at Bridgeport, Connecticut.